**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

SSA BONDS ANTITRUST LITIGATION

*This Document Relates To All Actions*

1:16-cv-03711-ER

**CONSOLIDATED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

NATURE OF THE ACTION ..................................................................................... 1

JURISDICTION AND VENUE ............................................................................... 4

PARTIES ...................................................................................................................... 5

    A.    Plaintiffs ............................................................................................. 5

    B.    Defendants ......................................................................................... 6

        1.    Dealer Defendants ............................................................... 7

        2.    Individual Defendants ....................................................... 16

BACKGROUND ON THE SSA BOND MARKET ............................................. 17

    A.    SSA Issuers ...................................................................................... 17

    B.    Issuance of SSA Bonds ................................................................. 18

    C.    Post-Issuance Trading of SSA Bonds ...................................... 19

    D.    How SSA Bond Prices Were Quoted ....................................... 21

ADDITIONAL FACTUAL ALLEGATIONS ..................................................... 22

I.    OVERVIEW OF DEFENDANTS' CARTEL ...................................... 22

    A.    How the Cartel Worked ............................................................. 22

    B.    Individuals Cartel Participants ................................................. 26

II.    ██████████████████████████████ ..................................... 28

    █    ████████████████████████████ ............... 29

    █    ██████████████████████████████ .......... 33

    █    ████████████████████████ ........................ 35

III.    THE DEALER DEFENDANTS USED INTERDEALER BROKERS TO FACILITATE THE CONSPIRACY AND MASK COLLUSIVE TRADES ................. 43

    A.    How the Dealer Defendants Used the Interdealer Brokers ..................... 43

B. ███████████████████████████████████████████ .................................................................................45

IV.     GOVERNMENT INVESTIGATIONS INTO DEFENDANTS'
        MANIPULATION OF THE SSA BOND MARKET ........................................52

V.      DEFENDANTS' CONSPIRACY INJURED PLAINTIFFS AND THE CLASS ............55

CLASS ACTION ALLEGATIONS ...............................................................................58

CAUSES OF ACTION ................................................................................................61

JURY DEMAND ........................................................................................................64

Plaintiffs Iron Workers Pension Plan of Western Pennsylvania ("Iron Workers"), KBC

Asset Management NV ("KBC"), and Sheet Metal Workers Pension Plan of Northern California

("Sheet Metal Workers"), individually and on behalf of all others similarly situated, bring this

class action and allege as follows:

## NATURE OF THE ACTION

1.      This case concerns a brazen conspiracy to manipulate the market for U.S. dollar-

denominated supranational, sovereign, and agency ("SSA") bonds.[1]  Rather than the Dealer

Defendants[2] competing with each other for the purchase and sale of SSA bonds to investors and

to each other, the Dealer Defendants worked as one team.  Each openly shared with others their

own bank's competitively sensitive pricing information, their customers' trading histories and

requests for quotes, their positions and trading strategies, and inside information about the

pricing and demand for new issues of SSA bonds.  In effect, the Dealer Defendants secretly

functioned as a unitary "super-desk" that enabled them to exert influence over the SSA bond

market that would be impossible if they had been acting independently.  This is the opposite of

what competition is supposed to look like.  By undermining competition across the SSA market

through this illegal scheme, Defendants reaped bountiful profits for nearly a decade at the

expense of Plaintiffs and other investors.

---

[1]   As described more fully in the background section below, SSA bonds are debt securities issued by governmental and quasi-governmental entities, such as the World Bank and the European Investment Bank, for the purpose of funding a range of economic and public-policy mandates.  SSA bonds are generally regarded as secure investments because they often enjoy special legal status, and their credit-worthiness is often pegged to sovereign, regional, or international entities.

[2]   The Dealer Defendants are Bank of America, BNP Paribas, Citi, Crédit Agricole, Crédit Suisse, Deutsche Bank, HSBC, Nomura, RBC, and TD Bank.

2.     Rare is the antitrust case where smoking gun evidence exists and rarer still does it exist at the pleading stage.  Nevertheless, that is the situation here.  Even before discovery begins, Plaintiffs already have obtained hundreds of electronic "chat" transcripts among the conspirators, covering over three hundred trading days. ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ Thousands of additional transcripts and audio recordings exist, many of which Plaintiffs understand have been collected by Defendants and produced to government authorities in the U.S. and Europe.

3.     The Dealer Defendants are some of the world's largest banks that worked as dealers, or "market makers," in the market for U.S. dollar-denominated SSA bonds.  If an investor wants to purchase or sell SSA bonds, it has no choice but to do so through a dealer such as the Dealer Defendants.  There is no exchange where investors can view the latest prices of SSA bonds and trade directly with other investors like themselves.  Rather, investors must contact a dealer or a range of dealers, ask for price quotes, and select the best price they can find.

4.     In a properly functioning market, the Dealer Defendants would compete for this business.  This competition would naturally lower investors' costs to buy or sell SSA bonds.  All things being equal, customers seek out dealers who enable customers to buy bonds for less money and to sell bonds for more.  Competition among dealers motivates them to buy bonds from customers for more than other dealers are willing to pay, and to sell them to customers for less than other dealers are willing to accept.

5.     But the Dealer Defendants only pretended to be competing. ██████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

6.      At the center of the scheme was a group of brash traders ████████████

███████████████████████████████████████████ Day after day, hour by

hour, these traders explicitly coordinated their trading strategies so Defendants could make

inflated profits ████████████████████████████████████████

██████████████████████████████████████████████████████

███████████

7.      In addition to directly coordinating with each other, the Dealer Defendants also

used a group of interdealer brokers to facilitate and conceal their conspiracy.  Interdealer brokers

ran trading platforms on which dealers traded SSA bonds with other dealers in order to manage

risk.  These trading platforms were supposed to be anonymous.  ████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ This allowed the Dealer Defendants to police

the cartel from accidental bouts of competition.

8.      The Dealer Defendants also directed the interdealer brokers to manipulate the

prices of the trades they posted on the electronic screens watched by every dealer in the SSA

bond market.  This again undermined true competition and impacted pricing while it perversely

made the Dealer Defendants' anticompetitive prices seem legitimate.  And the Dealer

Defendants used the interdealer brokers to conceal the Dealer Defendants' direct trades with

each other, by having the interdealer brokers book those trades through their platforms, even though the trades had been pre-negotiated outside of the platform. This enabled the cartel to move SSA bond inventory between parts of their single super-desk undetected.

9.     During the period of this conspiracy, collusion was rampant at these Wall Street banks, which lacked meaningful safeguards or oversight to prevent collusion. To the contrary, they had a pervasive culture of pursuing short-term profits at any cost. In their pursuit of this goal, the banks established mechanisms and forums for illicit conversations among competitors in order to advance the banks' collective financial interests over those of their customers. As detailed herein, the Dealer Defendants used these mechanisms and forums for collusion to conspire in an especially egregious manner in the SSA market.

10.     Only recently have the Dealer Defendants begun taking steps to prevent collusion from rigging the market against investors—such as by shutting down traders' ability to chat with their counterparts at other banks (*i.e.*, their competitors) in unmonitored electronic chat rooms. But those steps have come far too late to prevent investors from suffering significant financial harm as a direct result of Defendants' unlawful conduct. This class action now seeks to recover those damages suffered by investors as a result by Defendants' unlawful conspiracy.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26), and pursuant to 28 U.S.C. §§ 1331 and 1337(a). This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367, because those claims are so related to the federal claims that they form part of the same case or controversy, and under 28 U.S.C. § 1332, because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

12.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, as well as pursuant to 28 U.S.C. § 1391(b), (c), and (d), because during the Class Period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

13.     This Court has personal jurisdiction over Defendants pursuant to the nationwide contacts test provided for in 15 U.S.C. § 22 because numerous Defendants, as set forth below, were formed in or have their principal places of business in the United States.  In addition, this Court has personal jurisdiction over Defendants because each Defendant transacted business throughout the United States, including in this District; each Defendant had substantial contacts with the United States, including in this District; each Defendant committed overt acts in furtherance of Defendants' conspiracy in the United States; each Defendant is an agent of the other Defendants; and Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

14.     Defendants' conspiracy repeatedly targeted U.S. investors throughout the Class Period.

15.     Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and did have a substantial effect on interstate commerce.

