# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE:

SSA BONDS ANTITRUST LITIGATION

*This Document Relates To All Actions*

1:16-cv-03711-ER

**CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

NATURE OF THE ACTION ...............................................................................................1

JURISDICTION AND VENUE .........................................................................................8

PARTIES ...........................................................................................................................10

    A.      Plaintiffs ......................................................................................................10

    B.      Defendants ...................................................................................................12

          1.      Dealer Defendants...............................................................................12

          2.      Individual Defendants.........................................................................33

BACKGROUND FACTUAL ALLEGATIONS ..................................................................36

    A.      The SSA Bond Market.................................................................................36

    B.      U.S. Dollar-Denominated SSA Bonds.........................................................39

    C.      Trading Of SSA Bonds ...............................................................................41

    D.      How SSA Bond Prices Were Quoted...........................................................44

ALLEGATIONS REGARDING THE CONSPIRACY ....................................................45

I.      THE PRIMARY PLAYERS IDENTIFIED TO DATE.......................................46

II.     DEFENDANTS AGREED NOT TO COMPETE IN THE MARKET FOR SSA BONDS .............................................................................................................49

    A.      ██████████████████████████████████ ...............50

    B.      █████████████████████████████ ................54

    C.      █████████████████████████████ .................61

    D.      ███████████████████ .........................63

    E.      ███████████████████ .........................67

III.    DEFENDANTS DIRECTLY FIXED THE PRICE OF USD SSA BONDS....................68

IV.    DEFENDANTS EXPLOITED SENSITIVE CUSTOMER INFORMATION ................85

V.      THE CONSPIRACY OPERATED UNCEASINGLY DURING THE CLASS
        PERIOD, INFECTING ALL OF THE DEFENDANTS' SSA TRANSACTIONS .......104

        A.      Defendants Communicated In Real Time On An Ongoing Basis ......................104

        B.      Defendants' Cartel Systematically Harmed Their Customers On Every
                USD SSA Bond Transaction...................................................................................108

VI.     GOVERNMENT INVESTIGATIONS INTO DEFENDANTS'
        MANIPULATION OF THE SSA BOND MARKET ....................................................116

VII.    DEFENDANTS' CARTEL WAS DIRECTED AT INVESTORS IN THE U.S.
        AND IN NEW YORK ....................................................................................................119

        A.      Defendants' Conspiracy Deliberately Targeted The United States And
                New York................................................................................................................119

        B.      Defendants Committed Specific Acts In Furtherance Of The Conspiracy
                In The United States And In New York...............................................................122

        C.      Defendants Transacted With U.S. And New York Investors, Shared
                Confidential Information On U.S. Investors, And Engaged In U.S.- And
                New York-Linked Activities.................................................................................125

                1.      Bank of America .......................................................................................125

                2.      Barclays.....................................................................................................128

                3.      BNP Paribas ..............................................................................................129

                4.      Citi.............................................................................................................129

                5.      Crédit Agricole..........................................................................................130

                6.      Credit Suisse..............................................................................................131

                7.      Deutsche Bank ..........................................................................................133

                8.      HSBC.........................................................................................................137

                9.      Nomura ......................................................................................................138

                10.     RBC............................................................................................................138

                11.     TD Bank.....................................................................................................139

        EQUITABLE TOLLING BECAUSE OF DEFENDANTS' CONCEALMENT.......................140

        CLASS ACTION ALLEGATIONS .............................................................................143

CAUSES OF ACTION ................................................................................................146

JURY DEMAND ......................................................................................................149

Plaintiffs Iron Workers Pension Plan of Western Pennsylvania ("Iron Workers") and

Sheet Metal Workers Pension Plan of Northern California ("Sheet Metal Workers"), individually

and on behalf of all others similarly situated, bring this class action and allege as follows:

## NATURE OF THE ACTION

1.      This case concerns a brazen conspiracy by Defendants to fix prices and restrain

competition in the market for U.S. dollar-denominated ("USD") supranational, sovereign, and

agency bonds ("SSA bonds").

2.      SSA bonds are debt securities issued by governmental and quasi-governmental

entities, such as the World Bank and the European Investment Bank, for the purpose of funding a

range of economic and public-policy mandates.  SSA bonds are generally regarded as secure

investments by investors worldwide, because they often enjoy special legal status, and their

credit-worthiness is often pegged to sovereign, regional, or international entities.  USD SSA

bonds, which are the focus of this case, are principally directed at the U.S. market.

3.      Defendants in this case are (i) several banks that operated as primary dealers in

the USD SSA bond market ("Dealer Defendants"), and (ii) individuals with responsibility for the

USD SSA trading business at each of their respective banks ("Individual Defendants").

4.      As competitors in the market for USD SSA bonds, Defendants were expected to

compete vigorously for the business of their investor clients.  Free-market competition is, and

has long been, the fundamental economic policy of the United States.  As the Supreme Court has

explained, this policy is enshrined in the Sherman Act, which makes it *per se* illegal for

competitors (like Defendants here) to conspire and coordinate with each other to limit

competition regarding price and terms of sale.[1]  In financial markets, competition among dealers drives better terms and prices for investors—just as competition among suppliers drives better product quality and prices throughout the economy.  The Supreme Court has described collusion among competitors of the type that occurred in this case as "the supreme evil of antitrust."[2]

5.  Rare is an antitrust case like this one, where a large volume of "smoking gun" evidence exists at the pleading stage.  Cooperation materials produced by two settling Defendants,[3] ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

6.  ███████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████  Moreover, many more chats and illicit communications exist in the files of the non-settling Defendants.  Indeed, Plaintiffs understand that *thousands* of additional chat transcripts

---

[1]  *See N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 4 (1958) ("The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions.").

[2]  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

[3]  The claims against Bank of America and Deutsche Bank are subject to a settlement agreement, but these parties are named herein because the settlements have not yet been finally approved, and these two Defendants have thus not yet been dismissed from the action.

and audio recordings exist, many of which have been collected and produced by Defendants to government authorities as part of ongoing investigations into Defendants' collusion being conducted by regulators in the United States and Europe.  Those chats will reveal even more about the specifics of Defendants' cartel.

7. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

8. ████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████ It does not appear that the

bank Defendants did *anything* of consequence to monitor the "chats" their traders were having with their supposed competitors in these electronic chatrooms.[4]

9.      In addition to their extensive use of these chatrooms, Defendants also conspired through other means, such as emails. ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████

10.      ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████▌█████████████████████████

████████████████████████████████████████████████████████████

<hr>

[4]  The use of these types of chatrooms, which facilitated traders' ability to talk to their counterparts at other banks, was rampant at these banks during the period of the conspiracy.  Only recently, and far too late for the investor class here, have the banks taken steps to limit or prohibit their use.

[5]  ███████████████████████████████████████████████████
███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

█████████████████

11.   ████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

12.    Defendants' overarching objective was to ensure that the cartel members would

transact with investors at prices that were more favorable for the conspiring dealers—and thus

worse for their customers—than could have been achieved in the absence of collusion.  In

addition to refraining from competing with each other, Defendants actively helped each other to

subvert competition so they could execute USD SSA bond trades on financial terms that were

more favorable for the conspirators than they would have been in a competitive market.

13.    Defendants used a variety of techniques, which they honed over time, to

accomplish their shared objective.  █████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

14. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

15. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ Investors are careful about sharing such information with anyone and often take steps to prevent even a single dealer from knowing their inventory and order flow.  Investors know that dealers can exploit such information to supply investors with less attractive terms. ████████████████

████████████████████████████████████████

████████████████████████████████████████

6

████████████████████████████████████

███████████████████████████████████

██████████████████████████████████

████████████████████

16.     Defendants collaborated and shared information to such a degree that they effectively ceased being separate actors in the USD SSA bond market and instead functioned as a single, unitary "super-desk."  By effectively functioning as a single trading desk, rather than as many competing trading desks, they severely diminished the amount of competition in the market.  This elimination of competition had the predictable result that Defendants' customers were worse off than they would have been absent the conspiracy on virtually every trade.  That was, of course, the conspiracy's whole point.

17.     Although they exhibited no qualms about their collusion, Defendants knew it was illegal, so they took pains to keep it secret.  ████████████████████████████

████████████████████████████████████

███████████████████████████████████

██████████████████████████████████

███████████████████████████

18.     In 2015, the United States Department of Justice ("DOJ") launched its investigation of certain Defendants after it was finally tipped off to the collusion.  Most of the Individual Defendants have lost their jobs as a result of their wrongdoing in the conspiracy.  The DOJ investigation will likely lead to significant fines and potentially to other penalties, based upon the extensive impact Defendants' cartel had on U.S. commerce.

19.     The DOJ investigation will not, however, compensate the investor victims of Defendants' scheme for the financial harm they suffered over the course of many years.  These victims include the many investors who comprise the proposed class of Plaintiffs in this case (the "Class").  █████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

20.     As a result of Defendants' utter abandonment of competition, and their extensive efforts to harm their customers, every USD SSA bond transaction Class Members executed with Defendants was impacted by the conspiracy.  This class action now seeks to recover the monetary damages suffered by those U.S. investors who traded USD SSA bonds with Defendants during the Class Period (defined below).

**JURISDICTION AND VENUE**

21.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26), and pursuant to 28 U.S.C. §§ 1331 and 1337(a).  Jurisdiction is also had under 28 U.S.C. § 1332, because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than Defendants.

22.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, as well as pursuant to 28 U.S.C. § 1391(b), (c), and (d), because during the Class Period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

23.    This Court has personal jurisdiction over various corporate Defendants pursuant to the nationwide contacts test provided for in 15 U.S.C. § 22 because numerous corporate Defendants, as set forth below, were formed in or have their principal places of business in the United States.

24.    In addition, as detailed below, this Court has personal jurisdiction over Defendants because each Defendant transacted business in and throughout the United States, including in this District; each Defendant had substantial contacts with the United States, including in this District; each Defendant committed overt acts in furtherance of Defendants' conspiracy in the United States; each Defendant is an agent of the other Defendants; each Defendant continuously and deliberately exploited the U.S. market for USD SSA bonds and U.S. investors; and Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

25.    Defendants' conspiracy was directed at and repeatedly targeted U.S. investors throughout the Class Period, including in this District.  USD SSA bonds, some categories of which are referred to colloquially as "Yankee" bonds, are primarily marketed to U.S. investors, including pension funds, asset managers, insurance companies, university endowments, and hedge funds.  Furthermore, essential steps in the conspiracy occurred in the United States and

involved transactions with U.S. investors.  Thus, the scheme inherently involved trade or commerce taking place in the United States, with U.S. investors.  Defendants knew that the brunt of the harm caused by their scheme would be felt by investors in the United States.  To the extent that the conspiracy may also involve commerce with foreign entities, it remains the case that this scheme had a direct, substantial, and reasonably foreseeable effect on commerce in the United States.

26.     Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and did have a substantial effect on interstate commerce.

27.     The Court also has jurisdiction over Defendants pursuant to New York's C.P.L.R. § 302, because Defendants are present and/or transact business in New York State; each Defendant had substantial contacts with New York State; each Defendant committed overt acts in furtherance of Defendants' conspiracy in New York State; each Defendant is an agent of the other Defendants; and Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in New York State.

**PARTIES**

A.     **Plaintiffs**

28.     Plaintiff Iron Workers Pension Plan of Western Pennsylvania ("Iron Workers") is a multi-employer defined benefit pension plan headquartered in Pittsburgh, Pennsylvania. During the Class Period, Iron Workers transacted in USD SSA bonds, purchasing bonds from and selling bonds to one or more of the Dealer Defendants.  Iron Workers' decisions to buy and sell USD SSA bonds were made in the United States, after inquiries about a purchase or sale was made on their behalf with U.S.-based salespeople working at the Dealer Defendants, who then passed the inquiry to the Dealer Defendants' London-based traders for a price.  The U.S.-based salespeople then received the price and gave it to Iron Workers' domestic investment manager in

the United States.  In turn, the purchase or sale transaction was executed in the United States, and either the USD SSA bond or the sale proceeds were delivered to Iron Workers in the United States.  The Dealer Defendants' London desks knew they were pricing a trade for a U.S.-based investor and that the price would be conveyed back to the U.S.-based investor and result in a transaction executed in the United States, as they intended.  As a result of the conspiracy set forth herein, including because of acts undertaken by the Individual Defendants, Iron Workers' transactions with the Dealer Defendants were priced at artificial levels, causing harm to Iron Workers in the United States.

29.    Plaintiff Sheet Metal Workers Pension Plan of Northern California ("Sheet Metal Workers") is a multi-employer pension plan headquartered in Pleasanton, California.  During the Class Period, Sheet Metal Workers transacted in USD SSA bonds, purchasing bonds from and selling bonds to one or more of the Dealer Defendants.  Sheet Metal Workers' decisions to buy and sell USD SSA bonds were made in the United States, after inquiries about a purchase or sale was made on their behalf with U.S.-based salespeople working at the Dealer Defendants, who then passed the inquiry to the Dealer Defendants' London-based traders for a price.  The U.S.-based salespeople then received the price and gave it to Sheet Metal Workers' domestic investment manager in the United States.  In turn, the purchase or sale transaction was executed in the United States, and either the USD SSA bond or the sale proceeds were delivered to Sheet Metal Workers in the United States.  The Dealer Defendants' London desks knew they were pricing a trade for a U.S.-based investor and that the price would be conveyed back to the U.S.-based investor and result in a transaction executed in the United States, as they intended.  As a result of the conspiracy set forth herein, including because of acts undertaken by the Individual

Defendants, Sheet Metal Workers' transactions with the Dealer Defendants were priced at artificial levels, causing harm to Sheet Metal Workers in the United States.

