**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

SSA BONDS ANTITRUST LITIGATION

*This Document Relates To All Actions*

1:16-cv-03711-ER

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF DEALER DEFENDANTS' MOTION TO
DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
LACK OF SUBJECT MATTER JURISDICTION AND FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND ............................................................................... 4

    A.   Procedural History ............................................................. 4

    B.   SSA Bonds ....................................................................... 5

    C.   The Parties ....................................................................... 6

    D.   Government Actions Regarding SSA Bonds ............................ 7

    E.   Plaintiffs' Allegations ........................................................ 7

ARGUMENT .................................................................................. 8

    I.   PLAINTIFFS' CLAIMS SHOULD BE DISMISSED. ...................... 8

        A.   Plaintiffs Lack Antitrust Standing. ..................................... 8

            1.   Plaintiffs Fail to Allege Antitrust Injury. .................... 9

                a.   Plaintiffs Fail to Plead Injury-in-Fact Because They Do Not Plausibly Allege That Their Transactions Were Price-Fixed. ................................................ 11

                b.   Plaintiffs Do Not Plausibly Allege How Other Transactions with Other Investors Could Have Injured Them. .................................................... 12

                c.   Plaintiffs Cannot Plead Antitrust Injury Based on Conduct in the Interdealer Market, In Which Plaintiffs Did Not Transact. .......................................... 17

            2.   Plaintiffs Are Not Efficient Enforcers. ....................... 18

                 a.   Plaintiffs' Claims Are Too Remote and Indirect. ............ 19

                b.   More Efficient Enforcers Exist. ........................... 20

                c.   Damages Are Speculative. ................................. 21

        B.   Plaintiffs Do Not Plausibly Allege a Conspiracy. ................... 22

1.    The Conspiracy Alleged by Plaintiffs Is Implausible. .................. 24

2.    Plaintiffs Fail to Allege Direct Evidence of Agreement Among Defendants to Fix the Price of SSA Bonds. .................................. 29

3.    Plaintiffs Fail to Allege Circumstantial Evidence Sufficient to Support a Plausible Inference of Conspiracy. ............................... 32

    a.    Plaintiffs Fail to Adequately Allege Parallel Conduct by Defendants. .................................................................. 33

    b.    Plaintiffs' Allegations of a Motive to Conspire are Implausible. ......................................................................... 34

    c.    ██████████████████ ████████████████ ....................................... 35

    d.    Plaintiffs' Allegations of Government Investigations and Personnel Decisions are Insufficient to Support an Inference of Conspiracy. ................................................... 36

4.    Plaintiffs Fail to Define Any Proper Relevant Antitrust Market or Show That Defendants Had Market Power. ............................. 37

C.    Plaintiffs Engage in Improper Group Pleading. ......................................... 40

II.    PLAINTIFFS INCLUDE NO ALLEGATIONS RELATED TO PRE-JULY 20, 2009 TRANSACTIONS. .................................................... 43

CONCLUSION .................................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agfa Corp. v. Goldman Sachs Grp., Inc.*,
2016 WL 7009031 (S.D.N.Y. Nov. 30, 2016)........................................................17

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
175 F. Supp. 3d 44 (S.D.N.Y. 2016)..................................................13, 25, 33

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016)............................................................. *passim*

*American Sales Co. v. AstraZeneca AB*,
2011 WL 1465786 (S.D.N.Y. Apr. 14, 2011).....................................................42

*Apex Oil Co. v. DiMauro*,
822 F.2d 246 (2d Cir. 1987)............................................................30

*Arista Records LLC v. Lime Grp. LLC*,
532 F. Supp. 2d 556 (S.D.N.Y. 2007)..........................................9, 12, 19

*Associated Gen. Contractors v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983).......................................................9, 20, 21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................22, 44

*Chasins v. Smith, Barney & Co.*,
438 F.2d 1167 (2d Cir. 1970)..........................................................6, 35

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015).............................................................35

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
2013 WL 2156358 (N.D. Cal. May 17, 2013)......................................................39

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014)......................................................42

*In re Credit Default Swaps Antitrust Litig.*,
2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)......................................................44

*In re Currency Conversion Fee Antitrust Litig.*,
773 F. Supp. 2d 351 (S.D.N.Y. 2011)............................................................33

*Daniel v. Am. Bd. of Emergency Med.*,
428 F.3d 408 (2d Cir. 2005)..................................................................18, 19

*de Atucha v. Commodity Exch., Inc.*,
608 F. Supp. 510 (S.D.N.Y. 1985) ................................................................20

*In re Dig. Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011)..................................................13, 20, 43

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
747 F.3d 145 (2d Cir. 2014)........................................................................14

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)....................................................................22, 41

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*,
788 F. Supp. 1042 (D. Minn. 1992)..............................................................32

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016)..................................................44

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
74 F. Supp. 3d 581 (S.D.N.Y 2015)......................................................14, 25, 36

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017)..................................................42

*Gatt Commc'ns v. PMC Assocs., LLC*,
711 F.3d 68 (2d Cir. 2013).................................................................9, 18, 21

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016)...........................................................9, 13, 21, 22

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
998 F.2d 391 (7th Cir. 1993) ........................................................................9

*Harry v. Total Gas & Power N. Am., Inc.*,
244 F. Supp. 3d 402 (S.D.N.Y. 2017)................................................... *passim*

*Hinds Cty. v. Wachovia Bank N.A.*,
708 F. Supp. 2d 348 (S.D.N.Y. 2010).............................................................35

*In re Iconix Brand Grp., Inc.*,
2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) ...................................................37

-iv-

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)............................................................29

*Invamed, Inc. v. Barr Labs., Inc.*,
    22 F. Supp. 2d 210 (S.D.N.Y. 1998)..............................................32

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
    768 F. Supp. 2d 961 (N.D. Iowa 2011)......................................27, 29

*Kasada, Inc. v. Access Capital, Inc.*,
    2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004) ...............................39

*LaFlamme v. Societe Air France*,
    702 F. Supp. 2d 136 (E.D.N.Y. 2010) .........................................35, 36

*Laydon v. Mizuho Bank, Ltd.*,
    2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ...........................20, 21

*In re Lehman Bros. Sec. & Erisa Litig.*,
    2015 WL 5294759 (S.D.N.Y. Sept. 10, 2015)..................................6

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ...............................20

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    962 F. Supp. 2d 606 (S.D.N.Y. 2013)...........................................17

*In re Lithium Ion Batteries Antitrust Litig.*,
    2014 WL 309192 (N.D. Cal. Jan. 21, 2014) .................................44

*In re London Silver Fixing Antitrust Litig.*,
    213 F. Supp. 3d 530 (S.D.N.Y. 2016)...........................................44

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)......................................................22, 32

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
    676 F. Supp. 486 (S.D.N.Y. 1987) ...............................................22

*Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*,
    1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) ..............................20

*Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*,
    2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012) ................................41

*In re Optical Disk Drive Antitrust Litig.*,
2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ..........................................................29

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) .........................................14, 15, 20, 42

*Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*,
2013 WL 3873074 (S.D. Cal. July 25, 2013) ........................................................33

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997).................................................................................38

*Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*,
812 F. Supp. 387 (S.D.N.Y. 1993) .......................................................................39

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
631 F.2d 10 (2d Cir. 1980)..............................................................................20, 22

*Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*,
775 F.3d 154 (2d Cir. 2014)..................................................................................12

*SEC v. Diversified Corp. Consulting Grp.*,
378 F.3d 1219 (11th Cir. 2004) .........................................................................6, 35

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
947 F. Supp. 2d 88 (D.D.C. 2013) ........................................................................35

*Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.*,
414 F. App'x 372 (2d Cir. 2011) ...........................................................................38

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
2017 WL 4250480 (S.D.N.Y. Sept. 25, 2017).................................................28, 34

*Sonterra Capital Master Fund Ltd. v. UBS AG*,
2017 WL 1091983 (S.D.N.Y. Mar. 10, 2017) ......................................................11

*Starr v. Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010)..................................................................................36

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
580 F. Supp. 2d 896 (N.D. Cal. 2008) ..................................................................36

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*,
738 F. Supp. 2d 505 (D. Del. 2010)......................................................................36

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006)........................................................................................10

*United States v. Citizens & S. Nat'l Bank*,
    422 U.S. 86 (1975)......................................................................................10

*United Magazine Co. v. Murdoch Magazines Distrib., Inc.*,
    146 F. Supp. 2d 385 (S.D.N.Y. 2001).................................................22, 23, 24

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978)................................................................................30, 37

*Universal Grading Serv. v. eBay, Inc.*,
    2012 WL 70644 (N.D. Cal. Jan. 9, 2012).............................................34, 35

*In re Urethane Antitrust Litig.*,
    663 F. Supp. 2d 1067 (D. Kan. 2009)....................................................44

*W.R. Huff Asset Mgmt. Co. LLC v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008)..................................................................12

*Wyche v. Advanced Drainage Sys., Inc.*,
    2017 WL 971805 (S.D.N.Y. Mar. 10, 2017) ........................................37

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016).........................................29, 40, 42

**Statutes**

Private Securities Litigation Reform Act...........................................................5

Sherman Act Section 1, 15 U.S.C. § 1............................................... *passim*

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(1) ........................................................1

Federal Rule of Civil Procedure 12(b)(6) ....................................................1, 39

Dealer Defendants[1] respectfully submit this joint memorandum of law in support of their motion to dismiss the Consolidated Amended Class Action Complaint (Dkt. 306) (the "Complaint" or "CAC") for lack of subject matter jurisdiction and failure to state a claim pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiffs assert that a handful of traders in London participated in a conspiracy that, for more than a decade, somehow manipulated the price of hundreds of billions of dollars' worth of bonds from a diverse range of issuers as they were traded in the secondary market. According to Plaintiffs, electronic chats and telephone calls enabled these few traders to manipulate the price of every single transaction, anywhere in the world, involving hundreds of different U.S. dollar-denominated ("USD") supranational, sovereign, and agency bonds ("SSA bonds" or "USD SSA bonds").