## PARTIES

### A.     Plaintiffs

16.     Plaintiff Iron Workers Pension Plan of Western Pennsylvania ("Iron Workers") is a multiemployer defined benefit pension plan headquartered in Pittsburgh, Pennsylvania.  During the Class Period, Iron Workers transacted in U.S. dollar-denominated SSA bonds, purchasing

bonds directly from and selling bonds directly to various Dealer Defendants, including Citi, Credit Suisse, Banc of America, and Nomura.  Iron Workers' decisions to buy and sell SSA bonds were made in the U.S., after placing inquiries with U.S.-based salespeople working at the Dealer Defendants.

17.     Plaintiff Sheet Metal Workers Pension Plan of Northern California ("Sheet Metal Workers") is a multiemployer pension plan headquartered in Pleasanton, California.  During the Class Period, Sheet Metal Workers transacted in U.S. dollar-denominated SSA bonds, purchasing bonds directly from and selling bonds directly to various Dealer Defendants, including Citi, Credit Suisse, Deutsche Bank, and Nomura.  Sheet Metal Workers' decisions to buy and sell SSA bonds to were made in the U.S., after placing inquiries with U.S.-based salespeople working at the Dealer Defendants.

18.     Plaintiff KBC Asset Management NV ("KBC") is an asset management firm that maintains its principal place of business in Brussels, Belgium.  During the Class Period, KBC's funds transacted in U.S. dollar-denominated SSA bonds, purchasing bonds directly from and selling bonds directly to various Dealer Defendants, including Bank of America, Credit Suisse, Deutsche Bank, and Nomura.

### B.    Defendants

19.     Whenever reference is made to any Defendant entity, such reference includes that entity, its parent companies, subsidiaries, affiliates, predecessors, and successors.  In addition, whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

20.     Various other entities, persons, firms, and corporations, that are unknown and not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and/or made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

>    *1.*     *Dealer Defendants*

21.     **Bank of America.**  Defendant Bank of America Corporation is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  Bank of America Corporation is a multi-national banking and financial services corporation with its investment banking division located in New York, New York.

22.     Defendant Bank of America, N.A. is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina, and is an indirect, wholly owned subsidiary of Bank of America Corporation.

23.     Defendant Bank of America Merrill Lynch International Limited is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is an indirect subsidiary of Bank of America Corporation.

24.     Defendant Merrill Lynch International is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is an indirect subsidiary of Bank of America Corporation.

25.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is a corporation organized under the laws of Delaware with its principal place of business in New York, New York, and is a wholly owned subsidiary of Bank of America Corporation.

26.     Defendants Bank of America Corporation, Bank of America, N.A., Bank of America Merrill Lynch International Limited, Merrill Lynch International, Merrill Lynch, Pierce,

Fenner & Smith Inc., and their subsidiaries and affiliates are referenced collectively in this Complaint as "Bank of America."  During the Class Period, Bank of America marketed U.S. dollar-denominated SSA bonds in the United States, received orders from U.S. customers, and sold and bought SSA bonds at manipulated prices to customers in the United States.  In doing so, Bank of America engaged in trades of U.S. dollar-denominated SSA bonds amounting to billions of dollars with members of the Class in the United States, at prices impacted by Defendants' conspiracy.  Many of these trades involved customer inquiries placed to U.S.-based salespeople or were executed by U.S.-based traders and booked by U.S.-based trading and sales assistants. During the Class Period, Bank of America employed Amandeep Singh Manku and Hiren Gudka, both of whom are SSA bond traders under investigation by the DOJ.  Bank of America also employed traders Gary McDonald and ██████████.

27.     ***BNP Paribas.***  Defendant BNP Paribas S.A. ("BNP Paribas") is a French corporation with its principal place of business in Paris, France.  During the Class Period, BNP Paribas marketed U.S. dollar-denominated SSA bonds in the United States, received orders from U.S. customers, and sold and bought SSA bonds at manipulated prices to customers in the United States.  In doing so, BNP Paribas engaged in trades of U.S. dollar-denominated SSA bonds amounting to billions of dollars with members of the Class in the United States, at prices impacted by Defendants' conspiracy.  Many of these trades involved customer inquiries placed to U.S.-based salespeople or were executed by U.S.-based traders and booked by U.S.-based trading and sales assistants.  During the Class Period, BNP Paribas employed ██████████, an SSA bond trader.

28.     ***Citi.***  Defendant Citigroup Inc. ("Citigroup") is a Delaware corporation with its principal place of business in New York, New York.

8

29.     Defendant Citibank N.A. ("Citibank") is a federally chartered, national banking association with its principal place of business in Sioux Falls, South Dakota, and is a subsidiary of Citigroup.

30.     Defendant Citigroup Global Markets Inc. ("CGMI") is a New York corporation with its principal place of business in New York, New York.  CGMI is an indirect, wholly owned subsidiary of Citigroup.

31.     Defendant Citigroup Global Markets Limited ("CGML") is a U.K.-registered private limited company with its principal place of business in London, United Kingdom. CGML is an indirect, wholly owned subsidiary of Defendant Citigroup.

32.     Defendants Citigroup, Citibank, CGMI, and CGML are collectively referred to as "Citi" in this Complaint.  During the Class Period, Citi marketed U.S. dollar-denominated SSA bonds in the United States, received orders from U.S. customers, and sold and bought SSA bonds at manipulated prices to customers in the United States.  In doing so, Citi engaged in trades of U.S. dollar-denominated SSA bonds amounting to billions of dollars with members of the Class in the United States, at prices impacted by Defendants' conspiracy.  Many of these trades involved customer inquiries placed to U.S.-based salespeople or were executed by U.S.-based traders and booked by U.S.-based trading and sales assistants.  During the Class Period, Citi employed Gary McDonald as a major SSA bond trader.  McDonald had a close relationship with SSA bond traders under investigation.

33.     ***Crédit Agricole.***  Defendant Crédit Agricole S.A. is a corporation organized and existing under the laws of France with its principal place of business in Montrouge, France.

34.     Defendant Crédit Agricole Corporate and Investment Bank is a wholly owned subsidiary of Crédit Agricole S.A. and is a bank organized and existing under the laws of France

9

with its principal place of business in Paris, France, and with branch locations in New York, New York.

35.     Defendants Crédit Agricole S.A., Crédit Agricole Corporate and Investment Bank, and their subsidiaries and affiliates are collectively referred to as "Crédit Agricole" in this Complaint.  During the Class Period, Crédit Agricole marketed U.S. dollar-denominated SSA bonds in the United States, received orders from U.S. customers, and sold and bought SSA bonds at manipulated prices to customers in the United States.  In doing so, Crédit Agricole engaged in trades of U.S. dollar-denominated SSA bonds amounting to billions of dollars with members of the Class in the United States, at prices impacted by Defendants' conspiracy.  Many of these trades involved customer inquiries placed to U.S.-based salespeople or were executed by U.S.-based traders and booked by U.S.-based trading and sales assistants.  During the Class Period, Crédit Agricole employed Defendant traders Amandeep Singh Manku and Shailen Pau, as well as director █████████.

36.     ***Credit Suisse.***  Defendant Credit Suisse Group AG is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland.

37.     Defendant Credit Suisse AG is a wholly owned subsidiary of Credit Suisse Group AG and is a bank organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland, and it maintains a New York, New York branch.  Credit Suisse AG is licensed by the New York Department of Financial Services and operates a branch registered in New York, New York.