**B.**  **Defendants**

30.  Whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

31.  Various other entities, persons, firms, and corporations, which are unknown and not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and/or made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

*1.  Dealer Defendants*

32.  ***Bank of America.***  Defendant Bank of America, N.A. ("BANA") is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina, and is an indirect, wholly owned subsidiary of Bank of America Corporation. According to U.K. Financial Conduct Authority ("FCA") records,[6] colluding SSA bond traders Gary McDonald, Amandeep Singh Manku, and Hiren Gudka were registered as advisers to perform controlled functions or otherwise act on BANA's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class. As detailed more fully below, during the Class Period, BANA (acting at least through

---

[6]  The FCA uses codes to designate various functions that individuals may perform in the financial industry, most of which relate to the carrying on of regulated activities by a firm.  For instance, CF 30 ("Customer Function") means that the registered individual may, among other things, advise customers on various investments. The codes and their respective meanings can be found on the FCA's website, https://www.fca.org.uk/.

McDonald, Manku, and Gudka, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York.  Manku and Gudka are under investigation by the DOJ.

33.     Defendant Bank of America Merrill Lynch International Limited ("BAMLIL") is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is an indirect subsidiary of Bank of America Corporation. According to FCA records, colluding SSA bond traders Gary McDonald, Amandeep Singh Manku, and Hiren Gudka were registered as advisers to perform controlled functions or otherwise act on BAMLIL's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class.  As detailed more fully below, during the Class Period, BAMLIL (acting at least through McDonald, Manku, and Gudka, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York.  BAMLIL often directed and controlled the trading of USD SSA bonds by Merrill Lynch, Pierce, Fenner & Smith Inc. and booked the profit from such trades.

34.     Defendant Merrill Lynch International ("MLI") is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is an indirect subsidiary of Bank of America Corporation.  According to FCA records, colluding SSA bond traders Amandeep Singh Manku, Hiren Gudka, ███████████ ████████ were registered as advisers to perform controlled functions or otherwise act on MLI's behalf during the Class Period, which included pricing, promoting, and/or executing USD

SSA bond trades with members of the Class.  As detailed more fully below, during the Class

Period, MLI (acting at least through Manku, Gudka, ███████████ but likely many additional

employees) directed its USD SSA bond trading activities to the United States, including to New

York in particular, and engaged in these activities in the United States, including in New York.

MLI often directed and controlled the trading of USD SSA bonds by Merrill Lynch, Pierce,

Fenner & Smith Inc. and booked the profit from such trades.

35.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("MLPF&S") is a

corporation organized under the laws of Delaware with its principal place of business in New

York, New York, and is a wholly owned subsidiary of Bank of America Corporation.  MLPF&S

executed USD SSA bond trades with Plaintiffs Iron Workers and Sheet Metal Workers and other

members of the Class during the Class Period.  As detailed more fully below, during the Class

Period, MLPF&S directed its USD SSA bond trading activities to the United States, including to

New York in particular, and engaged in these activities in the United States, including in New

York, including by serving as a trading broker.  MLPF&S often purposely executed USD SSA

bond trades in the United States at the direction and with the knowledge and consent of BAMLIL

and/or MLI.

36.     Defendants BANA, BAMLIL, MLI, and MLPF&S are referenced collectively in

this Complaint as "Bank of America."

37.     Bank of America regularly transacts business in and has substantial contacts with

New York, New York.  For instance, BANA maintains one of its largest branches, with at least

hundreds of employees, located at the "Bank of America Tower," in New York, New York.[7]

---

[7] *See* Bank of America Locations, available at https://locators.bankofamerica.com/ny/newyork/financial-centers-new-york-16579.html.

Likewise, MLI has at least two "Global Wealth Management" offices, with many employees, located in New York, New York.[8]  As discussed above, MLPF&S has its principal place of business in New York, New York.  In addition, BANA, BAMLIL, MLI, and MLPF&S each participated in USD SSA bond trading with members of the Class located in New York, New York during the Class Period.

38.  ***Barclays.***  Defendant Barclays Bank plc ("BBPLC") is a corporation organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom.  According to FCA records, colluding SSA bond trader ███████ was registered as an adviser to perform controlled functions or otherwise act on BBPLC's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class.  As detailed more fully below, during the Class Period, BBPLC (acting at least through ████, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York.  BBPLC often directed and controlled the trading of USD SSA bonds by Barclays Capital Inc. and booked the profit from such trades.

39.  Defendant Barclays Capital Inc. ("BCI") is a corporation organized under the laws of Connecticut with its principal place of business in New York, New York.  BCI is the main U.S. broker-dealer entity for the Barclays group.  BCI had brokers based in the United States and New York who facilitated and executed USD SSA bond transactions with the Class, including Plaintiff Iron Workers.  As detailed more fully below, during the Class Period, BCI directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York, including

---

[8]  *See* Merrill Lynch Global Offices, available at https://www.ml.com/global-offices.html.

by serving as a trading broker.  BCI executed USD SSA bond trades with Plaintiff Iron Workers

and other members of the Class during the Class Period.  BCI often purposely executed USD

SSA bond trades in the United States at the direction and with the knowledge and consent of

BBPLC, Barclays Services Limited, and/or Barclays Capital Securities Limited.

      40.     Defendant Barclays Services Limited ("BSL"), formerly known as Barclays

Capital Services Limited, is a corporation organized under the laws of the United Kingdom with

its principal place of business in London, United Kingdom.  According to chat transcripts,

colluding bond trader ███████ acted on BSL's behalf during the Class Period, which

included pricing, promoting, and/or executing USD SSA bond trades with members of the Class.

As detailed more fully below, during the Class Period, BSL (acting at least through ████, but

likely many additional employees) directed its USD SSA bond trading activities to the United

States, including to New York in particular, and engaged in these activities in the United States,

including in New York.  BSL often directed and controlled the trading of USD SSA bonds by

Barclays Capital Inc. and booked the profit from such trades.

      41.     Defendant Barclays Capital Securities Limited ("BCSL") is a corporation

organized under the laws of the United Kingdom with its principal place of business in London,

United Kingdom.  BCSL has at least one employee based in New York and doing business on its

behalf.  According to FCA records, colluding SSA bond trader ███████ was registered as

an adviser to perform controlled functions or otherwise act on BCSL's behalf during the Class

Period, which included pricing, promoting, and/or executing USD SSA bond trades with

members of the Class.  As detailed more fully below, during the Class Period, BCSL (acting at

least through ████, but likely many additional employees) directed its USD SSA bond trading

activities to the United States, including to New York in particular, and engaged in these

activities in the United States, including in New York.  BCSL often directed and controlled the

trading of USD SSA bonds by Barclays Capital Inc. and booked the profit from such trades.

42.   Defendants BBPLC, BCI, BSL, and BCSL are referenced collectively in this

Complaint as "Barclays."

43.   Barclays regularly transacts business in and has substantial contacts with New

York, New York.  BBPLC has two branches located in New York, New York, which are

licensed by the New York Department of Financial Services ("NYDFS"), and which employ at

least hundreds of employees located in New York, New York."[9]  As discussed above, BCI has its

principal place of business in New York, New York.  Barclays also has other interests in the

state.  For example, the Barclays Center—a sports arena for which Barclays paid $400 million

for the naming rights—is located in Brooklyn, New York.[10]  In addition, BBPLC, BCI, BSL, and

and BCSL participated in USD SSA bond trading with members of the Class located in New

York, New York during the Class Period.

44.   ***BNP Paribas.***  Defendant BNP Paribas S.A. is a French corporation with its

principal place of business in Paris, France.  As of 2016, BNP Paribas S.A. maintained three

branches in the United States, including one in New York.  BNP Paribas S.A. also had one

agency office and two representative offices in the United States at that time.  BNP Paribas S.A.

is registered with the NYDFS to do business in New York.  As of the end of 2015, BNP Paribas

S.A. had at least 780 full-time employees in the United States, of which 78% were employed in

New York.  BNP Paribas S.A. operates a "Corporate Coverage team" in New York, which offers

---

[9]   *See* NYDFS, New York Banking Department approves License for Barclays Bank PLC to Open Representative Office in Long Island City, November 25, 2008 (available at http://www.dfs.ny.gov/about/ press/pr081125 htm).

[10]   R. Sandomir, What is in a Name? $400 Million, N.Y. TIMES (Jan. 19, 2007) (available at http://www.nytimes.com/2007/01/19/sports/basketbal1/19sandomir.html).

all of BNP Paribas' products.[11]  For the year ending December 31, 2016, BNP Paribas S.A. reported revenues from its operations in the United States of €4.456 billion ($4.689 billion).[12]

45.     According to FCA records, colluding SSA bond traders ███████████ ████████████ were registered as advisers to perform controlled functions or otherwise act on BNP Paribas S.A.'s behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class.  As detailed more fully below, during the Class Period, BNP Paribas S.A. (acting at least through ███████████, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York.  BNP Paribas S.A. often directed and controlled the trading of USD SSA bonds by BNP Paribas Securities Corp. and booked the profit from such trades.

46.     Defendant BNP Paribas Securities Corp. ("BNP Securities") is a Delaware Corporation with its principal place of business in New York, New York.  BNP Securities executed USD SSA bond trades with members of the Class during the Class Period.  As detailed more fully below, during the Class Period, BNP Securities directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York, including by serving as a trading broker. BNP Securities often purposely executed USD SSA bond trades in the United States at the direction and with the knowledge and consent of BNP Paribas S.A.

47.     Defendants BNP Paribas S.A. and BNP Securities are collectively referred to as "BNP Paribas" in this Complaint.

---

[11]  *See* BNP Paribas, *Registration Document and Annual Financial Report 2016*, at 13 (2017).

[12]  *Id*. at 538.

48.     BNP Paribas regularly transacts business in and has substantial contacts with New York, New York.  As discussed above, BNP Paribas S.A. has a branch office, hundreds of employees, and substantial financial operations in New York, New York.  As also discussed above, BNP Securities has its principal place of business in New York, New York.  In addition, BNP Paribas S.A. and BNP Securities both participated in USD SSA bond trading with members of the Class located in New York, New York during the Class Period.

49.     ***Citi.***  Defendant Citigroup Inc. ("Citigroup") is a Delaware corporation with its principal place of business in New York, New York.  Colluding SSA bond trader Defendant Gary McDonald has been employed by Citigroup since September 2010.  McDonald had a close relationship with several SSA bond traders under investigation by U.S. and European authorities.  Acting through at least McDonald, and likely many other employees, Citigroup priced, promoted, and/or executed USD SSA bond trades with members of the Class during the Class Period.

50.     Defendant Citibank N.A. ("Citibank") is a federally chartered, national banking association with its principal place of business in Sioux Falls, South Dakota, and is a subsidiary of Citigroup.  According to FCA records, colluding SSA bond trader Defendant Gary McDonald was registered as an adviser to perform controlled functions or otherwise act on Citibank's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class.  As detailed more fully below, during the Class Period, Citibank (acting at least through McDonald, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York.

51.     Defendant Citigroup Global Markets Inc. ("CGMI") is a New York corporation with its principal place of business in New York, New York.  CGMI is an indirect, wholly owned subsidiary of Citigroup.  CGMI executed USD SSA bond trades with Plaintiff Iron Workers and other members of the Class during the Class Period.  As detailed more fully below, during the Class Period, CGMI directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York, including by serving as a trading broker.  CGMI often purposely executed USD SSA bond trades at the direction and with the knowledge and consent of Citigroup Global Markets Limited.

52.     Defendant Citigroup Global Markets Limited ("CGML") is a U.K.-registered private limited company with its principal place of business in London, United Kingdom.  CGML is an indirect, wholly owned subsidiary of Defendant Citigroup.  CGML has at least one employee based in New York and doing business on its behalf.  According to FCA records, colluding SSA bond trader Defendant Gary McDonald was registered as an adviser to perform controlled functions or otherwise act on CGML's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class.  As detailed more fully below, during the Class Period, CGML (acting at least through McDonald, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York.  CGML often directed and controlled the trading of USD SSA bonds by CGMI and booked the profit from such trades.

53.     Defendants Citigroup, Citibank, CGMI, and CGML are collectively referred to as "Citi" in this Complaint.

20

54.     Citi regularly transacts business in and has substantial contacts with New York, New York.  As discussed above, Citigroup, Citibank, and CGMI each have their principal place of business in New York, New York.  In addition, Citigroup, Citibank, CGMI, and CGML each participated in USD SSA bond trading with members of the Class located in New York, New York during the Class Period.