But Plaintiffs come nowhere close to plausibly alleging such a massive conspiracy, much less that Plaintiffs were impacted by it. ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

---

[1] Defendants use Plaintiffs' defined term "Dealer Defendants" for convenience for purposes of this motion only, and notwithstanding Plaintiffs' improper group pleading. *See* Section I.C, *infra*. Dealer Defendants are: Barclays Bank PLC; Barclays Capital Inc.; Barclays Services Limited; Barclays Capital Securities Limited; BNP Paribas; BNP Paribas Securities Corp.; Citigroup Inc.; Citibank, N.A.; Citigroup Global Markets Inc.; Citigroup Global Markets Limited; Crédit Agricole Corporate & Investment Bank; Credit Suisse AG; Credit Suisse Securities (USA) LLC; Credit Suisse Securities (Europe) Ltd.; Credit Suisse International; HSBC Securities (USA) Inc.; HSBC Bank plc; Nomura Securities International, Inc.; Nomura International plc; Royal Bank of Canada; RBC Capital Markets, LLC; RBC Europe Limited; The Toronto-Dominion Bank; TD Securities Limited; TD Securities (USA) LLC. Unless otherwise noted, all internal citations and quotation marks are omitted.

*Plaintiffs Lack Antitrust Standing*.  Plaintiffs fail to plead any injury-in-fact caused by, or even fairly traceable to, Defendants' alleged conduct.  Thus, Plaintiffs lack standing to assert their claims.  ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████  Rather, Plaintiffs assert that, by allegedly manipulating individual, over-the-counter transactions, Defendants somehow affected the price of every USD SSA bond traded anywhere in the world.  But Plaintiffs plead no facts to support this fundamentally implausible assertion.  Because Plaintiffs have not alleged that they participated in any of the transactions supposedly targeted by Defendants' conspiracy, and have not plausibly alleged any impact on bonds traded across the purported USD SSA bond "market," they fall far short of alleging that they suffered any injury as a result of Defendants' alleged conduct.  Further, even if Plaintiffs could allege some cognizable injury arising from trades made on behalf of others, their claims still must be dismissed because any harm they may have suffered is far too remote and speculative to support their standing as efficient enforcers of the antitrust laws.  Plaintiffs' failure to articulate any concrete injury thus precludes standing.

*Plaintiffs Fail to Plead a Conspiracy*.  Plaintiffs do not plead any direct or circumstantial evidence sufficient to render plausible their allegations of a massive conspiracy to fix the prices of all USD SSA bonds.  ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████  Plaintiffs, however, fail to allege any concrete mechanism for effectuating such a broad-based conspiracy:  Plaintiffs do not explain how a handful of traders in London could

plausibly possess the power to control global prices in USD SSA bonds, particularly when, as Plaintiffs themselves acknowledge, non-Defendant dealers were also actively trading those bonds and the relevant instruments are not alleged to have any common pricing inputs or benchmark. Accordingly, Plaintiffs' conspiracy theory runs counter to common economic experience and must be rejected for this reason as well.

*Plaintiffs' Rule of Reason Allegations Fail.* Plaintiffs cannot salvage their failed *per se* price fixing claim by insisting, without adequate factual support, that allegations of information sharing state an antitrust claim under the rule of reason. Plaintiffs' generalized assertions about the supposed USD SSA bond market come nowhere close to actually defining a relevant market or pleading facts about competitive effects within it.

*Plaintiffs Rely on Improper Group Pleading.* Plaintiffs continue to impermissibly lump Defendants together with undifferentiated allegations and fail to distinguish among multiple entities within various different corporate families. Plaintiffs' failure to allege *each* Defendant's purported role in any supposed conspiracy is fatal to their claims.

*Plaintiffs Fail to Plead Pre-July 2009 Conduct.* Lastly, Plaintiffs' pre-July 2009 claims must be dismissed because Plaintiffs fail to plead any non-conclusory allegations of misconduct between 2005 and July 2009.[2]

---

[2] Though the CAC does not include a claim for unjust enrichment, the prayer for relief requests that the Court "[a]djudge and decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiffs and the Class." On November 14, 2017, Plaintiffs' counsel confirmed to counsel for the Dealer Defendants that Plaintiffs are not pursuing a claim based on unjust enrichment and are not pursuing this request for relief.

**BACKGROUND**

**A.      Procedural History**

The CAC is Plaintiffs' third attempt to state antitrust claims.  Between May 2016 and January 2017, the two named Plaintiffs (the "Named Plaintiffs"), along with several others, filed fourteen separate putative class actions.  The complaints filed in these initial, pre-consolidation actions relied on purported "economic analysis" to demonstrate that Defendants had conspired to fix USD SSA bond prices.  *See, e.g.*, Compl., *Sheet Metal Works Pension Plan of N. Cal. v. Bank of Am. Corp.*, No. 16-cv-04603, at 29-49  (S.D.N.Y. June 17, 2016) (Dkt. 1).  Following the consolidation of these cases and appointment of interim co-lead counsel, Plaintiffs filed the Consolidated Class Action Complaint on April 7, 2017.  *See* Dkt. 128.  In doing so, Plaintiffs abandoned the "economic analysis" upon which they based their original complaints, ██████████

████████████████████████████████████████████████████████████████████████

███████

The Consolidated Class Action Complaint suffered from a number of fatal flaws, which formed the basis for the Dealer Defendants' initial motions to dismiss, filed on July 14, 2017.  Dkts. 229, 230.  Rather than defend the Consolidated Class Action Complaint, Plaintiffs requested and, pursuant to a stipulation among the parties, were granted leave to file the CAC.  Dkt. 305. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ none of Plaintiffs' revised allegations does anything to salvage their implausible antitrust claim, which suffers from the same fatal defects, as set forth below.

4

### B.  SSA Bonds

Plaintiffs do not allege a conspiracy to manipulate a particular type of bond or transaction, or a centralized benchmark rate used to price an array of instruments, but rather claim a conspiracy to manipulate certain bonds encompassed by four broad, heterogeneous categories of products that are loosely referred to as "SSA bonds."  Plaintiffs allege that SSA bonds are debt securities issued by governmental and quasi-governmental institutions in countries around the world to raise capital needed to fund global, continental, and regional projects and development programs.  CAC ¶¶ 2, 99.  Plaintiffs allege that "SSA bonds" can be grouped into the following broad categories:  (i) supranational bonds issued by "large, multilateral institutions with shareholders from several countries and global economic mandates;" (ii) sovereign bonds issued by sovereign governments in a currency other than their local currency;[3] (iii) sub-sovereign bonds issued by governmental entities sitting "at least one level below a sovereign government;" and (iv) agency bonds issued by "subdivisions of a sovereign state or other institutions that perform tasks on behalf of a governing sovereign."  *Id.* ¶¶ 96-98.  Plaintiffs allege that there "are over $960 billion in USD SSA bonds outstanding."  *Id.* ¶ 104.

During the Class Period,[4] investors allegedly traded SSA bonds with dealers over the phone, via electronic chat messaging, and through electronic trading platforms.  *Id.* ¶¶ 110-11.  Investors seeking to purchase or sell an SSA bond could allegedly request quotes from one or

---

[3] According to the CAC, the SSA bond umbrella excludes government debt issued in a sovereign's domestic currency, such as U.S. Treasury bonds.  CAC ¶ 97 n.23.

[4] Plaintiffs purport to represent a Class of persons and entities who, "from January 1, 2005 to December 31, 2015, directly entered into U.S.-dollar denominated SSA bond transactions with Defendants . . . in the United States or its territories or otherwise involving U.S. trade or commerce."  CAC ¶ 404.

more dealers who acted as market makers.[5]  *Id.* ¶¶ 110, 112, 116.  Plaintiffs also separately

allege that dealers traded SSA bonds with other dealers in the alleged "interdealer market" by

submitting bid and offer prices to interdealer brokers, which then published those quotes on

trading platforms accessible to dealers.  *Id.* ¶ 116.

Plaintiffs allege that the Dealer Defendants were "very significant players in the overall

USD SSA bond market" (*id.* ¶ 310), but they do not allege the Dealer Defendants' market shares

or any other facts regarding their respective trading operations.

### C.     The Parties

There are 36 named defendants, including 11 bank entities and their affiliates (the

"Dealer Defendants") and five SSA bond traders who allegedly were employed by various

Dealer Defendants during the Class Period (the "Individual Defendants").  CAC ¶¶ 32-94.

There are two Named Plaintiffs:  (i) Plaintiff Iron Workers Pension Plan of Western

Pennsylvania ("Iron Workers") is a pension plan headquartered in Pittsburgh, Pennsylvania; and

(ii) Plaintiff Sheet Metal Workers Pension Plan of Northern California ("Sheet Metal Workers")

is a pension plan headquartered in Pleasanton, California.  *Id.* ¶¶ 28-29.  Neither Named Plaintiff

provides any facts describing any allegedly manipulated transactions in which they engaged with

any Defendant.  *Id.*  Both allege that they transacted in an unidentified number of USD SSA

---

[5] As courts have recognized, a market maker is "a dealer who, with respect to a particular security, holds himself out (by entering indications of interest in purchasing and selling in an inter-dealer quotations system or otherwise) as being willing to buy and sell for his own account on a continuous basis otherwise than on a national securities exchange."  *See Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1170 n.4 (2d Cir. 1970) (quoting SEC Rule 17a-9(f)(1)), *superseded in part by statute*, Private Securities Litigation Reform Act, Pub. L. No. 104–67, 109 Stat. 737, *as recognized in In re Lehman Bros. Sec. & Erisa Litig.*, Nos. 11-CV-4278 (LAK), 09-MD-2017 (LAK), 2015 WL 5294759, at *3 (S.D.N.Y. Sept. 10, 2015); *see also SEC v. Diversified Corp. Consulting Grp.*, 378 F.3d 1219, 1222 n.7 (11th Cir. 2004) ("A market maker in the over-the-counter market is a dealer who, with respect to a security, routinely enters quotations in an interdealer communication system or otherwise and is willing to buy and sell securities for the dealer's own account.").

bonds with certain Dealer Defendants at unidentified times during the ten-year Class Period, and that these "transactions with the Dealer Defendants were priced at artificial levels, causing harm" to Plaintiffs.  *Id.*

### D.    Government Actions Regarding SSA Bonds

In 2015 and 2016, news reports stated that certain domestic and foreign regulators[6] were inquiring into potential misconduct relating to SSA bonds.  CAC ¶¶ 315-18, 320.  According to one of the articles cited in the CAC, the DOJ was reportedly "focusing on activity by London-based traders."  *Id.* ¶ 315 n.46.  Plaintiffs do not allege that any inquiry resulted in any charges or fines against, or settlement by, any Defendant.  *See id.* ¶¶ 315-20.  It has been publicly reported that one of those regulators—the U.K. Financial Conduct Authority—has closed its investigation without taking action against any entity or individual.[7]  Plaintiffs do not—and cannot—allege that all of the Defendants were targeted by the alleged investigations.