38.     Defendant Credit Suisse Securities (USA) LLC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York, and is a wholly owned subsidiary of Credit Suisse Group AG.

39.     Defendant Credit Suisse Securities (Europe) Ltd. is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is a subsidiary of Credit Suisse Group AG.

40.     Defendant Credit Suisse International is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is a subsidiary of Credit Suisse Group AG.

41.     Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse Securities (USA) LLC, Credit Suisse Securities (Europe) Ltd., Credit Suisse International, and their subsidiaries and affiliates are referenced collectively in this Complaint as "Credit Suisse." During the Class Period, Credit Suisse marketed U.S. dollar-denominated SSA bonds in the United States, received orders from U.S. customers, and sold and bought SSA bonds at manipulated prices to customers in the United States.  In doing so, Credit Suisse engaged in trades of U.S. dollar-denominated SSA bonds amounting to billions of dollars with members of the Class in the United States, at prices impacted by Defendants' conspiracy.  Many of these trades involved customer inquiries placed to U.S.-based salespeople or were executed by U.S.-based traders and booked by U.S.-based trading and sales assistants.  During the Class Period, Credit Suisse employed Defendant Shailen Pau, an SSA bond trader who is under investigation by the DOJ.

42.     ***Deutsche Bank.***  Defendant Deutsche Bank AG is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany. Deutsche Bank AG is licensed by the New York Department of Financial Services with a registered address in New York, New York.

43.     Defendant Deutsche Bank Securities Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of Deutsche Bank AG.

44.     Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., and their subsidiaries and affiliates are referenced collectively in this Complaint as "Deutsche Bank." During the Class Period, Deutsche Bank marketed U.S. dollar-denominated SSA bonds in the United States, received orders from U.S. customers, and sold and bought SSA bonds at manipulated prices to customers in the United States.  In doing so, Deutsche Bank engaged in trades of U.S. dollar-denominated SSA bonds amounting to billions of dollars with members of the Class in the United States, at prices impacted by Defendants' conspiracy.  Many of these trades involved customer inquiries placed to U.S.-based salespeople or were executed by U.S.-based traders and booked by U.S.-based trading and sales assistants.  Deutsche Bank considers itself an "established top tier arranger of SSA bonds," and its team, including salespeople and traders, offered multiple services for SSA bond markets, often from the United States, including in this District.  During the Class Period, Deutsche Bank employed Defendant Hiren Gudka.

45.     **HSBC.**  Defendant HSBC Holdings plc is a public limited company organized and existing under the laws of the United Kingdom, with its headquarters in London, United Kingdom.

46.     Defendant HSBC Bank USA, N.A., is a federally chartered, national banking association with its principal place of business in New York, New York, and is a subsidiary of HSBC Holdings plc.

47.    Defendant HSBC Securities (USA) Inc. is a corporation organized under the laws of Delaware with its principal place of business in New York, New York, and is an indirect subsidiary of HSBC Holdings plc.

48.    Defendant HSBC Bank plc is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is a subsidiary of HSBC Holdings plc.

49.    Defendants HSBC Holdings plc, HSBC Bank USA, N.A., HSBC Securities (USA) Inc., HSBC Bank plc, and their subsidiaries and affiliates are referenced collectively in this Complaint as "HSBC."  During the Class Period, HSBC marketed U.S. dollar-denominated SSA bonds in the United States, received orders from U.S. customers, and sold and bought SSA bonds at manipulated prices to customers in the United States.  In doing so, HSBC engaged in trades of U.S. dollar-denominated SSA bonds amounting to billions of dollars with members of the Class in the United States, at prices impacted by Defendants' conspiracy.  Many of these trades involved customer inquiries placed to U.S.-based salespeople or were executed by U.S.-based traders and booked by U.S.-based trading and sales assistants.  HSBC is considered a top tier dealmaker for SSA bonds, and has taken "the top spot in global SSA volumes" as recently as 2015.  HSBC's team, including salespeople and traders, offered multiple services for SSA bond markets, often from the United States, including in this District.  During the Class Period, HSBC employed Defendant Amandeep Singh Manku, an SSA bond trader who is under investigation by the DOJ.

50.    **Nomura.**  Defendant Nomura Holdings, Inc. is a corporation organized and existing under the laws of Japan with its principal place of business in Tokyo, Japan.

51.     Defendant Nomura Securities International, Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York, and is a subsidiary of Nomura Holdings, Inc.

52.     Defendant Nomura International plc is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is an indirect subsidiary of Nomura Holdings, Inc.

53.     Defendant Nomura Holdings, Inc., Nomura Securities International, Inc., Nomura International plc, and its subsidiaries and affiliates are referenced collectively in this Complaint as "Nomura."  During the Class Period, Nomura marketed U.S. dollar-denominated SSA bonds in the United States, received orders from U.S. customers, and sold and bought SSA bonds at manipulated prices to customers in the United States.  In doing so, Nomura engaged in trades of U.S. dollar-denominated SSA bonds amounting to billions of dollars with members of the Class in the United States, at prices impacted by Defendants' conspiracy.  Many of these trades involved customer inquiries placed to U.S.-based salespeople or were executed by U.S.-based traders and booked by U.S.-based trading and sales assistants.  During the Class Period, Nomura employed Defendant Bhardeep Singh Heer, an SSA bond trader under investigation by the DOJ.

54.     ***RBC.***  Defendant Royal Bank of Canada is a Canadian company with its principal place of business in Toronto, Canada.

55.     Defendant RBC Europe Limited is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is a subsidiary of Royal Bank of Canada.

56.     Defendants Royal Bank of Canada, RBC Europe Limited, and its subsidiaries and affiliates are referenced collectively in this Complaint as "RBC."  During the Class Period, RBC

marketed U.S. dollar-denominated SSA bonds in the United States, received orders from U.S. customers, and sold and bought SSA bonds at manipulated prices to customers in the United States.  In doing so, RBC engaged in trades of U.S. dollar-denominated SSA bonds amounting to billions of dollars with members of the Class in the United States, at prices impacted by Defendants' conspiracy.  Many of these trades involved customer inquiries placed to U.S.-based salespeople or were executed by U.S.-based traders and booked by U.S.-based trading and sales assistants.  During the Class Period, RBC employed Defendant trader Shailen Pau.

57.     ***TD Bank.***  Defendant Toronto-Dominion Bank Group is a corporation organized and existing under the laws of Canada, with its headquarters in Toronto, Canada.

58.     Defendant TD Bank, N.A., is a federally chartered national banking association with its principal place of business in Cherry Hill, New Jersey, and is a subsidiary of Toronto-Dominion Bank Group.

59.     Defendant TD Securities Limited is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is an indirect subsidiary of Toronto-Dominion Bank Group.

60.     Defendants Toronto-Dominion Bank Group, TD Bank, N.A., TD Securities Limited, and their subsidiaries and affiliates are referenced collectively in this Complaint as "TD Bank."  During the Class Period, TD Bank marketed U.S. dollar-denominated SSA bonds in the United States, received orders from U.S. customers, and sold and bought SSA bonds at manipulated prices to customers in the United States.  In doing so, TD Bank engaged in trades of U.S. dollar-denominated SSA bonds amounting to billions of dollars with members of the Class in the United States, at prices impacted by Defendants' conspiracy.  Many of these trades involved customer inquiries placed to U.S.-based salespeople or were executed by U.S.-based

traders and booked by U.S.-based trading and sales assistants.  During the Class Period, TD

Bank employed trader Gary McDonald.

2.    *Individual Defendants*

61.    Defendant Hiren Gudka ("Gudka") is an individual residing in Middlesex, United

Kingdom.  During the Class Period, Gudka engaged in trades of SSA bonds with members of the

Class in the United States at artificial prices due the conspiracy.  During the Class Period, Gudka

was an SSA bond trader employed by Defendants Bank of America and Deutsche Bank.