55.     ***Crédit Agricole.***  Defendant Crédit Agricole Corporate and Investment Bank ("Crédit Agricole") is a bank organized and existing under the laws of France with its principal place of business in Paris, France.  Crédit Agricole has two branch locations in the United States, including one branch located in New York.  Crédit Agricole is registered with the NYDFS to do business in New York, which accounts for the largest share of its U.S.-based employees.  In 2016, Crédit Agricole recognized €939 million ($988 million) in revenue from its operations in the United States.  Crédit Agricole operates its parent's corporate and investment banking business line, which Crédit Agricole S.A. has touted as "the strategic partner of its customers, corporates, and financial institutions, in France and internationally, thanks to its network in the main countries in Europe, Americas, Asia-Pacific and Middle East."[13]

56.     According to FCA records, colluding SSA bond traders ███████, Amandeep Singh Manku, and ████████ were registered as advisers to perform controlled functions or otherwise act on Crédit Agricole's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class.  As detailed more fully below, during the Class Period, Crédit Agricole (acting at least through ██, Manku, and ████, but likely many additional employees) directed its USD SSA bond trading activities

---

[13]  *See* Crédit Agricole S.A.,  *Annual Financial Report Registration Document 2015*, at 23 (2016).

to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York.

57.     Crédit Agricole regularly transacts business in and has substantial contacts with New York, New York.  As discussed above, Crédit Agricole has a branch located in New York, New York, is registered with the NYDFS to do business in New York, and has the majority of its U.S. employees located in New York, New York.  In addition, Crédit Agricole participated in USD SSA bond trading with members of the Class located in New York, New York during the Class Period.

58.     ***Credit Suisse.***  Defendant Credit Suisse AG ("CSAG") is a bank organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland.  CSAG is the principal operating subsidiary of Credit Suisse Group AG.  In their 2016 Annual Report, Credit Suisse Group AG and CSAG listed their main office in the Americas as being in New York City.[14]  CSAG has direct and indirect subsidiaries in the United States, including Credit Suisse Holdings (USA), its U.S. holding company.  In 2016, all 105 of CSAG's U.S.-based employees were located in New York.

59.     According to FCA records, colluding SSA bond trader Defendant Shailen Pau was registered as an adviser to perform controlled functions or otherwise act on CSAG's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class.  CSAG is registered with the NYDFS to do business in New York.  As detailed more fully below, during the Class Period, CSAG (acting at least through Pau, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United

---

[14]     *See* Credit Suisse Group AG & Credit Suisse AG, *Annual Report 2016*, at A-12 (2017).

States, including in New York.  CSAG often directed and controlled the trading of USD SSA bonds by CSSUSA and booked the profit from such trades.

60.     Defendant Credit Suisse Securities (USA) LLC ("CSSUSA") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York, and is a wholly owned subsidiary of Credit Suisse Group AG. According to FCA and FINRA records, colluding SSA bond trader Defendant Shailen Pau was registered as an adviser to perform controlled functions or otherwise act on CSSUSA's behalf during the Class Period, which included pricing, promoting, and executing USD SSA bond trades with members of the Class.  CSSUSA executed USD SSA bond trades with Plaintiffs Iron Workers and Sheet Metal Workers and other members of the Class during the Class Period.  As detailed more fully below, during the Class Period, CSSUSA directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York, including by serving as a trading broker. CSSUSA often purposely executed USD SSA bond trades in the United States at the direction and with the knowledge and consent of CSAG, Credit Suisse Securities (Europe) Ltd., and/or Credit Suisse International.

61.     Defendant Credit Suisse Securities (Europe) Ltd. ("CSSEL") is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is a subsidiary of Credit Suisse Group AG.  Credit Suisse Securities (Europe) Ltd. has 16 subsidiaries in the United States, and approximately 31% of its credit risk exposures were attributable to the United States in 2016.[15]  Colluding SSA bond trader Defendant Shailen Pau was an employee of CSSEL and acted on its behalf to price, promote,

---

[15]  *See* Credit Suisse Securities (Europe) Limited, *Annual Report 2016*, at 12 (2017).

and/or executed USD SSA bond trades with members of the Class during the Class Period.  As detailed more fully below, during the Class Period, CSSEL (acting at least through Pau, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York.  CSSEL often directed and controlled the trading of USD SSA bonds by CSSUSA and booked the profit from such trades.

62.     Defendant Credit Suisse International ("CSI") is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is a subsidiary of Credit Suisse Group AG.  Approximately 32% of its credit risk exposures were attributable to the United States in 2016.[16]  According to FCA records, colluding SSA bond trader Defendant Shailen Pau was registered as an adviser to perform controlled functions or otherwise act on CSI's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class.  As detailed more fully below, during the Class Period, CSI (acting at least through Pau, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York.  CSI often directed and controlled the trading of USD SSA bonds by CSSUSA and booked the profit from such trades.

63.     Defendants CSAG, CSSUSA, CSSEL, and CSI are referenced collectively in this Complaint as "Credit Suisse."

64.     Credit Suisse regularly transacts business in and has substantial contacts with New York, New York.  As discussed above, CSAG maintains its main branch office for the

---

[16] *See* Credit Suisse International, *Annual Report 2016*, at 13 (2017).

Americas in New York, New York, is licensed by the NYDFS to do business in New York, and has over 100 employees located in New York, New York. CSSUSA has its principal place of business in New York, New York. In addition, CSAG, CSUSA, CSSEL, and CSI each participated in USD SSA bond trading with members of the Class located in New York, New York, during the Class Period.

65. **_Deutsche Bank._** Defendant Deutsche Bank AG ("DBAG") is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany. DBAG is licensed by the NYDFS, with a registered address in New York, New York. According to FCA records, colluding SSA bond traders Hiren Gudka and ████ ████ were registered as advisers to perform controlled functions or otherwise act on DBAG's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class. As detailed more fully below, during the Class Period, DBAG (acting at least through Gudka and ████, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York. DBAG often directed and controlled the trading of USD SSA bonds by DBSI and booked the profit from such trades.

66. Defendant Deutsche Bank Securities Inc. ("DBSI") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of DBAG. DBSI executed USD SSA bond trades with members of the Class during the Class Period. As detailed more fully below, during the Class Period, DBSI directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States,

including in New York, including by serving as a trading broker.  DBSI often purposely executed USD SSA bond trades in the United States at the direction and with the knowledge and consent of DBAG.

67.    Defendants DBAG and DBSI are referenced collectively in this Complaint as "Deutsche Bank."

68.    Deutsche Bank regularly transacts business in and has substantial contacts with New York, New York.  As discussed above, DBAG is licensed by the NYDFS with a registered address in New York, New York.  In addition, DBAG has a regional head office, and hundreds of employees located in New York, New York.  As discussed above, DBSI has its principal place of business in New York, New York.  DBAG and DBSI both participated in USD SSA bond trading with members of the Class located in New York, New York during the Class Period.

69.    **HSBC.**  Defendant HSBC Securities (USA) Inc. ("HSBC USA") is a corporation organized under the laws of Delaware with its principal place of business in New York, New York, and is an indirect subsidiary of HSBC Holdings plc.  According to FCA and FINRA records, colluding SSA bond trader Defendant Amandeep Singh Manku was registered as an adviser to perform controlled functions or otherwise act on HSBC USA's behalf during the Class Period, which included pricing, promoting, and executing USD SSA bond trades with members of the Class.  HSBC USA executed USD SSA bond trades with members of the Class during the Class Period.  As detailed more fully below, during the Class Period, HSBC USA directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York, including by serving as a trading broker.  HSBC USA often purposely executed USD SSA bond trades in the United States at the direction and with the knowledge and consent of HSBC Bank plc.

70.     Defendant HSBC Bank plc ("HSBCB") is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is a subsidiary of HSBC Holdings plc.  HSBCB has at least one branch located in New York. HSBCB's trading desk is responsible for market making and the trading of USD SSA bonds. According to FCA records, colluding SSA bond trader Defendant Amandeep Singh Manku was registered as an adviser to perform controlled functions or otherwise act on HSBCB's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class.  As detailed more fully below, during the Class Period, HSBCB (acting at least through Manku, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York.  HSBCB often directed and controlled the trading of USD SSA bonds by HSBC USA and booked the profit from such trades.

71.     Defendants HSBC USA and HSBCB are referenced collectively in this Complaint as "HSBC."  HSBC is considered a top tier dealmaker for SSA bonds, and has taken "the top spot in global SSA volumes" as recently as 2015.  HSBC's team, including salespeople and traders, offered multiple services for SSA bond markets, often from the United States, including in this District.  HSBC regularly transacts business in and has substantial contacts with New York, New York, and HSBC USA has its principal place of business in New York, New York. In addition, HSBC USA and HSBCB both participated in USD SSA bond trading with members of the Class located in New York, New York, during the Class Period.

72.     ***Nomura.***  Defendant Nomura Securities International, Inc. ("NSII") is a corporation organized and existing under the laws of the State of New York, with its principal

place of business in New York, New York.  NSII executed USD SSA bond trades with members

of the Class during the Class Period.  As detailed more fully below, during the Class Period,

NSII directed its USD SSA bond trading activities to the United States, including to New York

in particular, and engaged in these activities in the United States, including in New York,

including by serving as a trading broker.  NSII often purposely executed USD SSA bond trades

in the United States at the direction and with the knowledge and consent of Nomura International

plc.

73.     Defendant Nomura International plc ("NIPLC") is a company organized under the

laws of the United Kingdom with its principal place of business in London, United Kingdom.

NIPLC has at least one employee based in New York and doing business on its behalf.

According to FCA records, colluding SSA bond traders Defendant Bhardeep Heer and ███████

███████ were registered as advisers to perform controlled functions or otherwise act on NIPLC's

behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA

bond trades with members of the Class.  As detailed more fully below, during the Class Period,

NIPLC (acting at least through Heer and █████, but likely many additional employees) directed

its USD SSA bond trading activities to the United States, including to New York in particular,

and engaged in these activities in the United States, including in New York.  NIPLC often

directed and controlled the trading of USD SSA bonds by NSII and booked the profit from such

trades.

74.     Defendants NSII and NIPLC are referenced collectively in this Complaint as

"Nomura."

75.     Nomura regularly transacts business in and has substantial contacts with New

York, New York.  As discussed above, NSII has its principal place of business in New York,

New York, and NSII and NIPLC both participated in USD SSA bond trading with members of the Class located in New York, New York, during the Class Period.

76.     **RBC.**  Defendant Royal Bank of Canada is a Canadian company with its principal place of business in Toronto, Canada.  Royal Bank of Canada has nine offices in the United States, of which four are federally licensed.  Three of Royal Bank of Canada's branches are located in New York.  Each of Royal Bank of Canada's New York locations are licensed and supervised as federal branches by the Office of the Comptroller of the Currency.[17]  Royal Bank of Canada's stock is listed on the New York Stock Exchange, and at least three members of Royal Bank of Canada's Board of Directors reside in New York.  Royal Bank of Canada and its subsidiaries employ approximately 8,000 individuals in the United States.  Royal Bank of Canada has reported that its mission in the United States is "to be the preferred partner to corporate, institutional and high net worth clients and their businesses," and in 2016, 22% of Royal Bank of Canada's revenue came from operations in the United States.[18]

77.     According to FCA records, colluding SSA bond traders Defendant Shailen Pau and ▉▉▉▉▉▉ were registered as advisers to perform controlled functions or otherwise act on Royal Bank of Canada's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class.  As detailed more fully below, during the Class Period, Royal Bank of Canada (acting at least through Pau and ▉▉▉, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United

---

[17]  Royal Bank of Canada, *Form 40-F*, at 7 (Nov. 30, 2016).

[18]  Royal Bank of Canada, *Annual Report 2016*, at 1-2 (2016).

States, including in New York. Royal Bank of Canada often directed and controlled the trading of USD SSA bonds by RBC Capital Markets, LLC and booked the profit from such trades.

78.     Defendant RBC Capital Markets, LLC ("RBCCM") (formerly RBC Capital Markets Corp.), is a Minnesota limited liability company with its headquarters in New York, New York. According to FINRA records, colluding SSA bond trader Defendant Shailen Pau acted on RBC Capital Markets Corp.'s behalf (before it was renamed RBCCM) during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class. At all relevant times, RBCCM has been a wholly owned indirect subsidiary of the Royal Bank of Canada. RBCCM executed USD SSA bond trades with Plaintiff Iron Workers and other members of the Class during the Class Period. As detailed more fully below, during the Class Period, RBCCM directed its USD SSA bond trading activities to the United States, including by serving as a trading broker. RBCCM often purposely executed USD SSA bond trades in the United States at the direction and with the knowledge and consent of Royal Bank of Canada and/or RBCEL.

79.     Defendant RBC Europe Limited ("RBCEL") is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is a subsidiary of Royal Bank of Canada. According to FCA records, colluding SSA bond traders Defendant Shailen Pau and ▇▇▇▇▇▇▇ were registered as advisers to perform controlled functions or otherwise act on RBCEL's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class.[19] As detailed more fully below, during the Class Period, RBCEL (acting at least through

---

[19] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Pau and ▮▮▮▮, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York.  RBCEL often directed and controlled the trading of USD SSA bonds by RBCCM and booked the profit from such trades.