### E.    Plaintiffs' Allegations

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

██████████████  Plaintiffs allege a number of communications that they characterize as evidence of their conspiracy claims.  ██████████████████████████

---

[6] Regulators allegedly included the U.S. Department of Justice ("DOJ"), the U.K. Financial Conduct Authority, and the European Commission.  CAC ¶¶ 315-18.

[7] *See* Suzi Ring, *Agency Bond-Rigging Probe Is Said to Be Dropped by Britain's FCA*, Bloomberg (Oct. 31, 2017, 6:34 AM), https://www.bloomberg.com/news/articles/2017-10-31/agency-bond-rigging-probe-is-said-to-be-dropped-by-britain-s-fca.

[REDACTED] Plaintiffs also assert in conclusory fashion that Defendants' supposed "agreement not to compete" impacted all market prices by "greatly diminish[ing] the amount of dealer competition in the market." *Id.* ¶ 302. Instead of pointing to any facts to show that such market wide-effects occurred, Plaintiffs cite academic literature derived from markets that bear little resemblance to the alleged SSA bond market and make broad assertions about how damages might one day "potentially be quantified." *Id.* ¶¶ 300-12.

## ARGUMENT

**I. PLAINTIFFS' CLAIMS SHOULD BE DISMISSED.**

### A. Plaintiffs Lack Antitrust Standing.

Plaintiffs' Sherman Act claims must be dismissed because Plaintiffs lack antitrust standing. To satisfy the antitrust standing requirement, a plaintiff must plausibly allege that it

8

(i) suffered an "antitrust injury," and (ii) is an "acceptable plaintiff to pursue the alleged antitrust violations," meaning that the plaintiff is "an 'efficient enforcer' of the antitrust laws." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157-58 (2d Cir. 2016). The "limitation of antitrust standing to 'a proper party'" is an important limitation imposed by antitrust laws, *id.* at 157, which recognizes that, while an "antitrust violation may be expected to cause ripples of harm," the antitrust laws do not "provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation," *Associated Gen. Contractors v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 534 (1983). Permitting every potential plaintiff to pursue treble damages raises the troubling prospect of "'overdeterrence,' imposing ruinous costs on antitrust defendants, severely burdening the judicial system, and possibly chilling economically efficient behavior."[8]

In this case, Plaintiffs fail to plead they have suffered any antitrust injury, let alone that they are the proper parties to bring suit.

### 1. *Plaintiffs Fail to Allege Antitrust Injury.*

"To demonstrate antitrust injury, 'a plaintiff must show (1) an injury-in-fact; (2) that has been caused by the violation alleged; and (3) that is the type of injury contemplated by the statute.'" *Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 568 (S.D.N.Y. 2007). "It is not enough for the actual injury to be causally linked to the asserted violation." *Gatt Commc'ns v. PMC Assocs., LLC*, 711 F.3d 68, 76 (2d Cir. 2013). Instead, the plaintiff's injury must be "'of the type  . . . that flows from that which makes defendants' acts unlawful,'" which

---

[8] *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 394 (7th Cir. 1993); *see also Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 779 (2d Cir. 2016) ("[N]ot every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced.").

means, among other things, that the "plaintiff must be a participant in the very market that is directly restrained." *In re Aluminum*, 833 F.3d at 157, 161.

Here, Plaintiffs' antitrust claims fail because Plaintiffs have not pled facts suggesting they personally suffered any injury at all as a result of the alleged conspiracy. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████ █████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████ █████████████████████████████████

█████████████████████████████████████████████████████████████

---

[9] In addition to allegations of price fixing, ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
As explained in Section I.B.4, *infra*, to the extent Plaintiffs are attempting to assert some independent antitrust violation stemming from any such conduct, that claim must be evaluated under a "rule of reason" analysis, the factual underpinnings of which Plaintiffs have failed to plead. ████████████████████████████████
████████████████████████████████████████

[10] Indeed, for substantially the same reasons that Plaintiffs fail to allege injury-in-fact for purposes of antitrust standing, they also fail to allege injury sufficient to support Article III standing. *See, e.g., Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402, 416-17, 420 n.13 (S.D.N.Y. 2017) (dismissing antitrust claims for lack of antitrust injury because of plaintiffs' "failure to allege a single specific transaction that lost value" and finding, for the same reasons, that plaintiffs failed to allege Article III standing).

████████████████████████████████████████████████████████

████████████████████████████████

      a.     <u>Plaintiffs Fail to Plead Injury-in-Fact Because They Do Not<br>Plausibly Allege That Their Transactions Were Price-Fixed.</u>

Plaintiffs baldly assert that they engaged in "transactions with the Dealer Defendants [that] were priced at artificial levels," CAC ¶¶ 28-29, but fail to allege any facts surrounding these purported transactions to suggest they suffered any injury. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████ ███████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████ Finally, even if the CAC adequately alleged that some

---

[11] *See Harry*, 244 F. Supp. 3d at 416 (dismissing claims for "failure to allege a single specific transaction that lost value as a result of the defendants' alleged misconduct"); *see also Sonterra Capital Master Fund Ltd. v. UBS AG*, No. 15 Civ. 5844 (GBD), 2017 WL 1091983, at *2 (S.D.N.Y. Mar. 10, 2017) (injury-in-fact inadequately pled where misconduct only related to instruments the plaintiffs "did not transact in").



unidentified counterparty to any of the transactions allegedly described in the Complaint suffered injury, Plaintiffs would still lack standing to assert any claims on that basis. *See, e.g.*, *Arista Records*, 532 F. Supp. 2d at 569 (plaintiff failed to plead "injury-in-fact as a result of [the alleged] price-fixing scheme" because plaintiff never alleged that it attempted to purchase an allegedly price-fixed license). "[N]amed plaintiffs in a class action must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *W.R. Huff Asset Mgmt. Co. LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 n.5 (2d Cir. 2008).[13] Because neither Named Plaintiff adequately alleges it personally suffered some injury-in-fact linked to Defendants' alleged conduct, their antitrust claims must be dismissed.

> b. <u>Plaintiffs Do Not Plausibly Allege How Other Transactions with Other Investors Could Have Injured Them.</u>

Plaintiffs cannot salvage their claims by implausibly asserting that alleged communications between individual traders about individual trades somehow "impacted the *entire* USD SSA bond market." CAC ¶¶ 299, 418 (emphasis added). The allegation that a small group of London-based traders could manipulate the price of every USD SSA bond bought or sold over a decade-long period by communicating about a handful of individual over-the-counter trades, *see id.* ¶¶ 1, 20, 324, 333, 404, 418, is fundamentally implausible given the alleged size, breadth, and diversity of the "market" for SSA bonds. *Id.* ¶¶ 95-104 (alleging there are "over $960 billion in USD SSA bonds outstanding" from a diverse range of issuers). Plaintiffs fail to

---

[13] Further, Plaintiffs cannot establish so-called "class standing" to represent absent class members involved in any transactions alleged in the Complaint because, by Plaintiffs' own allegations, each SSA bond is priced differently through individual negotiations. *See, e.g.*, CAC ¶¶ 110-13, 119-22. Thus, Plaintiffs fail to allege facts sufficient to show that their claims are similar in "all essential respects" to the claims of absent class members. *Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 161 (2d Cir. 2014).

allege facts plausibly suggesting that manipulating the price of a few transactions would affect other transactions, nor do they support their fallback position that Defendants' alleged conspiracy reduced competition. Conclusory assertions about supposed market-wide harm are no substitute for pleading facts to show a "direct link" between any transactions purportedly described by the communications alleged and the prices of bonds Plaintiffs allegedly traded.[14]

Here, Plaintiffs do not plead any facts indicating how the price of any given transaction in one SSA bond has an impact on the price of other transactions in SSA bonds, particularly where there is no articulated commonality between the various different kinds of bonds Plaintiffs purport to group under a single umbrella. According to the CAC, "SSA bond trades occur primarily in private, [over-the-counter] transactions" at individually negotiated prices that take into account any number of independent market factors, including the creditworthiness of the issuer.[15] Plaintiffs allege no industry-wide benchmarks for pricing SSA bonds; indeed, documents cited in the CAC make clear that "the bond market . . . lacks readily manipulated benchmarks."[16] This fact distinguishes this case from other antitrust cases in which courts have upheld allegations of injury across a range of diverse financial products based on a common and allegedly manipulated input in the pricing scheme.[17]

---

[14] *See In re Dig. Music Antitrust Litig.*, 812 F. Supp. 2d 390, 405 (S.D.N.Y. 2011) (dismissing claims where complaint brought by purchasers of CDs did not allege a sufficient linkage between the CD market and the Internet Music market to make their allegations regarding the CD market cognizable for antitrust purposes).