62.    Defendant Bhardeep Singh Heer ("Heer") is an individual residing in Essex,

United Kingdom.  During the Class Period, Heer engaged in trades of SSA bonds with members

of the Class in the United States at artificial prices due the conspiracy.  During the Class Period,

Heer was an SSA bond trader employed by Nomura.

63.    Defendant Amandeep Singh Manku ("Manku") is an individual residing in Essex,

United Kingdom.  During the Class Period, Manku engaged in trades of SSA bonds with

members of the Class in the United States at artificial prices due the conspiracy.  During the

Class Period, Manku was an SSA bond trader employed by Bank of America and Crédit

Agricole.

64.    Defendant Gary McDonald ("McDonald") is an individual residing in London,

United Kingdom.  During the Class Period, McDonald engaged in trades of SSA bonds with

members of the Class in the United States at artificial prices due the conspiracy.  During the

Class Period, McDonald was an SSA bond trader employed by Bank of America, Citi, and TD

Bank.

65.    Defendant Shailen Pau ("Pau") is an individual residing in London, United

Kingdom.  During the Class Period, Pau engaged in trades of SSA bonds with members of the

Class in the United States at artificial prices due the conspiracy.  During the Class Period, Pau was an SSA bond trader employed by Credit Suisse and Crédit Agricole.

## BACKGROUND ON THE SSA BOND MARKET

### A.    SSA Issuers

66.     Supranational bond issuers are large, multilateral institutions with shareholders from several countries and global economic mandates.  Examples include the International Bank for Reconstruction and Development ("IBRD") and the International Finance Corporation ("IFC") of the World Bank Group; the European Investment Bank ("EIB"); and the African and Asian Development Banks ("AfDB" and "ADB," respectively).

67.     Sovereign bond issuers are sovereign governments, such as the Federal Republic of Germany, the Kingdom of Spain, and the Government of Canada, which issue debt in currencies other than their local currency.[3]  The category of "sovereign" issuers also includes sub-sovereign bond issuers, which are state-level entities sitting at least one level below a sovereign government.  Examples of sub-sovereign issuers include Germany's states.

68.     Agency bond issuers include subdivisions of a sovereign state or other institutions that perform tasks on behalf of a governing sovereign, such as Germany's Kreditanstalt für Wiederaufbau ("KFW"), France's Caisse d'Amortissement de la Dette Sociale ("CADES"), and Spain's Instituto de Credito Oficial ("ICO").

69.     These and other SSA institutions issue debt on a regular basis to raise capital needed to fund global, continental, and regional projects and development programs.

---

[3]  Government debt issued in a sovereign's domestic currency, such as U.S. Treasury bonds or U.K. gilts, are not considered part of the SSA bond market.

B.     **Issuance of SSA Bonds**

70.     SSA bonds are generally regarded as secure investments because they often enjoy special legal status, and their credit-worthiness is often pegged to sovereign, regional, or international entities.  SSA bonds were often perceived as high-quality assets of similar safety as government debt, but with higher yields even in a low interest rate environment.

71.     Issuers determine the currency in which an SSA bond issue will be denominated. The size of the U.S. dollar-denominated SSA bond market has grown significantly over the last ten years, driven by investor demand for safe assets in the years following the failure of Fannie Mae and Freddie Mac and the European debt crisis.  By some estimates, the SSA bond market tripled in size from 2005 to 2012, reflecting a major migration towards high-quality fixed income bonds.

72.     The U.S. dollar-denominated segment of the SSA bond market attracts investors looking for high-quality bonds with higher yields than U.S. Treasuries.  Today, there is approximately $960 billion in U.S. dollar-denominated SSA bonds outstanding.

73.     Unlike Treasury bonds, which are often issued through auctions, SSA bonds are typically issued through syndication.  In a syndication, an SSA institution seeking to issue bonds will retain a bank or group of banks to underwrite its bond issue and then sell those bonds to investors.  The syndicate banks serve as the lead managers or "bookrunners" on the deal, and are responsible for finding investors to purchase the bonds at the time of issuance and also for pricing the bonds.  These banks "sound the market" to gauge investor interest, build the order book (*i.e.*, collect orders from investors) for the bonds, and determine the final size of the issue and how many bonds to allocate to each investor.

### C.     Post-Issuance Trading of SSA Bonds

74.     After being issued, SSA bonds can be re-sold and traded by dealers and investors, including by sovereign wealth funds, central banks, pension funds, mutual funds and hedge funds.  Unlike with major exchanges such as the Nasdaq or the New York Stock Exchange, however, there was no open, anonymous exchange that matched all SSA bond buyers and sellers at the best available price.  Rather, investors traded SSA bonds "over-the-counter," meaning that investors seeking to trade SSA bonds had no choice but to deal with dealers such as the Dealer Defendants, who provided liquidity or "made markets" by being willing to continuously buy and sell SSA bonds.

75.     Most investor trading of SSA bonds during the Class Period occurred in a so-called "voice" environment, meaning that transactions were executed over the telephone or via electronic chat messaging.  In a typical voice trade, an investor contacted one or more dealers' sales desks to request a quote.  The sales desk communicated the request to the dealer's trading desk, which returned a quote that the sales desk relayed back to the investor.  The process typically took several minutes, and the time gap between quote requests and order executions provided Defendants with the lead-time they needed to collude ███████████.

76.     To a lesser degree, investors also used electronic trading platforms to execute orders with dealers during the Class Period.  Electronic trading platforms include single-dealer systems as well as multi-dealer platforms such as MarketAxess, TradeWeb, Bloomberg BondTrader, and MTS Bondvision.  Multi-dealer platforms enabled investors to request quotes from multiple dealers simultaneously, using a request for quote ("RFQ") protocol.

77.     Whether investors transacted by voice or through electronic trading platforms, the essential features of the protocol were the same.  Investors had no access to real-time market data to validate whether dealers' quotes were competitive.  Rather, investors were forced to rely

exclusively on dealers such as Defendants for pricing information on SSA bonds.  To find out the price of an SSA bond, investors had to reach out to a dealer and request a quote.  In the process, the investor would reveal their identity, the specific instrument and volume they sought to trade, and often the trade's direction.

78.     This activity generated a steady flow of market information, including a wealth of investor-specific information, such as which bonds an investor held and in what quantity, whether it was an ongoing buyer or seller of certain bonds, and the price levels at which it had traded.  The market information dealers collected through the customer inquiry process was a critical component in dealers' analysis of the market.  The information was proprietary, confidential, and extremely valuable.  In a properly functioning market, where dealers competed against each other, no dealer would forfeit its competitive advantage by disclosing such sensitive information to another dealer.

79.     Apart from their activity as market makers, dealers also traded SSA bonds with other dealers.  Unlike in the dealer-to-client segment, where dealers knew the identity of their investor counterparties from the initial requests for quotes, trading was anonymous in the interdealer segment.  When trading with other dealers, dealers' identities were concealed from one another, even after trade execution.

80.     Interdealer trades were matched by third parties known as interdealer brokers ("IDBs").  Dealers submitted bid and offer prices to IDBs, which then published those quotes on their various trading platforms, which traders could view from their desks on screens provided by each IDB, or in an aggregated feed on their own in-house screens.  The screens showed live, executable prices, allowing a dealer to immediately enter into a trade at the quoted price without negotiation.  When a bond traded at a specific price, the price would flash on the screen.  Dealers

watched these screens closely, and they treated the prices on IDB screens as a guide for where to set bond prices in response to investor inquiries.

81.    During the Class Period, the dominant IDBs in the SSA bond market included BGC Partners, GFI Group, ICAP, and Tullet Prebon.