80.     Defendants Royal Bank of Canada, RBCCM, and RBCEL are referenced collectively in this Complaint as "RBC."

81.     RBC regularly transacts business in and has substantial contacts with New York, New York.  As discussed above, Royal Bank of Canada has three branches, at least three members of its Board of Directors, and hundreds of employees located in New York.  RBCCM has its headquarters in New York, New York.  In addition, Royal Bank of Canada, RBCCM, and RBCEL each participated in USD SSA bond trading with members of the Class located in New York, New York during the Class Period.

82.     ***TD Bank.***  Defendant The Toronto-Dominion Bank is a corporation organized and existing under the laws of Canada, with its headquarters in Toronto, Canada.  The Toronto-Dominion Bank has two locations in the United States, one of which is in New York.  In 2016, The Toronto-Dominion Bank reported total revenue from U.S. operations of C\$12.217 billion (\$10.02 billion), which represented 36% of the company's total revenue for the year.[20]  The Toronto-Dominion Bank is listed on the New York Stock Exchange, and at least one member of its Board of Directors resides in New York.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Future discovery will likely yield substantial additional evidence of RBC's role in the conspiracy.

[20] The Toronto-Dominion Bank, *Annual Report 2016*, at 192 (2017).

83.     According to FCA records, colluding SSA bond trader Defendant Gary McDonald was registered as an adviser to perform controlled functions or otherwise act on The Toronto-Dominion Bank's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class.  As detailed more fully below, during the Class Period, The Toronto-Dominion Bank (acting at least through McDonald, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York.  The Toronto-Dominion Bank often directed and controlled the trading of USD SSA bonds by TD Securities (USA) LLC and booked the profit from such trades.

84.     Defendant TD Securities Limited ("TDSL") is a company organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom, and is an indirect subsidiary of The Toronto-Dominion Bank.  TDSL has branches in New York and Texas.  According to FCA records, colluding SSA bond trader Defendant Gary McDonald was registered as an adviser to perform controlled functions or otherwise act on TDSL's behalf during the Class Period, which included pricing, promoting, and/or executing USD SSA bond trades with members of the Class.  As detailed more fully below, during the Class Period, TDSL (acting at least through McDonald, but likely many additional employees) directed its USD SSA bond trading activities to the United States, including to New York in particular, and engaged in these activities in the United States, including in New York, including by serving as a trading broker.  TDSL often directed and controlled the trading of USD SSA bonds by TD Securities (USA) LLC and booked the profit from such trades.

85.     Defendant TD Securities (USA) LLC ("TDS USA") is a Delaware limited liability company with its principal place of business in New York, New York, and is an indirect

subsidiary of The Toronto-Dominion Bank. TDS USA executed USD SSA bond trades with Plaintiff Iron Workers and other members of the Class during the Class Period. TDS USA often purposely executed USD SSA bond trades in the United States at the direction and with the knowledge and consent of The Toronto-Dominion Bank and/or TDSL.

86.     Defendants The Toronto-Dominion Bank, TDSL, and TDS USA are referenced collectively in this Complaint as "TD Bank."

87.     TD Bank regularly transacts business in and has substantial contacts with New York, New York. As discussed above, The Toronto-Dominion Bank has a branch and at least one member of its board of directors located in New York, New York, and is listed on the New York Stock Exchange. TDS USA has its principal place of business in New York, New York. In addition, The Toronto-Dominion Bank, TDSL, and TDS USA each participated in USD SSA bond trading with members of the Class located in New York, New York, during the Class Period.

### 2.     *Individual Defendants*

88.     Defendant Hiren Gudka ("Gudka") is an individual residing in Middlesex, United Kingdom. During the Class Period, Gudka was an SSA bond trader employed by or acting on behalf of Defendants Bank of America (BAMLIL, BANA, and MLI) and Deutsche Bank (Deutsche Bank AG). ███████████████████████████████

███████████████████████████████████████████

███████████████ ████████████████████████████

██████████████████████████████████████████████

█████████

89.     ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████  ████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████  As noted above, Gudka is under

investigation by the DOJ concerning his SSA bond trading activities.

90.     Defendant Bhardeep Singh Heer ("Heer") is an individual residing in Essex,

United Kingdom.  During the Class Period, Heer was an SSA bond trader employed by Nomura

(Nomura International plc).  As discussed more fully below, during the Class Period, Heer

directed his USD SSA bond trading activities to the United States and New York in particular.

On multiple occasions during the Class Period, Heer traveled to New York to visit with his New

York accounts, promote his USD SSA bond trading services, and maintain relationships with his

New York-based customers for USD SSA bonds.  He promoted and priced USD SSA bonds to

and for U.S.-based investors and engaged in trades of USD SSA bonds with members of the

Class in the United States and New York at artificial prices due to the conspiracy.

91.     Defendant Amandeep Singh Manku ("Manku") is an individual residing in Essex,

United Kingdom.  During the Class Period, Manku was an SSA bond trader employed by or

acting on behalf of Bank of America (BAMLIL, BANA, MLI), Crédit Agricole, and HSBC

(HSBC USA, HSBCB).  ██████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████ Manku was previously a

broker registered with FINRA (CRD #4730575). ████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████ As noted above, Manku is under investigation by the DOJ concerning his SSA bond

trading activities.

92.     Defendant Gary McDonald ("McDonald") is an individual residing in London,

United Kingdom.  During the Class Period, McDonald was an SSA bond trader employed by or

acting on behalf of Bank of America (BAMLIL, BANA), Citi (CGML, Citibank), and TD Bank

(TDSL, The Toronto-Dominion Bank), and had close ties to Gudka.  During the Class Period,

McDonald directed his USD SSA bond trading activities to the United States and New York. ██

██████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

93.     Defendant Shailen Pau ("Pau") is an individual residing in London, United

Kingdom.  During the Class Period, Pau was an SSA bond trader employed by or acting on

behalf of RBC (Royal Bank of Canada, RBC, RBCCM), Credit Suisse (CSAG, CSI, CSSEL,

CSSUSA) and Crédit Agricole. ████████████████████████████████

██████████████████████████████████████████████████

On multiple occasions during the Class Period, Pau traveled to New York to visit with his New

York accounts, promote his USD SSA bond trading services, and maintain relationships with his New York-based customers for USD SSA bonds. He promoted and priced USD SSA bonds to and for U.S.-based investors and engaged in trades of USD SSA bonds with members of the Class in the United States and New York at artificial prices due to the conspiracy.

94. Pau was previously a broker registered with FINRA (CRD #4439683). Pau worked with his New York-based sales affiliates to generate business in the USD SSA bond market, worked directly with a New York fund, and traveled to New York for business purposes.



**BACKGROUND FACTUAL ALLEGATIONS**

A. **The SSA Bond Market**

95. The SSA bond market occupies a "segment of the broader bond market, sitting between sovereign government issuers on the one hand and private credit issuers on the other."[21] SSA bonds are issued by supranational organizations, sovereign and sub-sovereign entities, and quasi-governmental agencies, all of which are generally mandated with social or economic public policy initiatives, such as infrastructure development, economic stimulus, or export acceleration. Due to their special status conferred by law, or an explicit or implicit guaranty by

---

[21] Rabobank, *SSA Market Primer*, at 1 (Sep. 12, 2014).

one or more governments to back them, SSA bonds are generally regarded as highly secure investments.

96.     *Supranational organizations*:  Supranational bond issuers are large, multilateral institutions with shareholders from several countries and global economic mandates.  "The original creation of such institutions was generally the result of a perceived market failure, where suitable funding sources were unavailable or unreliable, thus creating the need for an alternative source of secure funding."[22]  Supranationals are vehicles for multiple states or shareholders from different countries to pool their resources to direct to particular projects or countries.  They can be global, continental or regional in their focus.  Examples of supranationals include the International Bank for Reconstruction and Development ("IBRD") and the International Finance Corporation ("IFC") of the World Bank Group; the European Investment Bank ("EIB"); and the African and Asian Development Banks ("AfDB" and "ASIA," respectively).

97.     *Sovereign and sub-sovereign borrowers*:  Sovereign bond issuers are sovereign governments, such as the Federal Republic of Germany, the Kingdom of Spain, and the Government of Canada, which issue debt in currencies other than their local currency.[23]  The category of "sovereign" issuers also includes sub-sovereign bond issuers, which are state-level entities sitting at least one level below a sovereign government.  Examples of sub-sovereign issuers include Germany's states (Länder) and Canada's provinces.

98.     *Agency borrowers*:  Agency bond issuers include subdivisions of a sovereign state or other institutions that perform tasks on behalf of a governing sovereign, such as Germany's Kreditanstalt für Wiederaufbau ("KFW") (a government-owned investment bank), France's

---

[22]   *Id.* at 2.

[23]   Government debt issued in a sovereign's domestic currency, such as U.S. Treasury bonds or U.K. gilts, are not considered part of the SSA bond market.

Societe de Financement de l'Economie Francaise ("SFEFR") (a refinancing vehicle for French banks), Caisse d'Amortissement de la Dette Sociale ("CADES") (an administrative public agency under the authority of the French government that provides accounting and financial information for financial markets, as well as issues inflation-linked bonds, among other things), and Spain's Instituto de Credito Oficial ("ICO") (a corporate state-owned entity with its own legal status, assets and independent management that enters into debts and obligations with the unconditional guarantee of the Spanish state).  Agencies include public banks, workout banks, infrastructure development bodies, export financiers, and social security facilities.

99.     SSA bond issuers issue bonds on a regular basis to raise capital needed to fund their global, continental, and regional projects and development programs.  During the Class Period, a handful of bond issuers, for which Defendant Dealers often served as underwriters, represented about 40% of the total SSA issuance market.  *Each* of these issuers were discussed by the conspirators in chats or phone calls reviewed by Plaintiffs:

- KFW – about 12% of SSA bond issues

- EIB – about 10% of SSA bond issues

- IBRD – about 8% of SSA bond issues

- CADES – about 4% of SSA bond issues

- Bank Nederlandse Gemeenten ("BNG") – about 4% of SSA bond issues

100.     The United States is a shareholder in a number of supranational issuers of SSA bonds, including the IBRD.  The principle terms of the articles of these institutions are incorporated into U.S. federal law and enforceable as any other federal statute.  These supranational issuers may be sued in U.S. courts if they default on a payment to investors.  The

supranationals issuers of which the United States is a member and their implementing statutes are identified below:

| Supranational | Acts of Congress |
|---|---|
| World Bank (IBRD) | Bretton Woods Act, 22 U.S.C. § 286, et. seq. |
| International Finance Corporation (IFC) | International Finance Corporation Act 22 U.S.C. § 282, et. seq. |
| Inter-American Development Bank (IADB) | Inter-American development Act 22 U.S.C. § 283, et. seq. |
| Asian Development Bank (ASIA) | Asian Development Bank Act 22 U.S.C. § 285, et. seq. |
| European Bank of Reconstruction and Development (EBRD) | European Bank for Reconstruction and Development Act 22 U.S.C. § 290l, et. seq. |
| African Development Bank (AfDB) | African Development Bank Act 22 U.S.C. § 290i, et. seq. |

### B.   U.S. Dollar-Denominated SSA Bonds

101.    Issuers determine the currency in which an SSA bond issue will be denominated. The most common options include U.S. dollars, Euros, pounds sterling, and Yen.  The decision as to which currency to use is often driven by the particular market in which the borrower seeks to maintain a portfolio, as well as the foreign exchange rates, and the amount of capital the borrower needs to raise.  Larger SSA issuers may issue bonds in multiple currencies so as to have exposure to a broad array of investors.

102.    This case concerns USD SSA bonds, at least some of which are referred to as "Yankee" bonds," because they are "issued by a foreign entity" but predominantly "issued and traded in the United States and denominated in U.S. dollars."[24]  USD SSA bonds are primarily marketed to investors located in the United States.  Data from MarketAxess, for example, shows that in 2013 over 75% of USD SSA activity came from US-based clients.

---

[24] *Yankee Bond*, INVESTOPEDIA, http://www.investopedia.com/terms/y/yankeebond.asp?optly_redirect=integrated&lgl=myfinance-dynamic-tags (last accessed Oct. 6, 2017).

103.    SSA issuers who wish to target the U.S. bond market specifically will issue bonds in U.S. dollars.  The U.S. bond market is particularly attractive for issuers because many U.S.-based investors—including pension funds, asset managers, insurance companies, university endowments, and state and municipal governments—often hold most of their assets in U.S. dollars and may be mandated to invest a certain percentage of their assets in U.S.-dollar denominated assets.  The U.S. dollar-denominated segment of the SSA bond market is also attractive to investors located in the U.S., particularly those looking for high-quality bonds with higher yields than U.S. Treasuries.

104.    Today, there are over $960 billion in USD SSA bonds outstanding.  Many of these bonds are registered with the Securities and Exchange Commission ("SEC").  Others, as discussed below, are exempt from registration but are still allowed to be marketed and sold in the United States.