[15] CAC ¶¶ 113-14, 396; *see also id.* ¶ 2 (each bond's "credit-worthiness is often pegged to sovereign, regional, or international entities"); Rabobank, *SSA Market Primer*, 1-6 (Sept. 12, 2014) (cited at CAC ¶ 95 n.21).

[16] *See* Craig McGlashan, Owen Sanderson, Ralph Sinclair & Toby Fildes, *Scandal rocks SSA market,* GlobalCapital (Jan. 7, 2016), http://www.globalcapital.com/article/vydmn22frhms/trading-scandal-rocks-ssa-market (cited at CAC ¶ 317 n.50).

[17] *See, e.g.*, *Gelboim*, 823 F.3d at 765, 770, 775 (alleged conspiracy to persistently suppress the London Interbank Offered Rate, a "benchmark used in countless business dealings"); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*,

Plaintiffs also allege that SSA bond trading is "non-exchange-based, closed, and private," with "no transparency into trading volumes or prices." CAC ¶¶ 114, 396. Notwithstanding these allegations, Plaintiffs assert in conclusory fashion that Defendants' purported misconduct had "effects that extended beyond any individual transaction," because "the price in the rigged transaction served as a reference point for the pricing of subsequent transactions." *Id.* ¶ 309. This theory must be rejected as it is contradicted by Plaintiffs' allegations about the absence of "post-trade price transparency," *id.* ¶ 114, in the trading of SSA bonds. *See DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151-52 (2d Cir. 2014) (court need not accept as true an allegation that is "contradicted by more specific allegations in the Complaint"). Moreover, Plaintiffs' only "support" for their assertion that prices of SSA bonds influence one another is a twenty-six-year-old journal article addressing transactions in stocks traded on the New York Stock Exchange where pricing information is publicly available.[18] Plaintiffs do not explain how such literature has any bearing on SSA bond trading, and have asserted no other basis upon which to infer they suffered any harm as a result of Defendants' alleged trading activities.

The court's analysis in *Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd.*, No. 08-CV-42 (JG)(VVP), 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011), is instructive. There, plaintiffs alleged that competing cargo carriers conspired to fix surcharges on

---

175 F. Supp. 3d 44, 49-51 (S.D.N.Y. 2016) (alleged conspiracy to engage in manipulative transactions and make false submissions to impact USD ISDAfix, "a benchmark interest rate [allegedly] incorporated into a broad range of financial derivatives"); *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 587 (S.D.N.Y 2015) (alleged conspiracy concerning trading practices to impact the "fix," a closing benchmark rate set daily by WM/Reuters on which foreign exchange transactions were allegedly priced).

[18] Joel Hasbrouck, *Measuring the Information Content of Stock Trades*, 46 J. FIN. 179, 179-80 (1991) (cited at CAC ¶ 309 n.41).

a diverse range of freight services across multiple routes. *Id.* at *5-8. But, like Plaintiffs here, the plaintiffs in *Precision* failed to allege that they personally "paid the fixed charges or even purchased services on the general routes on which the surcharges were allegedly imposed." *Id.* at *11. Rather, plaintiffs argued that they had standing "because the surcharges led to the inflation of prices for freight forwarding services in the U.S. market overall and that the plaintiffs purchased freight forwarding services from the defendants at these inflated prices." *Id.* at *8. The court flatly rejected that theory and found that plaintiffs lacked antitrust standing because the complaint "include[d] no allegations to support or lead to the conclusion that the imposition of surcharges on specific routes had such a dramatic effect on the broad and diverse market for U.S. Freight Forwarding Services." *Id.* at *10 (emphasis omitted). Similarly, here, Plaintiffs plead no facts to show that the alleged conduct involving any transactions alleged in the Complaint had any effect across the so-called "market" for SSA bonds such that it would have caused them injury.

Implicitly acknowledging that they have failed to plead facts plausibly suggesting that alleged sporadic conduct with respect to discrete bond transactions somehow impacted the entire global "market" for SSA bonds, Plaintiffs fall back on the untenable allegation that the prices of all bonds during the ten-year Class Period were somehow artificial because Defendants' purported "collusion," which is alleged to have occurred with respect to a handful of specific trading situations, "greatly diminished the amount of dealer competition in the market" as a whole. CAC ¶ 302. As an initial matter, this additional theory is little more than a restatement of Plaintiffs' unsupported conclusion that conduct with respect to specific transactions can somehow impact all trades. Furthermore, allowing a plaintiff to simply assert that a "reduction

in competition" occurred—which is a legal conclusion, not a factual allegation—is not a substitute for alleging an injury flowing from it. Plaintiffs would write the requirement of antitrust standing out of the law altogether, effectively eliminating the need to plead a causal link between any alleged agreement and an impact on the market, and contravening the requirement that antitrust law only remedy the type of injuries it was intended to guard against. *See In re Aluminum*, 833 F.3d at 157.

Plaintiffs' strained attempt to support this attenuated theory of harm with citations to "academic literature" addressing entirely distinguishable products and markets fails. CAC ¶¶ 303-07. For example, Plaintiffs cite Professor Darrell Duffie for the general principle that "the best price from among a small set of bidders is not as attractive as the best price available from an enlarged set of bidders." *Id.* ¶ 303. Regardless of whether this principle is true in theory, it is irrelevant here because it fundamentally conflicts with Plaintiffs' own description of how the SSA bond market functions. The CAC alleges that "[a]n investor interested in buying or selling an SSA bond generally contacted a *limited number* of dealers" because it is "time-consuming and laborious to contact dealers via the telephone or instant message." *Id.* ¶ 113 (emphasis added). Moreover, the allegedly "closed[] and private nature" of SSA bond transactions, *id.* ¶ 396, is nothing like the open "auctions" and public "trading platforms" that Plaintiffs' cited articles describe. *See id.* ¶¶ 303-05.[19] Thus, Plaintiffs have categorically failed to offer any facts

---

[19] Plaintiffs cite to academic studies relating to wholly different types of markets, such as the market for "corporate bonds" traded on public "trading platforms," CAC ¶ 304, which Plaintiffs allege are less "opaque" than the SSA bond market. *See* CAC ¶ 114 ("The OTC market in SSA bonds is even more opaque than many other OTC bond markets, such as corporate bonds, because there is no post-trade price transparency."). Plaintiffs also mistakenly rely on an article analyzing bid-ask spreads for credit default swaps, CAC ¶ 306, which, unlike SSA bond transactions, are subject to mandatory public reporting requirements as to trade price, trade size, and trade time. *See* Yee Cheng Loon & Ken Zhong, *Does Dodd-Frank Affect OTC Transaction Costs and Liquidity? Evidence from the Real-Time CDS Trade Reports*, 119 J. FIN. ECON. 645 (2016).

suggesting that any nebulous "reduction in competition" actually impacted pricing across the entirety of the supposed market for SSA bonds.

Regardless, even assuming that Defendants' alleged misconduct had some attenuated impact on the prices of SSA bonds generally, ███████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████

c.  <u>Plaintiffs Cannot Plead Antitrust Injury Based on Conduct in the Interdealer Market, In Which Plaintiffs Did Not Transact.</u>

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████  To allege "antitrust injury"—*i.e.*, an injury cognizable under the antitrust laws—a plaintiff must be a "participant in the very market directly distorted by the antitrust violation." *In re Aluminum*, 833 F.3d at 160-61, 163.  "[B]eing affected by the anticompetitive conduct is simply not enough." *Agfa Corp. v. Goldman Sachs Grp., Inc.*, No. 14-CV-0211 (KBF), 2016 WL 7009031, at *5 (S.D.N.Y. Nov. 30, 2016) ("a plaintiff must participate in the [sic] 'the very market that is directly restrained,'" which "is not the same as

---

█ ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████

participating in a market in which a defendant also participates but does not restrain").

Accordingly, as a matter of law, Plaintiffs cannot establish that they suffered any antitrust injury as a result of any allegedly rigged transactions in the interdealer market or any purported "collateral" effects therefrom. *See In re Aluminum*, 833 F.3d at 160-63; *see also Harry*, 244 F. Supp. 3d at 423 (plaintiff that purchased natural gas at one hub did not suffer antitrust injury as a result of alleged manipulation of natural gas at a different hub because any injury plaintiffs suffered was not in the very market that was allegedly "directly restrained" by the misconduct).[21]

For these reasons, Plaintiffs fail to allege any plausible injury-in-fact or injury "of the type the antitrust laws were intended to prevent," *In re Aluminum*, 833 F.3d at 157, and their antitrust claims must be dismissed.

### 2. *Plaintiffs Are Not Efficient Enforcers.*

Plaintiffs' antitrust claims should also be dismissed because Plaintiffs are not "efficient enforcer[s] of the antitrust laws." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005). In determining whether plaintiffs are efficient enforcers, courts consider, among other factors: (i) the "directness" of the asserted injury, which requires consideration of whether it is "close in the chain of causation"; (ii) the existence of other, more direct "potential plaintiffs" whose "self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"; and (iii) the "speculativeness" of alleged damages. *Gatt*, 711 F.3d at 78-79.

---

[21] Indeed, Plaintiffs fail to explain how any of these dealer-to-dealer transactions caused them any harm at all. Even crediting Plaintiffs' conclusory allegation that prices posted in the interdealer market were somehow used as "reference" points in pricing bonds in the dealer-to-investor market, Plaintiffs still fail to plead injury resulting from any alleged conduct in the interdealer market. Plaintiffs do not allege they ever bought or sold any of the bonds subject to alleged manipulation in the interdealer market, nor do they plead any facts to explain how dealer-to-dealer transactions in one type of bond impacted price negotiations for bonds of a different type, each bond having different issuers, issuance dates, volumes, maturity rates and other features. *See Harry*, 244 F. Supp. 3d at 420; *see also* Section I.A.1.b. Even if Plaintiffs articulated some sort of attenuated harm based on this, such "collateral damage" is insufficient to plead antitrust injury. *See In re Aluminum*, 833 F.3d at 160-63.