**D.    How SSA Bond Prices Were Quoted**

82.    Dealers typically quoted SSA bonds in basis points as a spread above the yield of U.S. Treasury bonds with a similar maturity, with one basis point equal to 1/100th of a percentage point.  Dealers provided both "bid" and "offer" quotes.  The "bid" was the spread above Treasury bonds at which a dealer was willing to buy an SSA bond.  The "offer" was the spread above Treasury bonds at which a dealer was willing to sell an SSA bond.  A dealer "got hit" when an investor accepted a dealer's bid, and "got lifted" when an investor accepted a dealer's offer.

83.    Investors could request either a one-way quote or a two-way quote from dealers. A one-way quote was either a bid or an offer, depending on the direction of the trade the investor sought to make.  The difference or margin between the bid and offer was the "bid-offer spread." A two-way quote consisted of both the bid and offer for a given bond.  A two-way quote was known as the "market" on a bond.  The fair, competitive market on a bond was referred to by dealers as the "real" or "inside" market.

84.    SSA bond yields are inversely related to bond prices:  the higher the spread over Treasury bonds, the *lower* the price of an SSA bond, and vice versa.  Investors sought to purchase SSA bonds at the highest available ask (*i.e.*, the highest available yield, and thus the lowest price) and to sell them at the lowest available bid (*i.e.*, the lowest available yield, and thus the highest price).  As a consequence, bids were higher than asks for SSA bonds, unlike with other instruments, for which bids and asks are quoted as dollar prices, rather than yield spreads.

21

85.     For example, if 30-year U.S. Treasury bonds had a yield of 3.00%, and an SSA

bond with a similar maturity (for instance, 25 years) last traded at a yield of 3.35%, then the SSA

bond was last traded at a spread of 35 basis points above U.S. Treasury bonds.  Asked to provide

a one-way quote for such an SSA bond, a dealer may provide an investor with a bid of 36 or

"+36," or an ask of 34 or "+34."  Asked to provide a two-way quote, the dealer would provide a

"market" of "36/34."

## ADDITIONAL FACTUAL ALLEGATIONS

**I.    OVERVIEW OF DEFENDANTS' CARTEL**

**A.    How the Cartel Worked**

86.     Beginning at least as early as 2005, traders working at the Dealer Defendants

agreed to work not as competitors but as one team, pooling their information and resources to

skew prices in SSA bond trades for the benefit of the group.  Every day, all day, the Dealer

Defendants' traders kept in constant communication via telephone calls, in-person meetings, and

electronic messaging and chat rooms.  They used Instant Bloomberg, an instant messaging

system available on terminals that Bloomberg LP leases to financial firms, to create permanent

chat rooms ██████████████████████████████ along with temporary chat rooms that

were created and shut down each day.

87.     The chat rooms functioned as a convenient way for the cartel members to

exchange information.  ████████████████████████████████

████████████████████████████████████████████

██████████  No competitor operating independently would share such commercially sensitive

information with its competitors absent collusion.  But by pooling their information and

knowledge, the Dealer Defendants functioned as branches of a single "super-desk" that was

greater than the sum of its parts.  ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

████████

88.     The group's tactics  can be grouped into the following categories.  **_First_**, the

Dealer Defendants conspired to fix the prices they quoted to investors.  When a trader received a

request for a quote, he would immediately ████████████████████████████████

████████████████████████████████████████ to subvert

competition and maximize the terms on which they would win the business.  When multiple

cartel members had received the same inquiry, for example, the group would typically decide

which trader would take the lead on the trade and how the other traders could provide cover and

support.  The cartel members often agreed to match each other's quotes so it would appear to

investors that the quotes were representative of a market consensus.  Other times, certain cartel

members would agree to present inflated, noncompetitive quotes to investors so it would appear

to the investor that the quote provided by the cartel member who had been pre-determined to win

the business was a bargain by comparison.

89.     **_Second_**, to ensure that a certain cartel member would win a trade, other cartel

members would often step back from the market by declining to provide quotes, or revising

existing quotes to make them less appealing to investors, or even withdrawing quotes they had

previously provided

90.     **_Third_**, the traders at the Dealer Defendants blatantly shared confidential and

competitively sensitive information whenever it could help them rip off their customers.  This

included information about client's requests for quotes, as well as clients' bond purchases and sales, identities, trading habits, trade flow, and order sizes.  Cartel members routinely updated the group on their own positions and strategies, so each cartel member knew the others' long and short positions, whether currently buyers or sellers of particular bonds, and the price and volumes they were quoting for those bonds.

91.     **Fourth**, the Dealer Defendants exchanged inside information regarding new SSA bond issues that had yet to be announced or were in the midst of the book-building process with the syndicate desks.  This inside information included pricing information or information about market demand for the new bond issue.  The Dealer Defendants would use this inside information by "front-running," *i.e.*, trading specific secondary bonds linked to the new issue.  In addition, the inside, non-public, knowledge of the strength of the new deal, relative to expectations, allowed the Dealer Defendants to adjust their overall positioning in the broader market.  Armed with proprietary inside information, the conspirators also engaged in manipulating the pricing of customer "switch" transactions (where customers would look to sell some of their existing bond holdings in order to buy the new issue).

92.     **Fifth**, the Dealer Defendants pooled their inventory so that an investor inquiry to one Dealer Defendant could be filled by any Dealer Defendant.  Behind the scenes, colluding traders routinely filled customer orders on behalf of other cartel members, using the other cartel members' inventory.  Colluding traders also would divvy up trades among different Dealer Defendants, so multiple cartel members could get a piece of a (non-competitive) trade with an investor, who had no reason to suspect the trade was anything but a competitive, bilateral transaction.

93.     The cartel members engaged in all of this illegal conduct ████████████
███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████

94.     Defendants' conspiracy had the effect of removing an enormous amount of
competition from the market for SSA bonds.  As a direct result of the Dealer Defendants'
agreement not to compete, investors unwittingly transacted at prices worse than one would
expect in a normally operating, competitive market.  Shopping around for better pricing was a
pointless endeavor because the quotes received from one Defendant would be at best identical to
those offered by the other Defendants, and at worst, set at manipulated levels.  From the
customer's perspective, the matching quotes suggested that the prices offered by any one
Defendant was a competitive market price or even a bargain.  Unbeknownst to the customer,
however, these prices were actually the product of back-channel collusion.

95.     Defendants harmed not only investors who paid too much and received too little
in SSA trades with the Dealer Defendants, but the entire market for SSA bonds.  The effect of
reducing some of the world's largest banks—supposed competitors—into a single super-desk,
reduced competition marketwide.  Economic literature has found that in collusive auction
markets, which are analogous to the market at issue here, purchase prices are likely to be higher
even when bids are won by non-conspirators, because in a competitive market, the number of
competitive bidders has a strong positive effect on prices.  Because Defendants deprived

investors of more competitors operating in a competitive market, investors across the market

paid more and received less in trades for SSA bonds.

### B.  Individuals Cartel Participants

96.     The conspiracy was carried out primarily by the following group of traders:

Hiren Gudka (Bank of America and Deutsche Bank), Shailen Pau (RBC, Crédit Agricole, and

Credit Suisse), Amandeep Singh Manku (HSBC, Bank of America, and Crédit Agricole),

Bhardeep Heer (Nomura), ████████████████████████████████████

████████████████ and Gary McDonald (TD Bank and Citi). ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

97.     The Individual Defendants worked as SSA bond traders at various Dealer

Defendants over the Class Period.  Gudka worked at Bank of America from December 2001 to

May 2009, and at Deutsche Bank from July 2009 to April 2014.  In July 2014, Gudka returned to

Bank of America as a managing director.  Gudka remained at Bank of America until

approximately November 2015.  Gudka, known as a "big name" in the SSA bond market, was a

central player in the cartel.

98.     McDonald worked at Bank of America from January 2001 to November 2007,

spending nearly all of that period working alongside Gudka.  McDonald then worked at TD Bank

from December 2007 to July 2010, and for Citi from October 2010 to March 2016.