105.    USD SSA bonds are typically issued through syndication.  In a syndication, an SSA institution seeking to issue bonds will retain a bank or group of banks to underwrite its bond issue and then sell those bonds to investors.  The syndicate banks serve as the lead managers or "bookrunners" on the deal, and are responsible for finding investors to purchase the bonds at the time of issuance and also for pricing the bonds.  These banks "sound the market" to gauge investor interest, build the order book (*i.e.*, collect orders from investors) for the bonds, and determine the final size of the issue and how many bonds to allocate to each investor.

106.    USD SSA bonds are generally either immediately available to U.S. investors at issuance or very soon thereafter.  Bonds may be sold to U.S. investors without full registration with the SEC if they are issued to U.S. Qualified Institutional Buyers ("QIBs") under Rule 144A.  Bonds issued under Rule 144A format are eligible to be sold to QIBs immediately at issuance,

and are indeed often issued precisely to target U.S. investors.  Bonds issued under Regulation S are restricted from sale to U.S. investors for a short 40-day seasoning period after the initial settlement date of the new bonds, but are often sold to U.S. investors in the secondary market after that period.

107.    Prospectuses for USD SSA bonds often state that the notes, guarantees, or indentures are to be interpreted and/or governed by New York law.  Some USD SSA bond prospectuses also list New York-based registrars, New York underwriters, or agents who maintain offices in New York.  Many prospectuses also require notices on the notes to be published in New York newspapers.

108.    The Depository Trust Company ("DTC"), which is organized under New York law and is headquartered in New York, is a utility for the financial markets.  As can be seen in numerous prospectuses for USD SSA bonds that were transacted between the Class and the Dealer Defendants, DTC often serves as a servicer and custodian (or appoints a custodian) for USD SSA bonds for U.S.-based investors.  Notes are often deposited with or on behalf of DTC, which typically maintains records on the bond offerings.

### C.    Trading Of SSA Bonds

109.    After being issued, SSA bonds can be re-sold and traded by dealers and investors, including by sovereign wealth funds, central banks, pension funds, mutual funds, and hedge funds.  The USD SSA bonds market is an over-the-counter ("OTC") trading market.  Unlike with major exchanges such as the Nasdaq or the New York Stock Exchange, there is no open, anonymous exchange that matches SSA bond buyers and sellers at the best available price.  Rather, investors trade SSA bonds OTC, meaning that investors seeking to trade SSA bonds have no choice but to transact with dealers, such as the Dealer Defendants, who provide liquidity or "make markets" by being willing to buy and sell SSA bonds.

110. Most investor trading of SSA bonds during the Class Period occurred in a so-called "voice" environment, meaning that transactions were executed over the telephone or via electronic chat messaging. In a typical voice trade, an investor contacted one or more dealers' sales desks to request a quote. The sales desk communicated the request to the dealer's trading desk, which returned a quote that the sales desk relayed back to the investor. The process typically took several minutes. The time gap between quote requests and order executions provided Defendants with the lead time they needed to collude in chat rooms, instant messaging services, or over the telephone.

111. To a lesser degree, investors also used electronic trading platforms to execute orders with dealers during the Class Period. Electronic trading platforms include single-dealer systems, as well as multi-dealer platforms, such as MarketAxess, TradeWeb, Bloomberg BondTrader, and MTS Bondvision. Multi-dealer platforms enabled investors to request quotes from multiple dealers simultaneously, using a request for quote ("RFQ") protocol that effectively replicated the limitations of the OTC marketplace.

112. Whether investors transacted by voice or through electronic trading platforms, the essential features of the protocol were the same. Investors had no access to real time market data to validate whether dealers' quotes were competitive. Rather, investors were forced to rely exclusively on dealers such as Defendants for pricing information on SSA bonds. To find out the price of an SSA bond, investors had to reach out to a dealer and request a quote. In the process, the investor would have to reveal their identity, the specific instrument and volume they sought to trade, and often the trade's direction.

113. An investor interested in buying or selling an SSA bond generally contacted a limited number of dealers. OTC markets have high search costs. It is time-consuming and

42

laborious to contact dealers via the telephone or instant message, and dealers usually placed short expiration times on the quotes they provided.  Given these constraints, it was not practical for investors to "shop around" to more than a few dealers at a time.  In addition, seeking quotes from too many dealers increased the number of market-makers that knew of the investor's interest in a given bond.  This increased the chance of "front-running" or other abusive behaviors.  Relatedly, investors in the USD SSA bond market would often engage with the same limited set of dealers repeatedly.

114.    The OTC market in SSA bonds is even more opaque than many other OTC bond markets, such as corporate bonds, because there is no post-trade price transparency.  Indeed, there is often no transparency into trading volumes or prices other than with respect to the initial issuance of the bonds.  Unlike many different markets, in SSA bonds there is limited ability to purchase secondary market trading information.  This significant limitation imposed an asymmetry of information between the dealers and the customers, a situation made worse when firms engage in collusive behavior.

115.    The need for investors to transact with dealers and reveal information surrounding the trade generated a steady flow of market information for Defendants, including a wealth of investor-specific information, such as which bonds an investor held and in what quantity, whether it was an ongoing buyer or seller of certain bonds, and the price levels at which it had traded or was seeking to trade.  The market information dealers collected through the customer inquiry process was a critical component in dealers' analysis of the market.  The information was proprietary, confidential, and extremely valuable.  In a market where dealers competed against each other, no dealer would forfeit its competitive advantage by disclosing such sensitive information to another dealer.

116.     Apart from their activity as market makers, dealers also traded SSA bonds with other dealers to hedge the risk on their books.  Interdealer trades were matched by third parties known as interdealer brokers ("IDBs").  Dealers submitted bid and offer prices to IDBs, which then published those quotes on their various trading platforms, which traders could view from their desks on screens provided by each IDB, or in an aggregated feed on their own in-house screens.  The screens showed live, executable prices, allowing a dealer immediately to enter into a trade at the quoted price without negotiation.  When a bond traded, the price would flash on the screen.  Dealers watched these screens closely, and they treated the prices on IDB screens as a reference point for where to set bond prices in response to investor inquiries.

117.     Unlike in dealer-to-client transactions, where dealers knew the identity of their investor counterparties from the initial requests for quotes, trading through IDBs was supposed to be anonymous.  When trading with other dealers, the parties' identities were supposed to be concealed from one another, even after trade execution.

118.     During the Class Period, the dominant IDBs in the SSA bond market included BGC Partners, GFI Group, ICAP, and Tullett Prebon, among others.

**D.     How SSA Bond Prices Were Quoted**

119.     Dealers typically quoted prices for SSA bonds in basis points as a spread above the yield of the relevant benchmark U.S. Treasury bonds with a similar maturity, with one basis point equal to 1/100th of a percentage point.[25]  Dealers provided both "bid" and "offer" quotes.  The "bid" was the spread above Treasury bonds at which a dealer was willing to buy an SSA bond.  The "offer" was the spread above Treasury bonds at which a dealer was willing to sell an

---

[25]  SSA bonds that had only a short period of time left to maturity would often be traded using the London Interbank Offered Rate ("LIBOR") as a benchmark.  For instance, if a certain bond had only six months left to maturity, there would be no prevailing underlying U.S. Treasury benchmark for such a short period, hence the bond's price would be referenced against, say, the prevailing 3-month U.S. dollar LIBOR rate.

SSA bond.  A dealer "got hit" when someone accepted a dealer's bid, and "got lifted" when someone accepted a dealer's offer.

120.    Investors could request either a one-way quote or a two-way quote from dealers. A one-way quote was either a bid or an offer, depending on the direction of the trade the investor sought to make.  The difference, or margin, between the bid and offer was the "bid-offer spread." A two-way quote consisted of both the bid and offer for a given bond.  A two-way quote was known as the "market" on a bond.

121.    SSA bond yields are inversely related to bond prices:  the higher the spread over Treasury bond yields, the *lower* the price of an SSA bond, and vice versa.  Investors sought to purchase SSA bonds at the highest available offer (*i.e.*, the highest available yield, and thus the lowest price) and to sell them at the lowest available bid (*i.e.*, the lowest available yield, and thus the highest price).  As a consequence, bids were higher than asks for SSA bonds, unlike with instruments for which quotes are provided in terms of dollar prices (rather than yields or yield spreads).

122.    For example, if 30-year U.S. Treasury bonds had a yield of 3.00%, and an SSA bond with a similar maturity last traded at a yield of 3.35%, then the SSA bond was last traded at a spread of 35 basis points of yield above U.S. Treasury bonds.  Asked to provide a one-way quote for such an SSA bond, a dealer may provide an investor with a bid of 36 or "+36," or an offer of 34 or "+34."  Asked to provide a two-way quote, the dealer would provide a "market" of "36/34."

## ALLEGATIONS REGARDING THE CONSPIRACY

123.    The fundamental agreement among Defendants was that they would not compete against each other in the market for USD SSA bonds.  They agreed instead to cooperate to maximize their own profits at the expense of their customers, many of whom they shared in

common (and for whose business they were supposed to be competing).  Defendants'
overarching objective was to ensure that cartel members could transact with investors at prices
that were more favorable for the conspiring dealers—and thus worse for their customers—than
they could have achieved without colluding.

## I.   THE PRIMARY PLAYERS IDENTIFIED TO DATE

124.    From information collected to date, Defendants' conspiracy was carried out by *at
least* the following individuals (and likely more), each of whom had significant responsibilities
for the USD SSA bond trading desk at their respective institutions:

a.     ***Hiren Gudka***:  Gudka worked at Bank of America from at least December
2001 to May 2009, and at Deutsche Bank from July 2009 to April 2014.  In July 2014,
Gudka returned to Bank of America, where he remained until approximately November
2015;

b.     ***Shailen Pau***:  Pau, ███████████████████ worked at RBC,
where he traded bonds from at least December 2001 until May 2009.  In July 2009, Pau
moved to Crédit Agricole, which he left in March 2010.  Around June 2010, Pau joined
Credit Suisse, where he remained until February 2016;

c.     ***Amandeep Singh Manku***:  Manku, ████████████████
███████████████ worked at HSBC from January 2002 to December
2009, when he left for Bank of America.  Manku traded SSA bonds at Bank of America
from January 2010 to October 2012.  In January 2013, Manku joined Crédit Agricole,
where he worked until December 2015;

d.     ***Bhardeep Heer***:  Heer worked at Nomura from January 2005 to March
2016;

    e.    ***Gary McDonald***:  McDonald worked at Bank of America from at least December 2001 to November 2007, ███████████████████████████████ ██████ McDonald then worked at TD Bank from December 2007 to July 2010 and at Citi from September 2010 to March 2016;

    f.    ████████████████████████████████

████████████████

    g.    ████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████

    h.    ██████████████████████████████████

███████████████████████████████

█████████████████████████████████

██████████████

    i.    ███████████████████████████████

████████████████████████████████████████

█████████████████████████████████

    j.    ███████████████████████████████

█████████████████████████████████

██████████████████████████████████

████████████████████████

    k.    ██████████████████████████████████

███████████████████

125.    The chart below depicts the approximate dates that various cartel participants worked at different Dealer Defendants.



126.    As a result of their participation in collusive behavior, each of these individuals has been suspended from further trading and/or fired from their jobs.



127.    ███████████████████████████████████████████

████     But that is not for a substantive reason relating to the cartel's operation.     ████████

████████████████████████████████████████████████

███████████████████████████████████████████     The precise resolution of that issue will be a matter of discovery.

128.    ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████     That clearly did not come into existence overnight.

129.    On such facts, it is reasonable to infer that the conspiracy was in place as early as 2005 (if not earlier) when *eight* of the individual cartel members were employed on the USD SSA trading desks of the Defendant Dealers:  Hiren Gudka and Gary McDonald were working at Bank of America; Shailen Pau was working at RBC; Amandeep Manku was working at HSBC;

Bhardeep Heer was working at Nomura; ███████████████████████████

████████████████████████████████████████████

## II.   DEFENDANTS AGREED NOT TO COMPETE IN THE MARKET FOR SSA BONDS

130.   As noted, Defendants agreed that they would not compete against each other for

the sale of USD SSA bonds to customers. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

131.   ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████

132.   ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████

133.   ████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████

█████████████████████████████

134.   Though the conspiratorial evidence amassed to date could be categorized in any number of ways, and though it all shows essentially the same thing (a horizontal conspiracy not to compete), this ████████████████████████████████

████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

██ █████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

███████████████████████

A.   ██████████████████████████████████

135.   ████████████████████████████████

████████████████████████████████████

██████████████████████████████████



136. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

137. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████
█████████████████████████

138. ████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████
████████████████████████████████████████████

139.

140.

███████████████████████████████████████████

██

141.   ████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

142.   ███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████

143.   ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████



**B.** ██████████████████████████

144. ████████████████████████████

146. ██████████████████████████████████████

147. ████████████████████████████████

148. ████████████████████████████████



149.

150.

---
[26]



151.

152.

153.

154. ████████████████████████████████████

154. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████████████████
████████████████████████████████████
███████████████████████████████████
████████████████████

155. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████
████████████████████████████████████
█████████████████

156. ██████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████

58

157.

158.