18

Courts do not hesitate to dismiss cases when one or more of these factors weighs against standing. *See, e.g.*, *Daniel*, 428 F.3d at 443-44 (holding that plaintiffs lacked antitrust standing where one efficient enforcer factor raised "particular standing concerns"). Here, *each* of these factors weighs decisively in favor of dismissing Plaintiffs' claims.

a. Plaintiffs' Claims Are Too Remote and Indirect.

Plaintiffs do not allege that they were parties to any of the purported transactions allegedly described by the chats cited, or that they were directly harmed by those transactions. *See supra* Section I.A.1. Instead, they allege that, by manipulating the transactions alleged in the Complaint, Defendants somehow "also affected the prices at which the investor would engage in subsequent trades," CAC ¶ 309, or otherwise reduced "dealer competition in the market" in undefined ways. *Id.* ¶¶ 301-02. Plaintiffs' assertion that any person who transacted in any USD SSA bond with any Defendant during the decade-long Class Period is an efficient enforcer is contrary to the law.

Plaintiffs are not efficient enforcers because the purported chain of causation linking Defendants' alleged conduct to Plaintiffs' alleged injury (if any) is far too remote and attenuated to give rise to antitrust standing. Because Plaintiffs were not parties to any transactions the alleged chats purportedly describe, their claims necessarily depend on a complex chain of events whereby the allegedly manipulated prices of the few transactions alleged or the unexplained effects of "diminished [] dealer competition," CAC ¶ 302, somehow impacted negotiations regarding other transactions in other bonds with different characteristics, terms, tenors, and often issuers. Plaintiffs have not even attempted to plead the links in this chain. *See Arista Records*, 532 F. Supp. 2d at 574 (failure to "specifically articulate any of the links in this causal chain" is

19

fatal to standing).  Even if Plaintiffs had, the "attenuated causation between the alleged

conspiracy and the asserted injury is too indirect to support antitrust standing."  *Laydon v.*

*Mizuho Bank, Ltd.* ("*Laydon I*"), No. 12-CV-3419 (GBD), 2014 WL 1280464, at *9 (S.D.N.Y.

Mar. 28, 2014); *see also AGC*, 459 U.S. at 540 ("vaguely defined links" are insufficient).  Courts

regularly dismiss antitrust claims that depend upon reconstructing the choices of multiple

decision-makers and the operation of independent market variables, as Plaintiffs' claim here

would require.[22]

███████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

b.    <u>More Efficient Enforcers Exist.</u>

Plaintiffs are also not efficient enforcers because, assuming *arguendo* that Defendants

engaged in the alleged misconduct, there would be a group of "more direct victims" of the

---

[22] *See Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13-14 (2d Cir. 1980) (finding no antitrust standing where "[t]o establish a causal chain, the actions of innumerable individual decision-makers must be reconstructed"); *see also In re Dig. Music*, 812 F. Supp. 2d at 403; *de Atucha v. Commodity Exch., Inc.*, 608 F. Supp. 510, 516 (S.D.N.Y. 1985); *Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, No. 98 Civ. 4067 (LAP), 1999 WL 1201701, at *3-4 (S.D.N.Y. Dec. 15, 1999).

[23] *See Precision*, 2011 WL 7053807, at *8 (dismissing antitrust claims despite direct purchases, because "plaintiffs d[id] not make any connection between the defendants' anticompetitive conduct and their alleged injuries").

alleged scheme, whose "self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"—namely, the counterparties who purchased or sold the bonds alleged to have been manipulated through the chats alleged in the Complaint. *See AGC*, 459 U.S. at 542, 545; *see also Gatt*, 711 F.3d at 79 (the "direct victims" of alleged bid-rigging conspiracy were the "state agencies" to whom the sham bids were submitted).[24] These counterparties, rather than Plaintiffs, would be the proper parties (if any) to bring suit if they perceived and plausibly alleged some cognizable injury.

c.    Damages Are Speculative.

Plaintiffs' alleged damages are also highly speculative and would not be susceptible to "a just and reasonable estimate . . . even with the aid of expert testimony." *Gelboim*, 823 F.3d at 779.[25] Any attempt to ascertain Plaintiffs' alleged damages would require the Court to engage in a series of speculative calculations, guessing as to what each Dealer Defendant's bids and offers, and the bids and offers of other dealers not alleged to have participated in the conspiracy, would have been with respect to a plethora of individual bond transactions absent the alleged collusion throughout a ten-year Class Period. The difficulty—and potential impossibility—of this task shows that Plaintiffs are not efficient enforcers. *See, e.g.*, *Laydon I*, 2014 WL 1280464, at *10. Even if such an alternative universe could be constructed, the Court would still need to determine whether and to what extent each Plaintiff suffered a net injury across all of its SSA bond

---

[24] *See also Harry*, 244 F. Supp. 3d at 423 ("There exist 'more direct victims' of the misconduct alleged, namely, those who purchased physical natural gas at the regional hubs during the time period in which the defendants are alleged to have manipulated the index prices at those hubs, and those who purchased derivative instruments tied to those index prices.").

[25] While Plaintiffs allege that "[w]ell-known methods exist" for estimating damages (CAC ¶ 312), they offer no support for that allegation. In fact, the "research literature" Plaintiffs cite as purported support once again relates to entirely different product markets.

transactions.[26]  Accordingly, "to find antitrust damages . . . would engage the court in hopeless speculation concerning the relative effect of an alleged conspiracy . . . on the price of [SSA bond transactions], where countless other market variables could have intervened to affect those pricing decisions."  *Reading*, 631 F.2d at 13-14.  Claims requiring such "intricate efforts to recreate the possible permutations in the causes and effects of a price change," *id.* at 14, are not contemplated by the antitrust laws and only show that Plaintiffs are "inefficient engine[s] of enforcement."  *Gelboim*, 823 F.3d at 779.

### B. Plaintiffs Do Not Plausibly Allege a Conspiracy.

To state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1"), under both the *per se* rule and the rule of reason, a plaintiff must allege "enough factual matter (taken as true) to suggest that an agreement was made" that imposed an unreasonable restraint on trade. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *accord Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  Accordingly, to survive a motion to dismiss, a plaintiff must either (i) "assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws," or (ii) "present circumstantial facts supporting the *inference* that a conspiracy existed."  *Citigroup*, 709 F.3d at 136.

Not only must the alleged facts be consistent with an inference of conspiracy, they also must "render a § 1 conspiracy plausible."  *Twombly*, 550 U.S. at 556; *accord In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007).  Where, as here, conspiracy allegations "make[] no economic sense," the conspiracy is implausible and the claim should be dismissed.  *United*

---

[26] *See Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F. Supp. 486, 489 (S.D.N.Y. 1987) ("An antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct.") (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986)).

*Magazine Co. v. Murdoch Magazines Distrib., Inc.*, 146 F. Supp. 2d 385, 402 (S.D.N.Y. 2001) (dismissing Section 1 claim "[s]ince, under any theory, plaintiffs['] alleged conspiracy . . . makes no economic sense"), *aff'd sub nom. United Magazine Co. v. Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008).

██████████████████████████████████████████████

███████████████████████████ Plaintiffs' latest attempt to articulate and support a plausible conspiracy theory remains fatally flawed. ████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ This theory is implausible and unsupported by the facts alleged.

Plaintiffs fail to plead facts sufficient to establish a conspiracy among Defendants to manipulate or fix prices for USD SSA bond transactions. As a threshold matter, Plaintiffs' conspiracy theory is fundamentally implausible as Plaintiffs do not—and cannot—allege facts establishing how Defendants could collectively manipulate USD SSA bond prices across the entire purported market for USD SSA bonds, because (1) Plaintiffs fail to allege an industry-wide mechanism to set, benchmark, or even affect prices, (2) Plaintiffs do not allege that every major USD SSA bond dealer was involved in the alleged conspiracy, or that the Dealer Defendants possessed market power significant enough to give them any incentive to enter into

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

the alleged conspiratorial agreement, and (3) Plaintiffs do not plausibly allege that each Dealer Defendant was active in the alleged conspiracy throughout the decade-long class period.

Absent these allegations, the broad-based conspiracy that Plaintiffs allege simply "makes no economic sense." *United Magazine Co.*, 146 F. Supp. 2d at 402. Moreover, Plaintiffs fail to allege any direct evidence of a conspiracy among Defendants to manipulate or fix the prices of SSA bonds or even circumstantial evidence supporting the inference of such an all-encompassing conspiracy.

1. *The Conspiracy Alleged by Plaintiffs Is Implausible.*

█████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████ ████████████████ This theory is implausible on its face.

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ Absent such allegations, the broad-based conspiracy that Plaintiffs advance is implausible—indeed, no rational person would agree to participate in such a "conspiracy." Failing to allege the existence of any process or mechanism to implement the allegedly global conspiracy, Plaintiffs likewise fail to explain how the Defendants could reasonably have expected such a conspiracy to work—even with respect to individual

---

█ ███████████████████████████████████████████

████████████████████████████

transactions—when any customer could obtain a competitive quote simply by requesting one from one of the many dealers that are not alleged to have been part of a price-fixing conspiracy, or indeed not alleged to have been a participant in the specific chat purportedly fixing the price of any particular bond. Relatedly, Plaintiffs also fail to allege that the Dealer Defendants had any ability to monitor their alleged co-conspirators and ensure compliance with the conspiracy.[29]

In other Section 1 cases alleging market manipulation, plaintiffs have, at the very least, pled a feasible process by which a small group of traders could broadly affect the price of the relevant financial products and thereby profit collectively. For example, in *In re Foreign Exchange Benchmark Rates Antitrust Litigation* ("*In re Forex*"), the plaintiffs alleged that, by engaging in certain trading practices, traders were able to affect the "fix," a closing benchmark rate set daily by WM/Reuters on which traders and investors relied in their transactions. 74 F. Supp. 3d 581, 587 (S.D.N.Y 2015). Similarly, in *Alaska Electrical Pension Fund v. Bank of America Corp.*, the plaintiffs alleged that the defendants conspired to engage in manipulative transactions and made false submissions in order to affect USD ISDAfix, "a benchmark interest rate incorporated into a broad range of financial derivatives." 175 F. Supp. 3d 44, 49-51 (S.D.N.Y. 2016).