99.     Manku, ████████████████████████████████ worked at HSBC from

January 2004 to December 2009, when he left for Bank of America.  Manku traded SSA bonds

at Bank of America from January 2010 to October 2012.  In January 2013, Manku joined Crédit

Agricole, where he worked until December 2015.

100.    Pau, known within the cartel as "███," began his career at RBC, where he traded bonds from May 1999 to May 2009, the same month that Gudka left Bank of America.  In July 2009, Pau began a short stint at Crédit Agricole, which he left in March 2010.  In May 2010, Pau joined Credit Suisse, where he remained until February 2016.

101.    ███ worked at Bank of America from June 2008 to September 2011, overlapping with Gudka's and McDonald's tenure for more than a year.  In September 2011, ███ left Bank of America for Crédit Agricole, where he still works today.

102.    Unlike their co-conspirators, Heer and ███ each worked at only one Dealer Defendant during the Class Period.  Heer worked at Nomura from January 2005 to March 2016, while ███ worked at BNP Paribas from November 2008 to March 2016.

103.    These traders colluded throughout their tenures at each Dealer Defendant, and the conspiracy was uninterrupted throughout the Class Period.  The chart below lists the approximate dates that the Individual Defendants and other key traders in the conspiracy were at different Dealer Defendants.



104.    The group had very close social ties, which they used to facilitate the conspiracy.



█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

105.   ██████████████████████████████████████

███████████████████████████████████████



106.   ██████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

**II.**   ███████████████████████████████████████████
████████████████████

107.   Plaintiffs have reviewed over ███████ transcripts of audio calls and

Bloomberg Instant chats involving the Dealer Defendants.  ████████████████████████

████████████████████████████   Plaintiffs present a small sample of the

chat transcripts below, grouped under headings that roughly categorize the wrongdoing in each

chat.  The categories are by no means exhaustive, and most of the chats fit within multiple

categories.

108. ██████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

**A.** ████████████████████████████████

109. ███████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███

110. ████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████



111.



113.

114. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████

115. ██████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████

116. ██████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████

117. ███████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████████



**B.** ██████████████████████████████████████

119. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

120. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

121. 

122.

123.



124. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

**C.** ████████████████████████████████

125. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

126. ████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

127. █████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
██████████

128. █████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████

129. ████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████

130. ███████████████████████████████
████████████████████████████████████
███████████████████████████████████
██████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████



131. ████████████████████████████████
███████████████████████████████████
███████████████████████████████████
█████████████████

132. █████████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████████
████████████████████████

133. █████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████████
██████████████████████████

134. ██████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████████

135.

136.

137.

138. █████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
█████████████████████████████████

139. ████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████

140. ██████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████
██████

141. ████████████████████████████████████
████████████████████████████████████████



142.

143. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

144. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

145. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



146.

147.

### III. THE DEALER DEFENDANTS USED INTERDEALER BROKERS TO FACILITATE THE CONSPIRACY AND MASK COLLUSIVE TRADES

#### A. How the Dealer Defendants Used the Interdealer Brokers

148. When the dealers traded SSA bonds with other dealers, they did so on trading platforms that were run by interdealer brokers such as BGC Partners, GFI Group, ICAP, and Tullet Prebon. Dealers submitted quotes to the interdealer brokers, which then streamed those quotes live to screens that sat atop traders' desks. The interdealer brokers matched trades anonymously, so that no dealer knew who was on the other side of any trade. For these services, the brokers earned a commission.

149. The Dealer Defendants used the interdealer brokers to conceal their conspiracy and enable the super-desk to function at full throttle. *First*, the Dealer Defendants used the interdealer brokers to help "launder" the Dealer Defendants' direct trades with each other,

allowing the Dealer Defendants to move inventory around the super-desk undetected.  A Dealer

Defendant that traded its co-conspirator's inventory could not execute that trade unless that

inventory was transferred to it.  Thus, operating the super-desk required the Dealer Defendants to

trade directly with each other in massive volumes.  The interdealer brokers laundered the Dealer

Defendants' direct trades by booking them through their own platforms, in exchange for fees.

Such trades were recorded as interdealer trades through IDBs, rather than direct inter-bank trades

that might set off red flags.

150.



151.     ***Second***, the Dealer Defendants used the interdealer brokers to help police the

conspiracy by keeping each Dealer Defendant apprised of the others' activity.  By monitoring

and broadcasting the group's activity, the interdealer brokers ensured that the Dealer Defendants

stayed out of each others' way and the conspiracy ran smoothly.  When a colluding trader

inadvertently submitted a quote that competed with another colluding trader's quote, a broker

would remove it, sometimes even on their own initiative without instruction from the trader who

had submitted the competing quote.

152.     ***Third***, the Dealer Defendants used the interdealer brokers to access confidential

information and manipulate the price information that was broadcast to the SSA bond market.

Despite the fact that interdealer trading was supposed to be anonymous, the interdealer brokers

regularly disclosed names of trading counterparties to the Dealer Defendants.  The Dealer Defendants also instructed the interdealer brokers not to post trades to the brokers' screens when the Dealer Defendants did not want to publicize the trades.  The interdealer brokers also agreed to post *inaccurate* prices at the Dealer Defendants' direction.  Thus, the Dealer Defendants used the interdealer brokers to disseminate false market information to every desk in the interdealer segment and cause price distortions throughout the market, given that the prices on IDB screens serve as a reference for dealers when they set the prices they quote to investors.

**B.** █████████████████████████████████████████
████████

153.  ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

154.  ███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

155.

156.

157.

158. █████████████████████████████████████

159. █████████████████████████████████████



160. ██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████

161. ████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████  ██████████████████████████████████████

██████████████████████████████████████████

162. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

_____

[6]  BGC Partners was formed in 2004 as a spinoff of Cantor Fitzgerald.  However, many in the industry continued to refer to BGC's legacy Cantor Fitzgerald business as "Cantor."

[7] ████████████████████████████████████████████████████

██████



163.

164.



165.

166.



167.

168.

169.

███████████████████████████████████████████████

███████████████████████████████████████

## IV. GOVERNMENT INVESTIGATIONS INTO DEFENDANTS' MANIPULATION OF THE SSA BOND MARKET

170.    In late 2015, Gudka, Pau, Manku, and Heer were removed from their positions on the SSA bond trading desks at the Dealer Defendants.  Around that same time came the first news reports that the U.S. Department of Justice ("DOJ") had launched an investigation into possible collusion in the SSA market, focusing on activity by London-based traders.[8]  On December 9, 2015, *Bloomberg* reported that the DOJ had launched an investigation into possible collusion in the SSA market, "focusing on activity by London-based traders."

171.    A month later, on January 6, 2016, the *Financial Times* and *International Financing Review* confirmed the DOJ's probe, the latter indicating that the DOJ was looking at "possible manipulation of bond prices."[9]

172.    According to the *International Financing Review* report, the DOJ was "investigating allegations that SSA traders at different banks agreed [on] prices and shared information on certain US dollar bonds in chat rooms they established for the purpose." According to the *Bloomberg* report, DOJ "[p]rosecutors have obtained transcripts of online chat-room conversations indicating possible misconduct and have contacted banks, asking them to

---

[8]   David McLaughlin & Tom Schoenberg, *U.S. Said to Probe Possible Rigging in Agency Bond Market*, BLOOMBERG (Dec. 9, 2015), http://www.bloomberg.com/news/articles/2015-12-09/u-s-said-to-probe-possible-rigging-in-agency-bond-market (last visited Apr. 6, 2017).