███████████████████████████████████

█████████████████████████████████████

████████████████████

159. █████████████████████████████

█████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

160. ████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████

161. ████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████

162.

C.

163.

164.

165.

**D.** ███████████████████████████

166. ████████████████████████████

███████████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████

██████████████████████

167. ████████████████████████

███████████████████████████████████

███████████████████████████████████

168.

169.



170.

171.

172.

173. █████████████████████████████████████████

173. █████████████████████████████████████

174. █████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

**E.**   ████████████████████████████████████

175.   ████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████

176.   ████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████

177.   ████████████████████████████████████████

█████████████████████████████████████████

67

[27]

178.

### III.   DEFENDANTS DIRECTLY FIXED THE PRICE OF USD SSA BONDS

179.    As a corollary to their overarching agreement not to compete in the USD SSA

bond market, Defendants also agreed to collaborate to fix prices in the USD SSA bond market in

more explicit ways.

---

[27]

180. █████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████
████████████████

181. █████████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████

182. █████████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████████████

183. ███████████████████████████████

184. ███████████████████████████████

185. ███████████████████████████████

██████████████████████████████████████████████

████████████████████

186. ████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

187. ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

188. ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

71



189.

190.

191.

192.

193.

194. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

195. ███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

███████

196. ███████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████



197.

198.

199.



200.

201.



202.



203.

204.

205.

███████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████

206.  ███████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

████

207.  ███████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

████████████████

208.  ███████████████████████████

██████████████████████████████████████



209.

210.



211.

212.

213.

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

214.   ███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████

215.   ██████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

216.   ████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

217.

218.

219.

220.

221. ██████████████████████████████████

222. ██████████████████████████████████

223. ██████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

## IV.  **DEFENDANTS EXPLOITED SENSITIVE CUSTOMER INFORMATION**

224.  ████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

████████  In financial markets especially, such information is invaluable.  Investors seek to limit and control the flow of information about their intentions and trading strategies, because they know that dealers can use their information to trade to the dealer's advantage.  Knowledge about an investor's trading position, for example, allows a dealer to assess the investor's eagerness to trade.  If a dealer learns information that shows a customer is especially eager to trade, the dealer can exploit that information by adjusting the price against the customer.

225.  ████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████

████████████████████

226.  Illicit sharing of information among dealers can also thwart a customer's effort to trade on the basis of private information.  For example, if an investor has accumulated a large inventory of $100 million of a security, and then puts an order to purchase an additional $100 million of the security, it is suggestive that the customer has some private information.  If a

dealer learns of how many bonds the customer holds (from a conspirator or otherwise), the dealer can raise the offer quote, thereby reducing the customer's ability to benefit from the trade.

227.    For these and many other reasons, it is well-recognized in the financial literature that the improper sharing of information among dealers regarding customer inventories, trading positions, and strategies causes customers to receive worse terms of trade.

228.    ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

229.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

230.    ████████████████████████████████████
████████████████████████████

231.    █████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

232. ███████████████████████████

████████████████████████████

█████████████████████████████

███████████████████████████

█████████████████████

233. ██████████████████████████

███████████████████████████

██████████████████████████

█████████████████████████████

█████████████████████████████

████████████████████████

████████████████████████

234. ██████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

█████████████████████████████

██████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████

235.  ████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

████████████████

236.  ███████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████

237. 

238.

239.

240. 

241.

242.

243. 

244.

245.

246.

247.

248.

249.

250. ███████████████████████████████████

███████████████████████████████████

███████

251. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████

252. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

253. 

254.

255.

256. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

257. ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

258. 

259.

260.

261.

262.

263.

264.

265.

266.

267.

268. 

269.

270.

271.

272.

273.

274.

275.

276.

277.

278.

279. ████████████████████████████████████

280. ████████████████████████████████████

281. 

282.

283.

284.

285. ████████████████████████████████████

## V.   THE CONSPIRACY OPERATED UNCEASINGLY DURING THE CLASS PERIOD, INFECTING ALL OF THE DEFENDANTS' SSA TRANSACTIONS

### A.   Defendants Communicated In Real Time On An Ongoing Basis

286.   In many antitrust conspiracy cases, the means by which the cartel members conspired are shrouded in secrecy, and plaintiffs must rely on inferences or suggestions about where cartel members may have had the "opportunity" to conspire.[29]  Not here.  ███████████

287.   ████████████████████████████████████

---

[29]   *See, e.g.*, *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 661 (S.D.N.Y. 2016) (explaining that defendants' misconduct occurs in secret in "many and maybe even most antitrust conspiracy cases") (internal parenthetical omitted).



288.

289.

290.

It is only recently, starting in late 2013, that the Dealer Defendants (and other Wall Street banks) could no longer ignore the degree to which traders had used these types of chat rooms to rig in multiple financial markets.  Governmental regulators had discovered multiple cartels, such as in the foreign exchange market, which relied

heavily on these chatrooms.  Starting in late 2013, Deutsche Bank,[30] UBS,[31]  Barclays,[32] and

Citi,[33] finally began to impose increased restrictions on traders using chat rooms (especially with

other banks).



291.

292.

293.

[30]   Gavin Finch & Nicholas Comfort, *JPMorgan, Deutsche Bank Expand Multitrader Chat Room Bans*, BLOOMBERG LAW (Dec. 17, 2013), https://www.bloomberg.com/news/articles/2013-12-17/jpmorgan-said-to-near-ban-on-traders-using-multi-bank-chat-rooms (last accessed Oct. 6, 2017).

[31]   *Trader Chat Rooms Part of Bigger Problem*, FIN. POST (Nov. 28, 2013), http://business.financialpost.com/investing/trader-chat-rooms-part-of-bigger-problem (last accessed Oct. 6, 2017).

[32]   Daniel Schafer, Alice Ross & Philip Stafford, *Banks Ban Traders From Group Chat Rooms*, FIN. TIMES (Nov. 21, 2013), https://www.ft.com/content/68c26cf6-52d5-11e3-a73e-00144feabdc0.

[33]   *Id.*



294.

295.

296.

297. 

298.

**B.    Defendants' Cartel Systematically Harmed Their Customers On Every USD SSA Bond Transaction.**

299.    Defendants' collusion harmed Class Members on USD SSA bond transactions throughout the Class Period.  As specifically defined below, the Class is composed of those investors, including pension funds, university endowment funds, hedge funds, insurance companies, corporate treasuries, fiduciary and depository institutions, small banks, and money managers, who executed USD SSA bond trades with Defendants and their co-conspirators throughout the Class Period, within the flow of U.S. commerce.  Although Defendants' cartel undoubtedly impacted the entire USD SSA bond market by fundamentally disrupting competition in the market, this case is limited to those investors who had the misfortune to trade directly with the cartel members—that is, the Dealer Defendants.

300.    By colluding, Defendants were able to transact with their investor clients at prices that were more favorable for the conspiring dealer—and thus worse for the customer—than Defendants could have achieved in the absence of the collusion.  That was, after all, the very reason why they conspired.  Defendants made the risky decision to conspire unlawfully day after day because it allowed them to make more money from customer transactions than they could have made without colluding. ████████████████████████

████████████████████████████████████████

████████████████████████████████████

301.    As noted above, the nation's economy relies on free market competition because it is a basic premise of economics that competition results in better prices and higher product quality for consumers.[34]  This basic economic premise holds true in financial markets.  It is well settled that in financial markets, like the USD SSA bond market, investors suffer harm in the form of worse prices when dealers do not compete.

302.    Most fundamentally, Defendants' collusion harmed their customers because it greatly diminished the amount of dealer competition in the market.  That is, Defendants' conspiracy significantly reduced how many trading desks were competing in the market for customer business.  As shown above, rather than operating as distinct dealers in the market vigorously competing for customer business, as they were expected to do, the cartel members scrupulously avoided competing with each other and effectively operated as a single trading desk.  Dealer competition in the USD SSA bond market was significantly reduced as a result.

303.    The academic literature has long established that more competition among dealers reduces spreads and prices paid by investors in financial markets.  Conversely, less competition

---

[34]  *See* note 1, *supra*.

among dealers *increases* spreads and prices.  As Professor Darrell Duffie, who is one of the world's leading experts on OTC market structure, explained as part of the Thirteenth Baffi Lecture presented at the Banca d'Italia in Rome, on September 15, 2017:  "Well-established economic theory implies that markets are more efficient and investors receive better pricing when more market participants compete for trade at the same venue.  Most obviously, from the viewpoint of a quote seeker, the best price from among a small set of bidders is not as attractive as the best price available from an enlarged set of bidders."[35]

304.    Professor Duffie highlighted, for example, a study of bond trading platforms by Terry Hendershott and Ananth Madhavan which found empirical support for the theoretically anticipated relationship between the number dealers providing quotes on a corporate bond trading platform and the expected cost to the quote requestor (*i.e.*, the investor), controlling for other factors.  Their analysis concludes that expected trading costs for investors decline rapidly with the number of dealers providing quotes, as displayed in the following figure:[36]

---

[35]   Darrell Duffie, *Bank Debt Overhang and Financial Market Liquidity*, THIRTEENTH PAOLO BAFFI LECTURE, 67 (2017) ("Baffi Lecture").  The Bank of Italy's Paolo Baffi Lecture is one of the most prestigious money and finance lecture series in the world.  The Baffi Lecture is devoted to promoting scholarly writings that advance theoretical and applied analysis in the field of economics.  The lecturers, selected by a committee of distinguished economists and civil servants, are preeminent scholars and leaders in their field that offer original contributions to a wide variety of issues related to money and finance.

[36]   *Id.; see also* Terrence Hendershott and Ananth Madhavan, *Click or Call? Auction Versus Search in the Over-the-Counter Market*, 1 JOURNAL OF FINANCE 419, 437 (2015).  The authors document that this decline in trading costs as the number of responding dealers increase remains statistically strong even after controlling for differences in bond and trade characteristics (Table VIII at 442).



Figure 4.2.2: How transaction costs vary with the number of dealers responding to a request for quotes. Source: Hendershott and Madhavan (2015). The figure shows costs in basis points of notional amount, by the number of dealer responses in all electronic auctions on Market Axess in the sample with at least one response, broken down for investment-grade (IG) and high-yield (HY) bonds. Data are from January 2010 through April 2011, excluding all interdealer trades.

305.    Note how this figure demosntrates that costs decrease every time an additional dealer responds to a request for quotes, which illustrates that removing even a *single dealer* from a market is expected to reduce competition and increase prices.  Here, the cartel did far more than remove a single dealer from the market.  At times, the cartel effectively converted as many as nine different dealers into a single dealer (and thus effectively removed eight dealers from the market).[37]

---

[37]    According to FCA records, for example, in December 2009, individual cartel members were working at least nine colluding banks, namely Bank of America ████, Barclays █████, BNP Paribas ██████, Citibank ████, Crédit Agricole (Pau), Deutsche Bank (Gudka and █████, HSBC (Manku), Nomura (Heer and █████), and TD Bank (McDonald).

306.     In another recently published research paper, Yee Cheng Loon and Ken Zhong reach a similar conclusion, by demonstrating that the greater the number of dealers competing to make markets for credit default swaps, the lower are the effective bid-ask spreads—and therefore the more favorable are the transaction prices—realized by customers for those swaps, again controlling for other factors.   As the authors conclude: "*Increased competition among dealers for order flow reduces bid-ask spreads and improves liquidity.*"[38]   A wealth of academic literature has reached this identical conclusion—that competition among dealers reduces spreads paid by investors in OTC markets and otherwise.[39]

307.     As Professor Duffie explains, when an OTC dealer perceives that an investor lacks attractive outside options to obtain quotes, "the dealer can widen its bid-ask spread accordingly."[40]   In this case, the cartel members *knew* that they had dramatically reduced (if not eliminated) attractive outside options for potential investors to obtain competitive quotes, so they were able to quote wider bid-ask spreads to investors than if they had not conspired and were instead facing competition from all of the other dealers in the market.   Numerous concrete examples of how Class Members suffered from this reduction of competition are provided above—but these are just examples.   As the literature demonstrates, the significant reduction in

---

[38]   Yee Cheng Loon and Ken Zhong, *Does Dodd-Frank affect OTC transaction costs and liquidity? Evidence from the real-time CDS trade reports*, 119 JOURNAL OF FINANCIAL ECONOMICS 645, 651 (2016).

[39]   *See, e.g.*, Yakov Amihud and Haim Mendelson, *Asset pricing and the bid-ask spread*, 17 JOURNAL OF FINANCIAL ECONOMICS 223, 224 (1986) (noting that "the relative spread on stocks has been found to be negatively correlated with liquidity characteristics such as the trading volume, the number of shareholders, the number of market makers trading the stock and the stock price continuity"); Seha M. Tinic and Richard R. West, *Competition and the pricing of dealer service in the over-the-counter stock market*, 7 JOURNAL OF FINANCIAL AND QUANTITATIVE ANALYSIS 1707, 1709 (1972) ("In brief, our principal conclusion is that increases in the amount of interdealer competition in this [OTC] market tend to reduce the price of dealer services (reduce spreads) and thus, tend to increase the marketability of issues."); Oleg Bondarenko, *Competing market makers, liquidity provision, and bid–ask spreads*, 4 JOURNAL OF FINANCIAL MARKETS 269, 273 (2001) (finding that "the bid-ask spreads resulting from non-cooperative but imperfect competition will usually be much narrower than those resulting from explicit collusion, in which market makers cooperate to fix prices").