Here, Plaintiffs do not allege any such mechanism that could have broadly impacted the numerous different USD SSA bonds that are traded in the purported market in which Plaintiffs allege they transacted.[30] To the contrary, Plaintiffs allege that USD SSA bonds are traded in

---

[29] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

[30] Documents cited in the Complaint make clear that "the bond market . . . lacks readily manipulated benchmarks."

25

individualized, over-the-counter transactions and that "there is no open, anonymous exchange that matches SSA bond buyers and sellers." CAC ¶ 109. In other words, Plaintiffs allege that prices are negotiated between individual buyers and sellers for the purpose of setting a price for a specific USD SSA bond in connection with a specific transaction. Plaintiffs do not, however, allege any means by which the handful of traders they identify could have controlled the prices at which such transactions occurred.

*Second*, Plaintiffs have sued only a small subset of the dealers that traded USD SSA bonds and ignored altogether how the conduct of other dealers would have impacted the alleged conspiracy.[31] *Id.* ¶ 113. Without the participation of all or most of the dealers trading USD SSA bonds, there would be nothing to prevent the sophisticated customers who trade in these bonds from obtaining better prices from other dealers.[32] Rather than pleading "reliable market share figures," Plaintiffs baldly contend that "Defendants were very significant players in the overall USD SSA bond market." *Id.* ¶ 310. The only non-conclusory facts Plaintiffs allege in support of this contention are that, according to news articles, Gudka was a "big name" in the industry and

---

Craig McGlashan, Owen Sanderson, Ralph Sinclair & Toby Fildes, *Scandal rocks SSA market*, GlobalCapital (Jan. 7, 2016), http://www.globalcapital.com/article/vydmn22frhms/trading-scandal-rocks-ssa-market (cited at CAC ¶ 317 n.50).

[31] Plaintiffs acknowledge the existence of non-Defendant dealers, *see* CAC ¶ 109, and that investors contacted multiple dealers to transact in USD SSA bonds. Plaintiffs also acknowledge the existence of "multi-dealer platforms" that customers could easily access to obtain competing quotes from multiple dealers simultaneously. *Id.* ¶ 111. Plaintiffs' allegation that it is impractical for investors to "'shop around' to more than a few dealers at a time," CAC ¶ 113, is irrelevant (and undercuts Plaintiffs' argument that "an enlarged set of bidders" would have provided them with better prices. CAC ¶ 303). Plaintiffs do not allege that investors solicited quotes only from Defendants. That investors could and likely did solicit quotes from any other dealers renders the alleged conspiracy implausible.

[32] Plaintiffs appear to suggest, based entirely on theoretical economic literature with no specific relation to USD SSA bond sales, that Defendants could benefit economically because they could assume that *any* reduction in competitors would allow them to quote wider bid-ask spreads. CAC ¶ 307. This contention is wholly speculative and, again, ignores the market reality that numerous other dealers would have stood ready and willing to undercut any non-competitive offer.

his move from Deutsche Bank to Bank of America was "deemed 'a blow'" because he was an experienced professional with "'strong client relationships.'" *Id*. These allegations about a single trader, even assuming their truth, fall woefully short of adequately pleading that a group of alleged co-conspirators had the kind of market power necessary to pervasively impact prices and provide any incentive to engage in the alleged conspiracy.

*Third,* Plaintiffs' claims are further undermined by the fact that Plaintiffs do not come close to alleging facts suggesting each of the Dealer Defendants participated in the purported conspiracy throughout the alleged Class Period. ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████

In an effort to cure this deficiency, in the CAC, ██████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

Even if it were theoretically possible to coordinate pricing of thousands of trades involving hundreds of bonds through *ad hoc* communications about individual trades, such coordination would require a massive amount of constant communication among *all* of the traders allegedly involved in the conspiracy.  But Plaintiffs plead nothing of the sort.

2. *Plaintiffs Fail to Allege Direct Evidence of Agreement Among Defendants to Fix the Price of SSA Bonds.*

Far from it.  Plaintiffs continue to rely on ███████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████ Such allegations do

not adequately plead the industry-wide price-fixing conspiracy Plaintiffs claim, *In re Zinc*

*Antitrust Litig.*, 155 F. Supp. 3d 337, 368-69 (S.D.N.Y. 2016), as Plaintiffs have failed to allege

how the alleged manipulation of one bond could plausibly affect the prices of bonds across the

market, *see* Section I.B.1, *supra*.



[36] As Plaintiffs acknowledge, the Dealer and Individual Defendants worked as market makers (CAC ¶ 109), which, at times, required the communication of certain information including going rates and bond availability. There is nothing surprising about market makers communicating with each other to offer or sell securities, or discuss related information. Separately, Plaintiffs assert that "[t]he OTC market in SSA bonds is even more opaque than many other OTC bond markets, such as corporate bonds, because there is no post-trade price transparency" and "[u]nlike many different markets, in SSA bonds there is limited ability to purchase secondary market trading information." CAC ¶ 114. This factual position asserted by the Plaintiffs would necessitate the sharing of market information that Plaintiffs rely upon as the foundation for much of their claim.

---

[36] These allegations are, at best, relevant to a rule of reason case, which, as discussed in more detail below, Plaintiffs have not pled. *See infra*, Section I.B.4.

Indeed, ███████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ The chat excerpts

included by Plaintiffs do not show what Plaintiffs say they show.  For example:

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ███████████████████████████████████

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████

At base, t███████████████████████████████████████

████████████████████████████ and the Court should not accept Plaintiffs' conclusory

characterizations to the contrary, particularly because they are so clearly contradicted by the

chats' (and the CAC's) actual text. ██████████████████████████

31

█████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████ ■ Plaintiffs'

allegations fail to show that the Defendants in this case altered their behavior based on any of

these exchanges, or acted anti-competitively in any way. Taken together, those communications

do not render plausible the massive price-fixing conspiracy among all Defendants alleged by

Plaintiffs.

3. *Plaintiffs Fail to Allege Circumstantial Evidence Sufficient to Support a Plausible Inference of Conspiracy.*

In the absence of allegations of direct evidence, "a horizontal agreement . . . may be

inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied

by circumstantial evidence and plus factors." *Citigroup*, 709 F.3d at 136. "These 'plus factors'

may include: a common motive to conspire, evidence that shows that the parallel acts were

against the apparent individual economic self-interest of the alleged conspirators, and evidence

of a high level of interfirm communications." *Id.* Here, Plaintiffs fail to make any such

allegations of parallel conduct among all Defendants. Further, Plaintiffs' allegations regarding

"plus factors" are deficient, as Plaintiffs' assertions regarding the Individual Defendants'

supposed motive, social ties and the reported government investigations of certain Defendants do

not give rise to any plausible inference of conspiracy.

---

■ █████████████████████████████████████████████████████████

████████████████████████████

a. Plaintiffs Fail to Adequately Allege Parallel Conduct by Defendants.

In the typical Section 1 case, a plaintiff seeking to establish an inference of widespread conspiracy alleges similarly widespread parallel conduct. For example, in price-fixing cases, plaintiffs, at the very least, provide factual allegations purporting to establish uniform pricing by alleged conspirators and similarities in the size and timing of price changes. *See, e.g.*, *In re Currency Conversion Fee Antitrust Litig.,* 773 F. Supp. 2d 351, 367-73 (S.D.N.Y. 2011) (alleging a two and a half year period during which the defendants met and subsequently implemented the same foreign currency conversion fee); *Alaska Elec. Pension Fund,* 175 F. Supp. 3d at 54 (alleging that the defendant banks made ISDAFIX submissions reflecting the "exact same bid/ask spread" nearly every day for multiple years). In stark contrast, nothing in the CAC comes close to alleging consistent, widespread parallel conduct by all Defendants from which a broad conspiracy could be inferred. *See Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, No 11.-CV-2652-GPC-RBB, 2013 WL 3873074, at *9 (S.D. Cal. July 25, 2013) ("[I]solated action" is insufficient to "prove the existence of a huge antitrust conspiracy with multiple objectives and goals."), *aff'd*, 642 F. App'x 665 (9th Cir. 2016). At best, ████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

b.    Plaintiffs' Allegations of a Motive to Conspire are Implausible.

Plaintiffs allege the Dealer Defendants had a motive to conspire so as to "ensure that cartel members could transact with investors at prices that were more favorable for the conspiring dealers—and thus worse for their customers—than they could have achieved without colluding." CAC ¶ 123. Aside from alleging no facts to support this conclusion, Plaintiffs' theory fails to take stock of Defendants' status as "market makers," charged with "provid[ing] liquidity . . . by being willing to buy and sell SSA bonds," *id.* ¶ 109 and who needed to continuously trade even with one another to "hedge risk," *id.* ¶ 116. Where, as here, the alleged co-conspirators would continuously find themselves on both sides of the market, "it is harder to infer a conspiracy from individual acts of trader-based manipulation" because "any changes may well offset each other." *CHF LIBOR*, 2017 WL 4250480, at *19. In addition, Plaintiffs allege no facts suggesting the purported cartel members would have overlapping interests regarding which direction the price of a particular bond should be moved at any given time. *Id.* ("With no consistent preference between a higher and a lower CHF LIBOR rate, plaintiffs fail to explain why it is plausible to think that defendants would consistently share a preference at any given time, particularly over the course of a decade, and why one defendant's interests might not be adverse to another's.").

Nor have Plaintiffs articulated how two traders could reasonably believe their coordinated pricing would not be undercut by any of the other traders in the market—both those traders not alleged to be part of the cartel, and any purported cartel members who were not parties to the bilateral chats allegedly coordinating the pricing of the particular bond. *Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755 (RMW), 2012 WL 70644, at *5 (N.D. Cal. Jan. 9,

2012), *aff'd sub nom. Universal Grading Serv., LLC v. eBay, Inc.*, 563 F. App'x 571 (9th Cir. 2014) (rejecting conspiracy theory in which prospect of profit to co-conspirators was unlikely).