[9]   Abhinav Ramnarayan & Helene Durand, *EXCLUSIVE – DoJ investigates bond traders over market-rigging*, INT'L FIN. REV. (Jan. 6, 2016) ("Ramnarayan & Durand"), www.ifre.com/exclusive-doj-investigates-bond-traders-over-market-rigging/21230385.article (last visited Apr. 6, 2017).

delve further into the behavior."  The DOJ has sent information requests to Bank of America,

Crédit Agricole, Credit Suisse, and Nomura, among others.[10]

173.    On January 20, 2016, *Bloomberg* reported that the U.K. Financial Conduct

Authority, which previously had been assisting the DOJ, had started its own investigation into

collusion in the SSA market.[11]  On February 9, 2016, the *Financial Times* reported that in

addition to the DOJ and Financial Conduct Authority, the European Commission had also

opened a cartel investigation into possible collusion in the SSA market.[12]

174.    Some Defendants have acknowledged the regulatory inquiries into their SSA

bond market operations.  For instance, Citigroup has noted in its filings that its SSA bond trading

activities were under investigation.[13]  Credit Suisse has also "received information requests from

regulators about the agency bond market."[14]  Similarly, Crédit Agricole has noted in its annual

---

[10]    Craig McGlashan, Owen Sanderson, Ralph Sinclair, & Toby Fildes, *Scandal rocks SSA market*, GLOBAL CAPITAL (Jan. 7, 2016), www.globalcapital.com/article/vydmn22frhms/ trading-scandal-rocks-ssa-market (last visited Apr. 6, 2017).

[11]    Suzi Ring and Tom Schoenberg, *U.K. Said to Open Probe Into Rigging of Aency-Bonds Market*, BLOOMBERG (Jan. 20, 2017), https://www.bloomberg.com/news/articles/ 2016-01-20/agency-bond-rigging-probe-said-to-expand-as-u-k-opens-inquiry-ijmri0ov (last visited Apr. 6, 2017).

[12]    Jim Brunsden, *EU probes suspected rigging of $1.5tn debt market*, Financial Times (Feb. 9, 2016), at https://next.ft.com/content/04befd8a-cf35-11e5-92a1-c5e23ef99c77 (last visited Apr. 6, 2017).

[13]    CITIGROUP INC., FORM 10-K (FISCAL YEAR 2015) 296 (2016) ("Government and regulatory agencies in the U.S. and in other jurisdictions are conducting investigations or making inquiries regarding Citigroup's sales and trading activities in connection with sovereign securities.  Citigroup is fully cooperating with these investigations and inquiries.").

[14]    Suzi Ring and Tom Schoenberg, *Agency Bond Traders Said to Face Questions in Rigging Probe*, BLOOMBERG (Feb. 1, 2017), https://www.bloomberg.com/news/articles/2017-02-01/agency-bond-traders-said-to-face-questions-in-rigging-probe-iyn8sg38 (last visited Apr. 6, 2017).

financial report that "[s]everal regulators have demanded information" on its SSA bonds business, and that Crédit Agricole has been cooperating with the authorities.[15]

175.    In February 2017, *Bloomberg* reported that the DOJ and FCA investigations "are escalating as authorities seek to interview traders." According to Bloomberg, U.S. prosecutors have "obtained transcripts of online chat-room conversations indicating possible misconduct" and are pressing forward with a criminal probe.[16]

176.    In late 2015, Bank of America suspended or terminated Gudka, its head of SSA trading. Gudka had previously worked at Deutsche Bank, where he participated in chat room discussions as part of Deutsche Bank's SSA trading desk until his departure in April 2014. Gudka has been inactive on the FCA register for traders since the start of December 2015. According to one head bond trader who was interviewed, Gudka was "a big name" in SSA bond trading, and ran one of the largest SSA trading books in the market.[17]

177.    In late 2015 or early 2016, Credit Suisse suspended or terminated SSA bond trader Pau. Pau previously worked at Crédit Agricole from 2009 to 2010, and worked at RBC until 2009. He has been inactive on the FCA register for traders since March 2016.

178.    In late 2015 or early 2016, Crédit Agricole suspended or terminated SSA bond trader Manku. Manku has been inactive on the FCA register for traders since the start of

---

[15]    CREDIT AGRICOLE, ANNUAL FINANCIAL REPORT 2015:  REGISTRATION DOCUMENT 397 (2015).

[16]    Suzi Ring and Tom Schoenberg, *Agency Bond Traders Said to Face Questions in Rigging Probe*, BLOOMBERG (Feb. 1, 2017), https://www.bloomberg.com/news/articles/2017-02-01/agency-bond-traders-said-to-face-questions-in-rigging-probe-iyn8sg38 (last visited Apr. 6, 2017).

[17]    Craig McGlashan, et al., *'Forced competition' to generate trading flow under fire for fomenting SSA scandal*, GLOBAL CAPITAL (Jan. 7, 2016), http://www.globalcapital.com/article/vz0phyg7g5jt/39forced-competition39-to-generate-trading-flow-under-fire-for-fomenting-ssa-scandal (last visited Apr. 6, 2017).

December 2015.  Manku was previously employed at Bank of America as recently as 2012 and at HSBC until at least 2009.

179.    In late 2015 or early 2016, Nomura suspended SSA bond trader Heer, who was removed from Nomura's trading desk and moved to a back-office role indefinitely.  He has been inactive on the FCA register for traders since March 2016.

180.    At the time of their departures, Gudka, Heer, Pau, and Manku were all under investigation by various authorities for possible manipulation of SSA debt prices.

181.    ██████████████ and Gary McDonald have both been inactive on the FCA register for traders since March 2016, suggesting that they, too, are under investigation for involvement in the conspiracy.

## V.    **DEFENDANTS' CONSPIRACY INJURED PLAINTIFFS AND THE CLASS**

182.    Defendants' conspiracy inflicted severe financial harm on Plaintiffs and the Class and restrained competition in the market for SSA bonds.

183.    As a direct result of their conspiracy, Defendants inflated their own profits while charging supracompetitive prices for SSA bonds to Plaintiffs and the Class.  Defendants injured each Class member—including pension funds, university endowment funds, hedge funds, insurance companies, corporate treasuries, fiduciary and depository institutions, small banks, and money managers—through a common scheme resulting in hundreds of millions and potentially billions of dollars in damages.

184.    The conspiracy alleged herein had and is having the following effects, among others:

    a.    The SSA bond prices charged to Plaintiffs and the Class have been fixed or stabilized at supracompetitive levels;

b.      Plaintiffs and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for SSA bonds; and

c.      Competition in establishing prices paid in the United States for SSA bonds has been unlawfully restrained, suppressed, and eliminated.

185.    By reason of the violations of Section 1 of the Sherman Act alleged in this complaint, Plaintiffs and the members of the Class have sustained injury to their business or property.  The injuries sustained by Plaintiffs and the Class are the payment of supracompetitive prices for SSA bonds as a result of Defendants' conspiracy to restrain trade as alleged.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**EQUITABLE TOLLING BECAUSE OF DEFENDANTS' CONCEALMENT**

186.    During the Class Period, Defendants actively, fraudulently, and effectively concealed their conspiracy from Plaintiffs and members of the Class.

187.    By its very nature, the unlawful activity alleged herein was self-concealing. Defendants conspired to artificially manipulate the SSA bond market to the benefit of Defendants and to the detriment of Plaintiffs and members of the Class, and they further conspired to keep their collusive and manipulative conduct secret.  As a result, Plaintiffs and the Class did not discover and could not have discovered through the exercise of reasonable due diligence that they were injured by Defendants' conspiracy until, at the earliest, December 9, 2015, when the DOJ investigation became public.

188.    Defendants fraudulently concealed their anticompetitive activities by, among other things, engaging in secret communications in furtherance of their conspiracy.  These communications occurred in non-public chat rooms, instant messages, and through email, telephone calls, and in-person meetings, none of which are or were reasonably available to Plaintiffs or members of the Class.