[40]   Baffi Lecture, at 64.

competition caused by Defendants' conspiracy would be expected, theoretically and empirically, to impact prices paid by their customers across the board.

308.    Moreover, as the above evidence demonstrates, Defendants were not content to rely on the overall diminishment of competition in the market to tilt the market in their favor (and against their customers).  Whenever they saw a specific opportunity to collaborate to make prices even better for them (and worse for their customers) they sprung into action.  They agreed on specific prices to quote; they coordinated on how to present prices to investors to trick them into believing that non-competitive prices were actually competitive; and they abstained from quoting or withdrew bids (or offers) so a customer would have no choice but to accept a less favorable price.  In short, they used virtually all of the techniques that fall within the rubric of *per se* unlawful "price fixing."  These techniques are *per se* unlawful because they are well known methods of artificially increasing prices when selling (or lowering prices when buying), which is precisely what Defendants did here.

309.    Defendants' ability to charge non-competitive prices to their customers by coordinating on certain transactions also had effects that extended beyond any individual transaction.  It is well understood in the finance literature, for example, that market participants use information gained from recent trade history to update their beliefs regarding the value of a security, causing current prices to propagate into future trade prices.[41]  As a result, the harm suffered by investors who traded with Defendants at an inflated price because of an instance of overt price fixing was not isolated to the worse execution price paid by the customer in the single transaction itself.  The artificially high price (if the customer purchased) or its artificially low sell

---

[41]    *See e.g.*, Joel Hasbrouck, *Measuring the Information Content of Stock Trades*, 1 JOURNAL OF FINANCE, 179, 179 (1991) ( "Central to the analysis of market microstructure is the notion that in a market with asymmetrically informed agents, trades convey information and therefore cause a persistent impact on the security price.").

price (if the customer sold) also affected the prices at which the investor would engage in subsequent trades, because the price in the rigged transaction served as a reference point for the pricing of subsequent transactions.

310.     Defendants were very significant players in the overall USD SSA bond market, and they gained even more market power by effectively becoming one unified entity.  Although reliable market share figures are not readily available, as a result of the opacity of this OTC market, Defendants comprised a significant share of the market.  Gudka, one of the cartel's principal ringleaders, was known himself to be one of the leading players in the market as a whole.  He was known as "a big name" in SSA bond trading, and ran one of the largest SSA trading books in the market.[42]  That is in part why Gudka's departure from Deutsche Bank to Bank of America in 2014 was deemed a "blow" to Deutsche Bank, which was deemed to have lost an "experienced" professional with "such strong client relationships."[43]  The other traders also commanded sizeable trading desks.  They bragged internally that other dealers were concerned that the conspirators had "cornered the market between us."

311.



---

[42]   Craig McGlashan, et al., *'Forced competition' to generate trading flow under fire for fomenting SSA scandal*, GLOBAL CAPITAL (Jan. 7, 2016), http://www.globalcapital.com/article/vz0phyg7g5jt/39forced-competition39-to-generate-trading-flow-under-fire-for-fomenting-ssa-scandal (last visited Oct. 6, 2017).

[43]   Helene Durand, *DB Departures Deal Blow to Flagging SSA Franchise,* REUTERS (Apr. 4, 2014), http://www.reuters.com/article/bonds-public-sector/db-departures-deal-blow-to-flagging-ssa-franchise-idUSL5N0MV4BM20140404 (last visited Oct. 6, 2017).

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

312.     The calculation of Class Member damages in this case will necessarily be informed by discovery and expert analysis.  Well-known methods exist for estimating the extent to which prices are affected by collusion of the type that occurred here.  These methods will be available in this case.  For example, damages can potentially be quantified by comparing the bid-ask spreads paid by Class Members in the actual world (the world affected by the conspiracy) to the spreads paid on comparable instruments after the period of collusion ended, while controlling for other (non-collusive) factors which can also impact bid-ask spreads.  The research literature on bonds and other OTC financial instruments provides guidance on other factors that can impact spreads and how to control for these factors in a statistical model so as to isolate the reduction in bid-ask spreads that occurred at the end of the collusion, thus isolating the impact of the collusion on the transactions prices of SSA bonds.[44]  As another example of analysis that could be used applied on a classwide basis, the profit margins and spreads on similar types of bonds or investment vehicles in a competitive market with a similar number of dealers over a similar period could be used to establish a benchmark of what spreads and profit margins should look like.

---

[44]     *See, e.g.,* Thomas Copeland and Dan Galai, *Information Effects on the Bid-Ask Spread*, 38 JOURNAL OF FINANCE 1457, 1457-68 (1983); Richard Roll, *A Simple Implicit Measure of the Effective Bid-Ask Spread in an Efficient Market*, 39 JOURNAL OF FINANCE 1127, 1127-39 (1994); Amy K. Edwards, Lawrence E. Harris and Michael S. Piwowar, *Corporate Bond Market Transaction Costs and Transparency*, 62 JOURNAL OF FINANCE 1421, 1421-51 (2007); Hendrik Bessembinder, William Maxwell, and Kumar Venkataraman, *Market Transparency, Liquidity Externalities, and Institutional Trading Costs in Corporate Bonds*, 82 JOURNAL OF FINANCIAL ECONOMICS 251, 251-88 (2006); Sugato Chakravarty and Asani Sarkar, *Trading Costs in Three U.S. Bond Markets*, 13 JOURNAL OF FIXED INCOME 39, 39-48 (2003).

## VI.   GOVERNMENT INVESTIGATIONS INTO DEFENDANTS' MANIPULATION OF THE SSA BOND MARKET

313.    Given the extensive evidence that exists of Defendants' collusion, it is unsurprising that they now face serious governmental investigations into their misconduct. These investigations were spearheaded by the U.S. Department of Justice ("DOJ"), based on information it received, and have since been joined by regulators from the U.K. and the European Commission and possibly others.

314.    Beginning in late 2015, as a consequence of their participation in the conspiracy, all or nearly all of the key participants in the cartel were removed from their positions on the SSA bond trading desks at the Dealer Defendants:

a.    In late 2015, Bank of America suspended or terminated Gudka.  Gudka has been inactive on the FCA register for traders since the start of November 2015.

b.    In late 2015 or early 2016, Credit Suisse suspended or terminated Pau. Pau has been inactive on the FCA register for traders since February 2016.

c.    In late 2015 or early 2016, Crédit Agricole suspended or terminated Manku.  Manku has been inactive on the FCA register for traders since the start of December 2015.  ███████████████████████████████

████████████████████████████████

d.    In late 2015 or early 2016, Nomura suspended Heer, who was removed from Nomura's trading desk and moved to a back-office role indefinitely.  He has been inactive on the FCA register for traders since March 2016.[45]

---

[45] ████████████ and Gary McDonald have both been inactive on the FCA register for traders since March 2016.

315.    In December 2015, came the first news reports that the DOJ had launched an investigation into collusion in the SSA market.[46]

316.    A month later, on January 6, 2016, the *Financial Times* and *International Financing Review* confirmed the DOJ's probe, the latter indicating that the DOJ was looking at "possible manipulation of bond prices."[47]

317.    According to the *International Financing Review* report, the DOJ was "investigating allegations that SSA traders at different banks agreed [on] prices and shared information on certain US dollar bonds in chat rooms they established for the purpose."[48] According to a *Bloomberg* report, "Prosecutors have obtained transcripts of online chat-room conversations indicating possible misconduct and have contacted banks, asking them to delve further into the behavior."[49]  The DOJ reportedly had sent information requests to Bank of America, Crédit Agricole, Credit Suisse, and Nomura, among others.[50]

318.    On January 20, 2016, *Bloomberg* reported that the U.K. Financial Conduct Authority, which previously had been assisting the DOJ, had started its own investigation into

---

[46]    David McLaughlin & Tom Schoenberg, *U.S. Said to Probe Possible Rigging in Agency Bond Market*, BLOOMBERG (Dec. 9, 2015), http://www.bloomberg.com/news/articles/2015-12-09/u-s-said-to-probe-possible-rigging-in-agency-bond-market (last visited Oct. 6, 2017).

[47]    Abhinav Ramnarayan & Helene Durand, *EXCLUSIVE – DoJ Investigates Bond Traders Over Market-Rigging*, INT'L FIN. REV. (Jan. 6, 2016) ("Ramnarayan & Durand"), www.ifre.com/exclusive-doj-investigates-bond-traders-over-market-rigging/21230385.article  (last visited Oct. 6, 2017).

[48]    *Id.*

[49]    David McLaughlin & Tom Schoenberg, *U.S. Said to Probe Possible Rigging in Agency Bond Market*, BLOOMBERG (Dec. 9, 2015), http://www.bloomberg.com/news/articles/2015-12-09/u-s-said-to-probe-possible-rigging-in-agency-bond-market (last visited Oct. 6, 2017).

[50]    Craig McGlashan, Owen Sanderson, Ralph Sinclair & Toby Fildes, *Scandal Rocks SSA Market*, GLOBAL CAP. (Jan. 7, 2016), www.globalcapital.com/article/vydmn22frhms/trading-scandal-rocks-ssa-market (last visited Oct. 6, 2017).

collusion in the SSA market.[51]  On February 9, 2016, the *Financial Times* reported that in addition to the DOJ and Financial Conduct Authority, the European Commission had also opened a cartel investigation into possible collusion in the SSA market.[52]

319.    Citigroup has noted in its filings that its SSA bond trading activities were under investigation.[53]  Credit Suisse has also "received information requests from regulators about the agency bond market."[54]  Similarly, Crédit Agricole disclosed in its annual financial report that "[s]everal regulators have demanded information" on its SSA bonds business, and that Crédit Agricole has been cooperating with the authorities.[55]

320.    In February 2017, *Bloomberg* reported that the DOJ and FCA investigations "are escalating as authorities seek to interview traders."[56]  According to Bloomberg, U.S. prosecutors "obtained transcripts of online chat-room conversations indicating possible misconduct" and are pressing forward with a criminal probe.[57]

---

[51]    Suzi Ring & Tom Schoenberg, *U.K. Said to Open Probe Into Rigging of Aency-Bonds Market*, BLOOMBERG (Jan. 20, 2017), https://www.bloomberg.com/news/articles/2016-01-20/agency-bond-rigging-probe-said-to-expand-as-u-k-opens-inquiry-ijmri0ov (last visited Oct. 6, 2017).

[52]    Jim Brunsden, *EU Probes Suspected Rigging of $1.5tn Debt Market*, FIN. TIMES (Feb. 9, 2016), https://next.ft.com/content/04befd8a-cf35-11e5-92a1-c5e23ef99c77 (last visited Oct. 6, 2017).

[53]    CITIGROUP INC., FORM 10-K (FISCAL YEAR 2015) 296 (2016) ("Government and regulatory agencies in the U.S. and in other jurisdictions are conducting investigations or making inquiries regarding Citigroup's sales and trading activities in connection with sovereign securities.  Citigroup is fully cooperating with these investigations and inquiries.").

[54]    Suzi Ring and Tom Schoenberg, *Agency Bond Traders Said to Face Questions in Rigging Probe*, BLOOMBERG (Feb. 1, 2017), https://www.bloomberg.com/news/articles/2017-02-01/agency-bond-traders-said-to-face-questions-in-rigging-probe-iyn8sg38 (last visited Oct. 6, 2017).

[55]    CRÉDIT AGRICOLE, ANNUAL FINANCIAL REPORT 2015:  REGISTRATION DOCUMENT 397 (2015).

[56]    Suzi Ring and Tom Schoenberg, *Agency Bond Traders Said to Face Questions in Rigging Probe*, BLOOMBERG (Feb. 1, 2017), https://www.bloomberg.com/news/articles/2017-02-01/agency-bond-traders-said-to-face-questions-in-rigging-probe-iyn8sg38 (last visited Oct. 6, 2017).

[57]    *Id.*

## VII.  DEFENDANTS' CARTEL WAS DIRECTED AT INVESTORS IN THE U.S. AND IN NEW YORK

### A.  Defendants' Conspiracy Deliberately Targeted The United States And New York

321.    The fact that the DOJ has taken the worldwide lead on the investigation into Defendants' cartel underscores that Defendants deliberately directed their conspiracy to the United States.  Defendants did so in part because U.S.-based investors are most likely to have U.S. dollars available to buy, hold, and trade USD SSA bonds.  Defendants continuously and deliberately exploited the U.S. market for USD SSA bonds and U.S. investors.  Defendants also knew that the brunt of the harm caused by their scheme would be felt by investors in the United States.

322.    Individual investors, pension funds, mutual funds, and domestic banks are among the entities that purchase USD SSA bonds (some of which are colloquially called "Yankee bonds") within the United States.  These entities are often mandated to invest a minimum percentage of assets under management in U.S. dollar-denominated assets, such as USD SSA bonds.  USD SSA bonds are appealing to U.S.-based investors because they offer a unique combination of high credit quality, frequent backing by sovereigns, and higher yields than U.S. Treasuries.  This is a primary reason that USD SSA bonds are typically issued in a format that allows for their immediate, or close to immediate, acquisition by U.S. investors.