Plaintiffs also allege the existence of ongoing investigations into trading of SSA bonds by government agencies (*see* CAC ¶¶ 313-20), but courts have consistently held that the pendency of an investigation is insufficient to support an inference of conspiracy. *See, e.g.*, *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 154 (E.D.N.Y. 2010) (allegation of an investigation "'carries no weight in pleading an antitrust conspiracy claim'") (quoting *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007)).[40] Here, Plaintiffs do not allege that Defendants have pled guilty to any charges related to trading SSA bonds, or even that all Defendants are the subject of an investigation into alleged price fixing.[41] Moreover, Plaintiffs do not and cannot allege that any such investigations are even based on Plaintiffs' theory of industry-wide price-fixing, much less that they have uncovered any wrongdoing probative of such a conspiracy. For this reason, the facts of this case are plainly distinguishable from those at issue in cases where courts have found that investigations or penalties relating to "the very conduct alleged in the Complaint" were a plus factor supporting an inference of conspiracy. *See, e.g.*, *In re Forex*, 74 F. Supp. 3d at 592; *see also Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) (conspiracy was plausibly alleged where, among other things, the DOJ allegedly "launched two new investigations" into the very conduct plaintiffs were suing over). And as noted above, it has been publicly reported that one of the

---

[40] *See also Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.*, 738 F. Supp. 2d 505, 517 (D. Del. 2010) (dismissing complaint and ruling that a government investigation is not probative of an antitrust violation because the existence of a government investigation "is equally consistent with Defendants' innocence"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (existence of a DOJ investigation did not support plaintiff's antitrust claims).

[41] Plaintiffs do not allege any investigations at all concerning any of the Barclays, BNPP, HSBC, RBC, or TD Bank Defendants.

regulators at issue—the U.K. Financial Conduct Authority—has already closed its investigation without taking action against any entity or individual.[42]

Plaintiffs also allege that Dealer Defendants suspended or terminated certain traders, and that certain traders are now listed as "inactive" on the FCA register. CAC ¶ 314. These allegations, too, are insufficient to support an inference of conspiracy. Plaintiffs plead no facts that establish either that these personnel decisions or any trader's status on the FCA register are the result of any purported conspiracy.[43] *Cf. In re Iconix Brand Grp, Inc.*, No. 15 Civ. 4860 (PGG), 2017 WL 4898228, at *19 (S.D.N.Y. Oct. 25, 2017) ("[T]here are any number of reasons that an executive might resign, most of which are not related to fraud"); *accord Wyche v. Advanced Drainage Sys., Inc.*, 15 Civ. 5955 (KPF), 2017 WL 971805, at *17 (S.D.N.Y. Mar. 10, 2017), *aff'd*, 2017 WL 4570663 (2d Cir. Oct. 13, 2017).

4.  *Plaintiffs Fail to Define Any Proper Relevant Antitrust Market or Show That Defendants Had Market Power.*

To the extent Plaintiffs purport to assert Section 1 claims based merely on exchanges of information, they are required to plead their claims under the rule of reason. *See U.S. Gypsum Co.*, 438 U.S. at 441 n.16. Plaintiffs, however, fail to allege the required elements of a rule of reason claim. Under the rule of reason,

---

[42] *See supra* n.7.

[43] Notably, there is no allegation that any of the Barclays, BNP Paribas, Citi, HSBC, RBC or TD Defendants ever suspended or terminated any traders in connection with any misconduct related to SSA bond trading. Furthermore, as a result of the FCA's new Senior Managers and Certification Regime, effective March 7, 2016, only senior management must be pre-approved by the FCA. As of March 2016, certain categories of individuals no longer require FCA approval and would therefore have been listed as "inactive" on the FCA register as of a date in March 2016, despite continuing in their existing roles. Accordingly, to the extent that Plaintiffs seek to rely on the "inactive" status of any trader, no plausible inference that a trader was terminated, suspended or under investigation, *see* CAC ¶ 313-14, can be drawn from this status.

> [w]here the plaintiff fails to define its proposed relevant market with reference to
> the rule of reasonable interchangeability and cross-elasticity of demand, or alleges
> a proposed relevant market that clearly does not encompass all interchangeable
> substitute products even when all factual inferences are granted in plaintiff's
> favor, the relevant market is legally insufficient and a motion to dismiss may be
> granted.

*Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.*, 414 F. App'x 372, 375

(2d Cir. 2011); *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 441 (3d

Cir. 1997) (dismissing antitrust claim where "plaintiffs have not pleaded a valid relevant

market").

Although the CAC repeatedly and conclusorily refers to the "market" for USD SSA

bonds, *see, e.g.*, CAC ¶¶ 1-2, 14, 16, 109, 113, 123, it is devoid of allegations establishing that

this is a legally sufficient antitrust market. Plaintiffs allege no facts regarding how USD SSA

bonds interact competitively with other securities, including non-USD denominated SSA bonds,

or why other types of securities are not viable substitutes for USD SSA bonds. Plaintiffs

conclusorily allege that the relevant market consists of sovereign government debt issued in

foreign currencies, *id.* ¶ 97, but not "[g]overnment debt issued in a sovereign's domestic

currency." *Id*. ¶ 97 n.23. And yet, Plaintiffs do not even attempt to explain why these products

are not interchangeable. In fact, Plaintiffs acknowledge that SSA bonds are part of a "'segment

of the broader bond market sitting between sovereign government issuers on the one hand and

private credit issuers on the other,'" *id.* ¶ 95, but fail to offer any economic basis as to why the

relevant antitrust market does not include other products within this "broader bond market."

In addition, Plaintiffs' proposed market lumps together bonds offered by four types of

issuers—supranational, sovereign, sub-sovereign and agency—without any basis for doing so.

*See id.* ¶¶ 95-98. As alleged, the purported market actually includes hundreds of different types

38

of bonds offered by a disparate array of issuers.[44]  *Id.*  Yet Plaintiffs make no factual allegations about the competitive interaction among these bonds.  *See Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993) ("If a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand, as the complaint here fails to do, a court may grant a Rule 12(b)(6) motion.").

Plaintiffs' allegations also are insufficient under the rule of reason because they fail to allege "with . . . particularity the effect of the defendants' alleged actions on the [purported] market," or otherwise establish that the Defendants possess "market power sufficient to inhibit competition on a market-wide basis."  *Kasada, Inc. v. Access Capital, Inc.*, No. 01 Civ. 8893 (GBD), 2004 WL 2903776, at *8 (S.D.N.Y. Dec. 14, 2004).  *See also* Section I.B.1, *supra*.  Plaintiffs offer no facts that show *any* competitive effect.

First, Plaintiffs attempt to show an effect on competition through theoretical economic literature.  This economic literature is not a substitute for well-pled facts, and is insufficient to support a claim at the pleading stage.[45]  Regardless, the economic literature that Plaintiffs cite is entirely irrelevant.  *See* Section I.A.1.b, *supra*.  It discusses competition in markets—such as those for exchange-traded stocks, certain OTC bonds and credit default swaps—where there is

---

[44] This fact is unchanged by Plaintiffs' unsupported allegation that several bonds account for 40% of the alleged market.  CAC ¶ 99.  In fact, one source quoted by Plaintiffs characterizes the term "SSA" as "encompass[ing] a highly diverse array of international issuers, all with varied funding requirements."  Rabobank, *SSA Market Primer*, 1 (Sep. 12, 2014) (cited at CAC ¶ 95 n.21).

[45] *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, No. 5:11-CV-04003-LHK, 2013 WL 2156358, at *7 (N.D. Cal. May 17, 2013) (holding that "[expert] opinions cannot substitute for facts" and dismissing the complaint for failure to state a claim).

public reporting of transactions.[46]  This literature is entirely inapplicable to the allegedly "opaque" SSA bond market where there was allegedly no price transparency or informational efficiency.  *See, e.g.*, CAC ¶ 114 ("[T]here is often no transparency into trading volumes or prices . . . . Unlike many different markets, in SSA bonds there is limited ability to purchase secondary market trading information.").

Second, Plaintiffs assert that any customer who transacted with Dealer Defendants was forever tainted "because the rigged transaction served as a reference point for the pricing of future transactions."  CAC ¶ 309.  This contention is utterly speculative.  Plaintiffs do not allege a single transaction in which any Plaintiff—or any other party—paid an artificial price as the result of a previous transaction with any Defendant.  In addition, this contention is implausible.  As noted above, Plaintiffs could have availed themselves of quotes from numerous other USD SSA bond dealers that Plaintiffs do not allege were part of the supposed conspiracy.  *See* Section I.B.1, *supra*.  Even assuming any Plaintiff had a flawed reference point, it would be swiftly corrected by competitive bids, or rendered irrelevant by the passage of time and movement of prices in the broader market.

### C.     Plaintiffs Engage in Improper Group Pleading.

The CAC violates the prohibition on group pleading because Plaintiffs do not distinguish in key ways between and among the Dealer Defendants.  *In re Zinc*, 155 F. Supp. 3d at 384

---

[46] *See, e.g.*, Yee Cheng Loon & Ken Zhong, *Does Dodd-Frank Affect OTC Transaction Costs and Liquidity? Evidence from the Real-Time CDS Trade Reports*, 119 J. FIN. ECON. 645 (2016) (examining the price effects of mandatory reporting and price dissemination on OTC credit default swap transactions); Terrence Hendershott & Ananth Madhavan, *Click or Call?  Auction versus Search in the Over-the-Counter Market*, 70 J. FIN. 419 (2015) (discussing the competitive effects of OTC bonds being traded via a multi-dealer auction); Amy K. Edwards, Lawrence E. Harris & Michael S. Piwowar, *Corporate Bond Market Transaction Costs and Transparency*, 62 J. FIN. 1421 (2007) (using a trade data registry maintained by the Financial Industry Regulatory Authority to measure transaction costs associated with OTC bonds).