56

189.    Defendants also used interdealer brokers to conceal their conspiracy.  At Defendants' request, interdealer brokers "laundered" direct trades between the Dealer Defendants by booking them through their own trading platforms.  By concealing the nature of their direct trades, Defendants were able to move massive volumes of inventory between Dealer Defendants undetected, so that cartel members could execute trades on behalf of other cartel members.

190.    The chat rooms in question were operated by high-ranking traders within Defendants' operations, and Defendants strictly limited access to the chat rooms.  The substance of the conversations occurring within these chat rooms was unknowable to Plaintiffs until December 9, 2015, at the earliest.  Even now, the full contours of Defendants' conspiracy are not public.

191.    Defendants knew that they could not subject their collusive conduct to public scrutiny.  Defendants actively and jointly concealed their conspiracy.  For instance, Defendants agreed among themselves not to publicly discuss or otherwise reveal the nature and substance of the acts and communications in furtherance of the conspiracy.  Defendants even went as far as setting up new chat rooms on a daily basis to avoid detection.

192.    None of the facts or information available to Plaintiffs, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged in this Complaint.

193.    There are many additional reasons why these facts could not have been known.  SSA bond trades occur primarily in private, over-the-counter transactions, and Defendants' trades and trading strategies are not public information.  Reasonable due diligence could not have uncovered Defendants' conspiracy because the non-exchange-based, closed, and private

nature of the trades helped to conceal Defendants' conduct.  Indeed, throughout the Class Period,

Plaintiffs and members of the Class regularly monitored news reports concerning the financial

industry and the SSA market.  Plaintiffs and members of the Class undertook such activity in

order to try to buy and sell SSA bonds at good prices.  Nonetheless, Plaintiffs and members of

the Class did not know of, and could not have known of, Defendants' conspiracy at least until the

*Bloomberg* article was published on December 9, 2015.

194.    Because of Defendants' concealment, any applicable statute of limitations

affecting or limiting the rights of action by Plaintiffs or members of the Class have been tolled

during the period of concealment.

## CLASS ACTION ALLEGATIONS

195.    Plaintiffs, on behalf of themselves and those similarly situated, seek damages

against Defendants based on the allegations contained herein.

196.    Plaintiffs bring this action on behalf of themselves and, under Federal Rule of

Civil Procedure 23(a) and (b)(3), as the representatives of a Class defined as follows:

> All persons or entities who, from January 1, 2005 to August 31, 2015, directly
> entered into U.S.-dollar denominated SSA bond transactions with Defendants, or
> their respective subsidiaries or affiliates, in the United States or its territories or
> otherwise involving U.S. trade or commerce.  Excluded from the Class are
> Defendants, their co-conspirators identified herein, and their officers, directors,
> management, employees, current subsidiaries or affiliates, and all federal
> governmental entities.

197.    ***Numerosity.***  Members of the Class are so numerous that joinder is impracticable.

Plaintiffs do not know the exact size of the Class, but believe that there are thousands of Class

members geographically dispersed throughout the United States.

198.    ***Typicality.***  Plaintiffs' claims are typical of the claims of the members of the

Class.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct of

Defendants.  Specifically, Defendants' wrongdoing caused Plaintiffs and members of the Class

to pay inflated bond prices when they were buying and to receive suppressed bond prices when they were selling.

199.     Plaintiffs will fairly and adequately protect and represent the interests of the Class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving its own claims, Plaintiffs will prove other Class members' claims as well.

200.     ***Adequacy of Representation.***  Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.  Plaintiffs and its counsel have the necessary financial resources to adequately and vigorously litigate this class action.  Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

201.     ***Commonality.***  There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

> a.     whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize SSA bond prices in interstate commerce in the United States;
>
> b.     the identity of the participants of the conspiracy;
>
> c.     the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance thereof;
>
> d.     whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.    whether the conduct of Defendants and their co-conspirators, as alleged, caused injury to the business and property of Plaintiffs and other members of the Class;

f.    whether Defendants fraudulently concealed the conspiracy from Plaintiffs and the Class;

g.    the appropriate measure of damages sustained by Plaintiffs and other members of the Class;

h.    whether Plaintiffs and other Class Members are entitled to injunctive relief; and

i.    the appropriate injunction needed to restore competition.

202.    ***Predominance.***  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making a common methodology for determining class damages as a whole appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

203.    ***Superiority.***  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs

potential difficulties in management of this class action.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

204.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

## CLAIM ONE

### VIOLATION OF 15 U.S.C. § 1
### AGREEMENT RESTRAINING TRADE

205.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

206.    Defendants, and their co-conspirators, entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, or made artificial prices on SSA bonds.

207.    Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among Defendants and other unnamed co-conspirators. Defendants' conspiracy is a *per se* violation of the Sherman Act and is, in any event, an unreasonable and unlawful restraint of trade.

208.    There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' unreasonable restraint of trade.  Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

209.    Defendants' conspiracy, and the resulting impact on the prices of SSA bonds occurred in and affected interstate commerce and commerce in and between the Territories of the United States.

210.    As a direct, intended, foreseeable, and proximate result of Defendants' conspiracy and overt acts taken in furtherance thereof, Plaintiffs and each member of the Class have suffered injury to their business or property.  Plaintiffs and each Class member's damages are directly attributable to Defendants' conduct, which resulted in all Class members transacting in manipulated prices on every SSA bond they purchased or sold during the Class Period.

211.    Plaintiffs' and the Class's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

212.    Plaintiffs and the Class are entitled to treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of the Sherman Act.

## CLAIM TWO

### UNJUST ENRICHMENT

213.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

214.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs and the Class.

215.    Plaintiffs and the Class seek restitution of the monies of which they were unfairly and improperly deprived, as described herein.

## PRAYER FOR RELIEF

216.    WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class of similarly situated entities, respectfully request that the Court:

a.      Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, designate Plaintiffs as Class representatives, and appoint Plaintiffs' counsel as counsel for the Class;

b.      Adjudge and decree that Defendants' unlawful conduct alleged herein violates Section 1 of the Sherman Act;

c.      Adjudge and decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiffs and the Class;

d.      Permanently enjoin and restrain Defendants from continuing and maintaining the conspiracy alleged in the Complaint;

e.      Find Defendants jointly and severally liable for the damages incurred by Plaintiffs and the Class;

f.      Award Plaintiffs and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

g.      Award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law;

h.      Award Plaintiffs and the Class all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity, from the date of service of the initial Complaint in this action; and

i.      Order such other, further, and general relief as it may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

DATED:   New York, New York
   April 7, 2017

**ROBBINS GELLER RUDMAN  &**
**DOWD LLP**

By: _Donal Mitchell_

Samuel H. Rudman
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Fax: (631) 367-1173
SRudman@rgrdlaw.com

David W. Mitchell
Brian O. O'Mara
Carmen A. Medici
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Fax: (619) 231-7423
davidm@rgrdlaw.com
bomara@rgrdlaw.com
cmedici@rgrdlaw.com

**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**

By: _Dan Brockett_

Daniel L. Brockett
Sascha N. Rand
Steig D. Olson
Thomas J. Lepri
Thomas Popejoy
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
danbrockett@quinnemanuel.com
sascharand@quinnemanuel.com
steigolson@quinnemanuel.com
thomaslepri@quinnemanuel.com
thomaspopejoy@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice* application
 forthcoming)
Adam B. Wolfson
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com
adamwolfson@quinnemanuel.com

**MOTLEY RICE LLC**

By: _M Buchman_

Michael M. Buchman
600 Third Avenue, Suite 2101
New York, NY 10016
Telephone: (212) 577-0040
Fax: (212) 577-0054

mbuchman@motleyrice.com

Ann K. Ritter
Christopher F. Moriarty
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Telephone:  (843) 216-9000
Fax:  (843) 216-9450
aritter@motleyrice.com
cmoriarty@motleyrice.com

*Counsel for Plaintiffs and the Proposed Class*