323.    Within the United States, Defendants directed their conspiracy in particular to New York, which is where many of Defendants' customers, offices, and key employees were located; where Defendants often attended industry conferences and focused their marketing efforts for USD SSA bonds; and where their U.S.-based clients' investment managers were primarily located.  Defendants extensively promoted USD SSA bonds to investors in the U.S.

119

and in New York in several ways, soliciting business in order to capitalize on commissions and boost profits.

324.    *First*, every day, Defendants' USD SSA bond desks in London would circulate to their U.S.-based salespeople a list of their "runs" and "axes"—a summary list of SSA issuers' relevant bonds with indicative trading levels, as well as specific SSA bonds that Defendants would like to buy or sell.  Using this information, these salespeople would then reach out to their U.S. clients to see if they could promote a trade.  If the U.S.-based customer was interested in a particular bond or bonds, the Defendant's U.S.-based salesperson would then typically either contact the Defendant's London desk directly for a quote on the bond or contact a U.S.-based trader who would then contact the London desk.  In distributing their "runs" and "axes" to their affiliated U.S.-based salespeople, Defendants knew and intended that they would be reviewed and acted upon by U.S-.based investors.

325.    *Second*, it was routine practice during the Class Period for the Dealer Defendants to communicate with U.S.-based investors through, among other things, a daily call during which SSA bond traders would give information to U.S. investors related to the performance of the SSA bond market.  A foreign-based trader might give this information directly to U.S.-based customers, or the trader might relay the information through a U.S.-based trader that handles any bond inquiries that come during post-trading hours.  This information is then distributed by U.S. salespeople to their U.S. customers.  In this way, U.S.-based investors are kept up-to-date about the USD SSA bond market and can also use this as an opportunity to initiate trades.

326.    ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



327.

328.

329.



**B.** **Defendants Committed Specific Acts In Furtherance Of The Conspiracy In The United States And In New York**

330.

 

1. An investor located in the United States made an inquiry about particular USD SSA bonds;

2. A salesperson or trader in the U.S. received the inquiry;

3. The salesperson or trader asked one of the Dealer Defendants' London-based SSA bond traders for the price(s);

4. Defendants' London-based SSA bond trader gave the U.S.-based salesperson or trader the price(s). The London-based traders and entities priced the trades, approved the trades, and had the power to cancel trades;

5.       The U.S.-based salesperson or trader conveyed the price(s) to the U.S.-based investor;

6.       The U.S.-based investor made the decision to buy or sell and relayed that decision to the U.S.-based salesperson or trader;

7.       The U.S.-based salesperson or trader relayed the U.S. investor's decision to the London-based trader; and

8.       The USD SSA bond trade was executed in the United States, and either the USD SSA bond or the sale proceeds were delivered to the investor in the United States.

331.     During the Class Period, each Defendant engaged in the conspiracy at one or more points in the chain.  For example, the following Defendants at the very least received inquiries from and conveyed manipulated prices to U.S.-based investors while in the United States:  BANA, BAMLI, BBPLC, BSL, BCSL, BNP Paribas, Citigroup, Citibank, CGML, Crédit Agricole, CSAG, CSSEL, CSI, DBAG, HSBCB, MLI, NIPLC, Royal Bank of Canada, RBCEL, TDSL, The Toronto-Dominion Bank, Hiren Gudka, Bhardeep Singh Heer, Amandeep Singh Manku, Gary McDonald, and Shailen Pau.  The following Defendants at very least executed USD SSA bond trades with U.S.-based investors—including the named Plaintiffs: BCI, BNP Securities, CGMI, CSSUSA, DBSI, HSBC USA, MLPF&S, NSII, RBCCM, and TDS USA.

332.     These essential steps in furtherance of the conspiracy often occurred in New York.  Defendants' London-based SSA bond desks and traders were constantly receiving inquiries from and providing prices to traders and salespeople based in the U.S., including in New York.  ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Any price for an SSA bond had to come through

Defendants' London desks and there was a constant flow of market information to and from

Defendants' U.S.- and New York-based salespeople and traders, and the London SSA desk.

333.    While discovery will undoubtedly reveal thousands of additional relevant

communications between Defendants' London-based SSA bond traders and U.S. personnel.█

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

334.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

C.    **Defendants Transacted With U.S. And New York Investors, Shared
      Confidential Information On U.S. Investors, And Engaged In U.S.- And New
      York-Linked Activities**

335.   ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████ The other Defendants, all large players in their own

right in this space, undoubtedly similarly engaged in many thousands of transactions with

hundreds of U.S. Class Members.

336.   ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

        1.    *Bank of America*

337.   ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████



338.

339.

340.

341. 

342.

343.

344.

345.

██████████████████████████████████████████████████

████████████████████████████

346.  ████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

2.  *Barclays*

347.  ████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████

348.  ████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

3.   *BNP Paribas*

349.   ███████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████

350.   ███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████

4.   *Citi*

351.   ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████

352.   ██████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

███████████

353.  ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████

     *5.*    <u>*Crédit Agricole*</u>

354.  ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

355.  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

### 6.    *Credit Suisse*

356.    ████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████

357.    ███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████

358.    ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████



359.

360.

361.



362.

363.

364.

365.

7.    *Deutsche Bank*

366.



367.

368.

369.

370.

371.



372.

373.

374.

375.



376.

377.

378.

379.

380.

381.   ███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████

382.   ████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

8.   *HSBC*

383.   ████████████████████████████████████

██████████████████████████████

384.   █████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████

385.   ██████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████.

386. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

### 9.     *Nomura*

387. ██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

388. ███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

### 10.     *RBC*

389. ███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████

11. _TD Bank_

390. 

391.

392.

393.

394.

[REDACTED]

## EQUITABLE TOLLING BECAUSE OF DEFENDANTS' CONCEALMENT

395.    During the Class Period, Defendants actively, fraudulently, and effectively concealed their conspiracy from Plaintiffs and members of the Class.  Plaintiffs and members of the Class did not know of, and could not have known of, Defendants' conspiracy at least until the *Bloomberg* article revealing the existence of the DOJ investigation was published on December 9, 2015.  None of the facts or information available to Plaintiffs before that time, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged in this Complaint.

396.    By its very nature, the unlawful conspiracy in which Defendants engaged was self-concealing.  Defendants conspired to artificially manipulate the SSA bond market to the benefit of Defendants and to the detriment of Plaintiffs and members of the Class.  SSA bond trades occur primarily in private, OTC transactions, and Defendants' trades and trading strategies are not public information.  Reasonable due diligence could not have uncovered Defendants' conspiracy because the non-exchange-based, closed, and private nature of the trades helped to conceal Defendants' conduct.  Indeed, throughout the Class Period, Plaintiffs and members of the Class regularly monitored news reports concerning the financial industry and the SSA

market.  Plaintiffs and members of the Class undertook such activity in order to try to buy and sell SSA bonds at competitive prices.

397.    For such a conspiracy to work, it must remain secret—a fact which the cartel members understood.  Not content to rely on the opaque nature of the market alone, ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████

398.    Defendants also fraudulently concealed their anticompetitive activities by, among other things, █████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████    The substance—or even the existence—of the conversations occurring within these chat rooms was unknowable to Plaintiffs until December 9, 2015, at the earliest.  ███████████

█████████████████████████████████████████████████████████

███████████████████████

399.    █████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

400. ███████████████████████████████████████████████

███████████████████████████████████████████████

401.    Further, as part of the "super-desk" strategy, Defendants often had to move inventory between and amongst cartel members. ███████████████████

402.    Defendants would also seek to avoid scrutiny by falsely reporting the prices at which these sweetheart deals between conspiracy members occurred. ███████████



403.    Because of Defendants' concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class were tolled during the period of concealment.

## CLASS ACTION ALLEGATIONS

404.    Plaintiffs bring this action on behalf of themselves and, under Federal Rule of Civil Procedure 23(a) and (b)(3), as the representatives of a Class defined as follows:

> All persons or entities who, from January 1, 2005 to December 31, 2015, directly entered into U.S.-dollar denominated SSA bond transactions with Defendants, or their respective subsidiaries or affiliates, in the United States or its territories or otherwise involving U.S. trade or commerce.  Excluded from the Class are Defendants, their co-conspirators identified herein, and their officers, directors, management, employees, current subsidiaries or affiliates, and all federal governmental entities.

405.    ***Numerosity.***  Members of the Class are so numerous that joinder is impracticable. Plaintiffs do not know the exact size of the Class, but believe that there are at least several hundred and likely thousands of Class Members geographically dispersed throughout the United States.

406.   *Typicality.*  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.  Specifically, Defendants' wrongdoing caused Plaintiffs and members of the Class to pay inflated bond prices when they were buying and to receive suppressed bond prices when they were selling.

407.   Plaintiffs will fairly and adequately protect and represent the interests of the Class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class.  Accordingly, by proving its own claims, Plaintiffs will prove other Class Members' claims as well.

408.   *Adequacy of Representation.*  Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.  Plaintiffs and its counsel have the necessary financial resources to adequately and vigorously litigate this class action.  Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

409.   *Commonality.*  There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.   whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize USD SSA bond prices in interstate commerce in the United States;

b.   the identity of the participants of the conspiracy;

c.   the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance thereof;

    d.        whether the alleged conspiracy violated Section 1 of the Sherman Act;

    e.        whether the conduct of Defendants and their co-conspirators, as alleged, caused injury to the business and property of Plaintiffs and other members of the Class;

    f.        whether Defendants fraudulently concealed the conspiracy from Plaintiffs and the Class;

    g.        the appropriate measure of damages sustained by Plaintiffs and other members of the Class;

    h.        whether Plaintiffs and other Class Members are entitled to injunctive relief; and

    i.        the appropriate injunction needed to restore competition.

410.    ***Predominance.***  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the entire Class, thereby making a common methodology for determining class damages as a whole appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

411.    ***Superiority.***  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs

145

potential difficulties in management of this class action.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

412.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### CLAIM ONE

#### VIOLATION OF 15 U.S.C. § 1
#### AGREEMENT RESTRAINING TRADE

413.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

414.    Defendants, and their co-conspirators, entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, or made artificial prices on SSA bonds.

415.    Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among Defendants and other unnamed co-conspirators. Defendants' conspiracy is a *per se* violation of the Sherman Act and is, in any event, an unreasonable and unlawful restraint of trade.

416.    There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' unreasonable restraint of trade.  Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

417.    Defendants' conspiracy, and the resulting impact on the prices of SSA bonds occurred in and affected interstate commerce and commerce in and between the Territories of the United States.

418.    As a direct, intended, foreseeable, and proximate result of Defendants' conspiracy and overt acts taken in furtherance thereof, Plaintiffs and each member of the Class have suffered injury to their business or property.  Plaintiffs and each Class Member's damages are directly attributable to Defendants' conduct, which resulted in all Class Members transacting in manipulated prices on every USD SSA bond they purchased or sold during the Class Period.

419.    Plaintiffs' and the Class's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

420.    Plaintiffs and the Class are entitled to treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of the Sherman Act.

## PRAYER FOR RELIEF

421.    WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class of similarly situated entities, respectfully request that the Court:

a.    Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, designate Plaintiffs as Class representatives, and appoint Plaintiffs' counsel as counsel for the Class;

b.    Adjudge and decree that Defendants' unlawful conduct alleged herein violates Section 1 of the Sherman Act;

c.    Adjudge and decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiffs and the Class;

    d.       Permanently enjoin and restrain Defendants from continuing and maintaining the conspiracy alleged in the Complaint;

    e.       Find Defendants jointly and severally liable for the damages incurred by Plaintiffs and the Class;

    f.       Award Plaintiffs and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

    g.       Award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law;

    h.       Award Plaintiffs and the Class all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity, from the date of service of the initial Complaint in this action; and

    i.       Order such other, further, and general relief as it may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and

the proposed Class, demand a trial by jury on all issues so triable.


DATED:    New York, New York
          October 6, 2017


**ROBBINS GELLER RUDMAN &**
**DOWD LLP**

By: _____

David W. Mitchell
Brian O. O'Mara
Carmen A. Medici
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Fax: (619) 231-7423
davidm@rgrdlaw.com
bomara@rgrdlaw.com
cmedici@rgrdlaw.com

Samuel H. Rudman
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Fax: (631) 367-1173
srudman@rgrdlaw.com

**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**

By: _____

Daniel L. Brockett
Sascha N. Rand
Steig D. Olson
Thomas J. Lepri
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
sascharand@quinnemanuel.com
steigolson@quinnemanuel.com
thomaslepri@quinnemanuel.com

Jeremy D. Andersen
Adam B. Wolfson
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com
adamwolfson@quinnemanuel.com

*Interim Co-Lead Class Counsel and Counsel*
*for Plaintiffs Sheet Metal Workers Pension*
*Plan of Northern California and Iron Workers*
*Pension Plan of Western Pennsylvania and the*
*Proposed Class*