("[A]t the pleading stage [of an] antitrust case, . . . each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose.").  In the CAC, this defect takes two forms.

First, ███████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
█████████  This violates basic pleading requirements.  Plaintiffs may not "merely 'lump[] all the defendants together in each claim and provid[e] no factual basis to distinguish their conduct.'" *Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, No. 12 Civ. 2837 (KBF), 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012) (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (alterations in original)), *aff'd*, 530 F. App'x 19 (2d Cir. 2013); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (complaint may not state allegations "in entirely general terms without any specification of any particular activities by any particular defendant"). ████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████████████

███████████  Indeed, as to five of the Dealer Defendants, there are no specific allegations about their conduct at all.[47]  *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 Civ. 5263 (AKH), 2017 WL 3600425, at *11 (S.D.N.Y. Aug. 18, 2017) (dismissing antitrust claims against certain defendants where "plaintiffs have failed to allege with specificity how [those defendants] participated in the conspiracy.").

Pleading corporate affiliates collectively as a single defendant is no more permissible than any other form of group pleading.  "The fact that two separate legal entities may have a corporate affiliation . . . does not alter [the] pleading requirement" because "[i]n the absence of allegations that corporate formalities have been ignored, courts appropriately and routinely adhere to legal separateness."  *In re Zinc*, 155 F. Supp. 3d at 384.  Furthermore, as this Court has previously acknowledged,

> Conclusory, collective language is too convenient, too undisciplined, and too unfocused in light of exposures to litigation expense and disruption (even without ultimate liability) that are so great in antitrust (and other) cases.  Such exposure ought to be limited to those who have been made at least reasonably aware of what they have done or failed to do, lest the litigants be left to wander aimlessly through the wilds and wilderness of discovery to no ultimate destination.

*Concord Assocs., L.P. v. Entm't Props. Tr.*, No. 12 Civ. 1667 (ER), 2014 WL 1396524, at *25 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016) (quoting *In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011)).  For this reason, courts consistently dismiss claims pleaded against undifferentiated groups of corporate affiliates without any specificity as to which entity took which actions, as Plaintiffs plead here.[48]

---

[47] No specific allegations of inappropriate conduct are made against Barclays Capital Inc., BNP Paribas Sec. Corp., RBC Capital Markets, LLC, TD Securities (USA) LLC, or Nomura Securities International, Inc.

[48] *See, e.g.*, *In re Zinc*, 155 F. Supp. 3d at 383-84; *Concord Assocs.*, 2014 WL 1396524, at *24-27; *American Sales Co. v. AstraZeneca AB*, No. 10 Civ. 6062 (PKC), 2011 WL 1465786, at *4-5 (S.D.N.Y. Apr. 14, 2011); *Precision*,

Plaintiffs' sampling of alleged communications between Individual Defendants raises the precise concerns that have led courts to reject group pleading. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ By proceeding in this way, Plaintiffs purport to add multiple defendants to their suit without a single allegation against any of them. This information is critical because the excerpted messages are the only specific facts Plaintiffs allege in support of their claims. The many affiliates that did not employ the named traders therefore have no alleged "direct involvement" in the purported conspiracy, and the claims against them should be dismissed on this ground alone. *In re Dig. Music*, 812 F. Supp. 2d at 417 (unless the complaint "allege[s] a basis to disregard the separate corporate forms of these entities," those entities without "direct involvement" in the allegations are not proper defendants).

## II. PLAINTIFFS INCLUDE NO ALLEGATIONS RELATED TO PRE-JULY 20, 2009 TRANSACTIONS.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

2011 WL 7053807, at *14-19 (E.D.N.Y. Jan. 4, 2011) (also noting that to hold otherwise would "impose liability on dozens of defendants based on corporate affiliation alone"), *report and recommendation adopted by* 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

Courts routinely trim such overbroad and insufficiently pleaded class periods.[50]  The CAC does not contain a single alleged communication or other substantive allegation relating to the four-and-a-half year period between 2005 and July 2009.  Plaintiffs have not pleaded *any* pre-July 2009 conduct, let alone any specific pre-July 2009 statements by any Defendant that might plausibly suggest the existence of an unlawful conspiracy.  Plaintiffs have not even alleged any pre-July 2009 meetings or communications during which Defendants would have had an *opportunity* to conspire.  Indeed, the only non-conclusory references in the CAC to the pre-July 2009 period are a few paragraphs alleging that certain Individual Defendants worked as SSA bond traders at various Dealer Defendants.  *See, e.g., id.* ¶ 125.  In short, nothing in the CAC supports *any* contention of misconduct pre-July 2009, much less gives rise to a plausible inference of a conspiracy.

## CONCLUSION

For the foregoing reasons, the Consolidated Amended Class Action Complaint should be dismissed with prejudice.

Dated:  December 12, 2017
        New York, New York

---

[50] *See, e.g., In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789 (LGS), 2016 WL 5108131, at *16-17 (S.D.N.Y. Sept. 20, 2016) (plaintiffs did not plausibly allege any conspiratorial activity before 2007; court limited class period to 2007-2013); *In re London Silver Fixing Antitrust Litig.*, 213 F. Supp. 3d 530, 558 n.19 (S.D.N.Y. 2016) (limiting class period to from 2007 to 2013 when  it had "absolutely no basis, apart from conjecture, to assume that Defendants' conduct continued beyond" that period); *In re Credit Default Swaps Antitrust Litig.*, No. 13MD2476 (DLC), 2014 WL 4379112, *14 (S.D.N.Y. Sept. 4, 2014) (dismissing portion of antitrust claim because the "Complaint does not plausibly allege injury-in-fact as early as the date specified."); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 (YGR), 2014 WL 309192, at *12 (N.D. Cal. Jan. 21, 2014) (dismissing antitrust claim prior to 2002 because "the allegations of the complaints do not support a class period extending back to the years 2000 and 2001"); *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1077 (D. Kan. 2009) (finding "[u]nder *Twombly*, plaintiffs cannot simply allege a conspiracy beginning at a particular time; rather, they must allege facts to support the existence of a conspiracy during the entire period").

/s/ Carmine D. Boccuzzi Jr.
Carmine D. Boccuzzi Jr.
Martha E. Vega-Gonzalez
Timothy Thomas Leech
CLEARY GOTTLIEB STEEN & HAMILTON
LLP
One Liberty Plaza
New York, NY 10006
Telephone:  (212) 225- 2508
Fax: (212) 225-3999
cboccuzzi@cgsh.com
mvega-gonzalez@cgsh.com
tleech@cgsh.com

*Attorneys for Defendant BNP Paribas and BNP Paribas Securities Corp.*

/s/ Lisa J. Fried
Lisa J. Fried
Kevin T. Baumann
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York  10022
Telephone: (212) 918-3000
Fax: (212) 918-3100
lisa.fried@hoganlovells.com
kevin.baumann@hoganlovells.com

Benjamin F. Holt
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-8845
Fax: (202) 637-5910
benjamin.holt@hoganlovells.com

*Attorneys for Defendant Crédit Agricole Corporate & Investment Bank*

/s/ Jay B. Kasner
Jay B. Kasner
Paul M. Eckles
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, New York  10036
Telephone: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
paul.eckles@skadden.com

*Attorneys for Defendants Citigroup Inc., Citibank N.A., Citigroup Global Markets Inc., and Citigroup Global Markets Limited*

/s/ Herbert S. Washer
Herbert S. Washer
David G. Januszewski
Elai Katz
Jason M. Hall
Sheila C. Ramesh
Adam S. Mintz
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
Telephone: (212) 701-3000
Fax: (212) 269-5420
hwasher@cahill.com
djanuszewski@cahill.com
ekatz@cahill.com
jhall@cahill.com
sramesh@cahill.com
amintz@cahill.com

*Attorneys for Defendants Credit Suisse AG, Credit Suisse Securities (USA) LLC, Credit Suisse Securities (Europe) Ltd., and Credit Suisse International*

/s/ Daniel L. Stein
Daniel L. Stein
Jennifer Rosa
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 506-2500
Fax: (212) 262-1910
dstein@mayerbrown.com
jrosa@mayerbrown.com

Andrew S. Marovitz
Britt M. Miller
Robert Entwisle
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600
Fax: (312) 701-7711
amarovitz@mayerbrown.com
bmiller@mayerbrown.com
rentwisle@mayerbrown.com

*Attorneys for Defendants HSBC Securities (USA)
Inc. and HSBC Bank plc*

/s/ John D. Buretta
John D. Buretta
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Fax: (212) 474-3700
jburetta@cravath.com

*Attorneys for Defendant Nomura
International plc*

/s/ Aidan Synnott
Aidan Synnott
Kristen-Elise F. DePizzo
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3213
Fax: (212) 492-0213
asynnott@paulweiss.com
kdepizzo@paulweiss.com

*Attorneys for Defendant Nomura Securities
International, Inc.*

/s/ Alexander J. Willscher
Alexander J. Willscher
Matthew J. Porpora
Stephen H. O. Clarke
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588
willschera@sullcrom.com
porporam@sullcrom.com
clarkest@sullcrom.com

*Attorneys for Royal Bank of Canada, RBC
Capital Markets, LLC and RBC Europe
Limited*

/s/ Joel M. Cohen
Joel M. Cohen
James H.R. Windels
Bryan McArdle
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Fax: (212) 701-5800
joel.cohen@davispolk.com
james.windels@davispolk.com
bryan.mcardle@davispolk.com

*Attorneys for Defendants The Toronto-Dominion Bank, TD Securities Limited, and TD Securities (USA) LLC*


/s/ Barry G. Scher
Barry G. Sher
Anthony Antonelli
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Fax: (212) 230-7716
barrysher@paulhastings.com
anthonyantonelli@paulhastings.com

*Attorneys for Barclays Bank PLC, Barclays Capital Inc., Barclays Services Limited, and Barclays Capital Securities Limited*