UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE SSA BONDS ANTITRUST LITIGATION

**OPINION AND ORDER**

16 Civ. 3711 (ER)

Ramos, D.J.:

This litigation arises from fourteen related complaints filed against a number of banks and certain of their employees who allegedly conspired to fix the price of supranational, sovereign, and agency ("SSA") bonds sold to and purchased from investors in the secondary market. These actions were consolidated under the caption *In re SSA Bonds Antitrust Litigation*, No. 16 Civ. 3711. *See* Docs. 36, 314. Pending before the Court are Defendants' motions to dismiss the Consolidated Amended Class Action Complaint ("CAC") for lack of subject-matter jurisdiction, failure to state a claim, lack of personal jurisdiction, and improper venue. Docs. 342, 358, 365, 373, 376, 378. For the reasons set forth below, the Court GRANTS the motions to dismiss for failure to state a claim.

**I.    Background**

    **A.    Factual Background[1]**

SSA bonds are debt securities issued by governmental and quasi-governmental entities to fund a range of public-policy mandates. CAC ¶ 2, Doc. 306. Entities issuing SSA bonds include supranational organizations, which are multilateral institutions with shareholders from multiple countries, such as the World Bank's International Bank for Reconstruction and Development

---

[1] The following facts, drawn from the CAC, are presumed to be true for the purposes of Defendants' motions to dismiss. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

("IBRD") and the European Investment Bank ("EIB"); sovereign and subsovereign borrowers, which are national, state, or provincial governments that issue debt in foreign currencies; and agency borrowers, which are typically entities owned by or working on behalf of governments, such as Germany's Kreditanstalt für Wiederaufbau ("KFW") (a government-owned investment bank). CAC ¶¶ 95–98. SSA bonds are generally regarded as secure investments because they often enjoy special legal status or government backing. CAC ¶¶ 2, 95. SSA bonds can be U.S. dollar denominated ("USD") as a way to target the U.S. bond market. CAC ¶ 103.

After being issued, SSA bonds can be resold and traded by dealers and investors. CAC ¶ 109. Investors trade SSA bonds in an over-the-counter market, meaning that rather than using an open, anonymous exchange that matches buyers and sellers, investors transact individually and privately with dealers. CAC ¶¶ 109, 396. An investor typically contacts one or more dealers by telephone, electronic chat messaging, or an electronic trading platform to request a quote, which the dealer relays to the investor, who can then place the order.[2] CAC ¶¶ 110–112. Because it is time-consuming to contact dealers and their quotes usually expire in a short amount of time, investors generally do not "shop around" with more than a few dealers at a time. CAC ¶ 113. Investors also do not have access to real-time market data and have limited ability to purchase secondary market trading information, so they rely on dealers for pricing information on SSA bonds. CAC ¶¶ 112, 114. Dealers typically quote prices for SSA bonds in basis points (one basis point is 1/100th of a percentage point) as a spread above the yield of the relevant

---

[2] Dealers can also trade with other dealers through interdealer brokers. CAC ¶ 116. Dealers submit bid and offer prices to interdealer brokers, which publish them to trading platforms, where other dealers can view and accept them. *Id.* Transactions through interdealer brokers are supposed to be anonymous. CAC ¶ 117.

benchmark U.S. Treasury bonds with a similar maturity.[3]  CAC ¶ 119.  SSA bond yields are inversely related to bond prices:  the higher the spread above Treasury bond yields, the cheaper the price of the bond, and vice versa.  CAC ¶ 121.  Therefore, investors sought to buy SSA bonds at the highest available offer in basis points (*i.e.*, the highest yield, and thus the cheapest price) and to sell them at the lowest available bid in basis points (*i.e.*, the lowest yield, and thus the most expensive price).  *Id.*

Defendants are several banks operating as dealers in the USD SSA bond market (the "Dealer Defendants") and certain of their employees responsible for the USD SSA bond trading business (the "Individual Defendants").  CAC ¶ 3.  The Dealer Defendants are Bank of America, Barclays, BNP Paribas, Citi, Crédit Agricole, Credit Suisse, Deutsche Bank, HSBC, Nomura, RBC, and TD Bank.[4]  CAC ¶¶ 32–87.  The Individual Defendants, who worked at various Dealer Defendants over time, are Hiren Gudka, who worked at Bank of America and Deutsche Bank; Bhardeep Singh Heer, who worked at Nomura; Amandeep Singh Manku, who worked at Bank of America, Crédit Agricole, and HSBC; Gary McDonald, who worked at Bank of America, Citi, and TD Bank; and Shailen Pau, who worked at RBC, Credit Suisse, and Crédit Agricole.  CAC ¶¶ 88–94.  In addition to the Individual Defendants, the CAC alleges that the conspiracy was also carried out by several other employees of the Dealer Defendants: ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████

---

[3] The Court will simply refer to "basis points" as a shorthand for this method of pricing.

[4] The CAC names as defendants numerous subsidiaries and affiliates of the Dealer Defendants, but for brevity's sake, the Court lists them here using the definitions employed in the CAC.

3



CAC ¶ 124.

Plaintiffs allege that Defendants conspired to not compete against each other for the sale of USD SSA bonds to customers, and instead to cooperate to achieve prices and terms more favorable to them and worse for their customers. CAC ¶¶ 7, 12, 130. In support of this allegation, Plaintiffs quote from transcripts of over 150 chats and phone calls ▮▮▮, which they dub the "cooperation materials" that were produced by two settling Dealer Defendants (Bank of America and Deutsche Bank).[6] CAC ¶ 5, Pls.' Merits Opp'n 2, Doc. 424. Generally, the communications amongst these employees purport to show that, rather than compete for business, they were actively conspiring in real time to quote prices to potential customers that would steer the customer to one or another bank, among other things. The Court will not attempt to recount all the alleged conversations here, but rather provides the following representative examples:



---

[5] ▮▮▮

[6] The CAC notes that "[t]he claims against Bank of America and Deutsche Bank are subject to a settlement agreement, but these parties are named herein because the settlements have not yet been finally approved, and these two Defendants have thus not yet been dismissed from the action." CAC ¶ 5 n.3.

4





In December 2015, news broke that the U.S. Department of Justice had launched an investigation into collusion in the SSA bond market, which was followed by reports of investigations by the United Kingdom Financial Conduct Authority and the European Commission. CAC ¶¶ 315–320. Media reports and public filings indicated that Bank of

America, Citi, Crédit Agricole, Credit Suisse, and Nomura were among those being investigated. CAC ¶¶ 317, 319. In late 2015 or early 2016, "all or nearly all of the key participants in the cartel," including four of the five Individual Defendants, "were removed from their positions on the SSA bond trading desks" by their employers as a result of their alleged misconduct.[7] CAC ¶ 314.

Plaintiffs are the Iron Workers Pension Plan of Western Pennsylvania ("Iron Workers") and the Sheet Metal Workers Pension Plan of Northern California ("Sheet Metal Workers"). CAC ¶¶ 28–29. Plaintiffs seek to represent a class comprising "[a]ll persons or entities who, from January 1, 2005 to December 31, 2015 [the "Class Period"], directly entered into U.S.-dollar denominated SSA bond transactions with Defendants, or their respective subsidiaries or affiliates, in the United States or its territories or otherwise involving U.S. trade or commerce." CAC ¶ 404. Plaintiffs allege that at some point during the Class Period, one or both Plaintiffs transacted with six of the eleven Dealer Defendants for USD SSA bonds.[8] CAC ¶¶ 35, 39, 51, 60, 78, 85.

Plaintiffs do not allege that any of the approximately 150 cited chats referred to transactions to which they were a party. Instead, they allege that "the conspiracy was in operation on *every* transaction entered into by these Defendants during the Class Period," not just those associated with the chats summarized in the CAC. CAC ¶ 298. Consequently, they allege

---

[7] The CAC does not allege that McDonald was suspended or terminated from his position, but it alleges that he has been inactive on the Financial Conduct Authority register for traders since March 2016. CAC ¶ 314 n.45.

[8] Plaintiffs allege that they transacted with Bank of America, Barclays, Citi, Credit Suisse, RBC, and TD Bank. CAC ¶¶ 35, 39, 51, 60, 78, 85. Plaintiffs do not allege that they transacted with BNP Paribas, Crédit Agricole, Deutsche Bank, HSBC, and Nomura, although they allege that putative class members did. CAC ¶¶ 45–48, 56–57, 65–75.

7

that USD SSA bond transactions with Defendants had prices that were artificially inflated or deflated across the board. CAC ¶¶ 307–308. In support of this theory, they cite several pieces of "academic literature" for the proposition that "less competition among dealers increases spreads and prices" paid by investors. CAC ¶ 303 (emphasis omitted). Although Plaintiffs have not specified the amount of their damages, they state that, among other methods, "damages can potentially be quantified by comparing the bid-ask spreads[9] paid by Class Members in the actual world (the world affected by the conspiracy) to the spreads paid on comparable instruments after the period of collusion ended," while controlling for other factors. CAC ¶ 312.



### B.   Procedural Background

The first complaint in this case was filed on May 18, 2016, and was followed by several related actions. On August 22, 2016, the Court consolidated these and subsequent related actions under the above caption. Doc. 36. Ultimately, fourteen actions were consolidated, although

---

[9] A "bid-ask spread" or "bid-offer spread" is the difference, or margin, between a dealer's bid to buy a bond and the dealer's offer to sell the same bond. CAC ¶¶ 119–120.

some plaintiffs withdrew from the consolidated action or dismissed their action.  *See* Docs. 304, 314.  On December 22, 2016, the Court appointed Quinn Emanuel Urquhart & Sullivan, LLP and Robbins Geller Rudman & Dowd LLP as interim co-lead counsel in the consolidated action.  Doc. 88.

On April 7, 2017, Plaintiffs filed a Consolidated Complaint.  Doc. 130.  Following their settlement with Deutsche Bank, Plaintiffs requested leave to file a Consolidated Amended Complaint ("CAC") on October 6, 2017, which the Court granted on November 3, 2017.  Doc. 305.  The CAC asserts a single cause of action for conspiracy to restrain trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.  CAC ¶¶ 413–420.  On December 12, 2017, Defendants moved to dismiss the CAC for lack of subject-matter jurisdiction, failure to state a claim, lack of personal jurisdiction, and improper venue.  Docs. 342, 358, 365, 373, 376, 378.  In March 2018, the Court preliminarily approved the settlement agreements staying proceedings between Plaintiffs and Bank of America, Deutsche Bank, and Gudka, and Plaintiffs voluntarily dismissed TD Securities Limited, a TD Bank subsidiary.  Docs. 428, 430, 431, 448.

## II.  Subject-Matter Jurisdiction

At the outset, the Court must address the question of standing under Article III of the Constitution.[10]  In a footnote, the Dealer Defendants argue that Plaintiffs' failure to allege an injury-in-fact supporting antitrust standing means they have also failed to allege an injury-in-fact sufficient to support Article III standing.[11]  Dealer Defs.' Merits Mem. 10 n.10, Doc. 347.  That

---

[10] "A court proceeds to an antitrust standing analysis only after Article III standing has been established." *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 n.1 (2d Cir. 2008).

[11] For this proposition, the Dealer Defendants cite the district court's decision in *Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402, 420 n.13 (S.D.N.Y. 2017), *aff'd as modified*, 889 F.3d 104 (2d Cir. 2018), but this holding was subsequently rejected on modification by the Second Circuit, *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 107 (2d Cir. 2018).

9

is incorrect because "the pleading standard for constitutional standing is lower than the standard for a substantive cause of action." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 110 (2d Cir. 2018).

"Article III of the Constitution limits the jurisdiction of federal courts to the resolution of 'cases' and 'controversies.'" *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008) (quoting U.S. Const. art. III, § 2). "To establish standing under Article III of the Constitution, a plaintiff must allege '(1) *injury-in-fact*, which is a concrete and particularized harm to a legally protected interest; (2) *causation* in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability*, or a non-speculative likelihood that the injury can be remedied by the requested relief.'" *Total Gas*, 889 F.3d at 110 (quoting *W.R. Huff*, 549 F.3d at 106–07).

It is important to note, however, that while "at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating'" an injury-in-fact, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)), "'[c]learly alleging' is a 'low[er] threshold' than that for 'sustaining a valid cause of action,'" *Total Gas*, 889 F.3d at 110 (second alteration in original) (quoting *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008)). Put another way, while a plaintiff must show that a cause of action is "plausible" in order to state a claim, *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), "[f]or standing purposes, [it] is enough" to merely "place [the injury] within the realm of possibility," *Total Gas*, 889 F.3d at 111.[12]

---

[12] To be sure, on a motion to dismiss, a plaintiff's allegations must "plausibly suggest that it has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). But "at the pleading stage, 'general factual allegations of injury . . . may suffice,'" *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)), to

10

Here, Plaintiffs allege that they were injured by Defendants who engaged in a conspiracy to not compete and to charge supracompetitive prices on every SSA bond transaction, including those that Plaintiffs entered into. CAC ¶¶ 130, 298. As will be explained, the Court finds this alleged injury too implausible to state an antitrust claim, but because it is "within the realm of possibility," it is sufficient to confer Article III standing on Plaintiffs. *Total Gas*, 889 F.3d at 111.

## III. Failure to State a Claim[13]

### A. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 & n.3 (2d Cir.

---

meet the "low threshold" of injury-in-fact under Article III, *id.* (quoting *WC Capital Mgmt., LLC v. UBS Sec., LLC*, 711 F.3d 322, 329 (2d Cir. 2013)).

[13] "Under the circumstances, the Court exercises its discretion to address [Defendants'] motion to dismiss for failure to state a claim before addressing personal jurisdiction" and venue. *In re London Silver Fixing, Ltd., Antitrust Litig.*, Nos. 14 MDL 2573, 14 Misc. 2573 (VEC), 2018 WL 3585277, at *5 n.5 (S.D.N.Y. July 25, 2018); *see Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012) ("[I]n cases such as this one with multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants."). Because Plaintiffs fail to state a claim, as will be explained, the Court declines to address personal jurisdiction and venue.

2007) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007)), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits'" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)). The Court therefore must ordinarily confine itself to the four corners of the complaint and look only to the allegations contained therein. *Id.* When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . .").

Likewise, "[t]here is no heightened pleading requirement in antitrust cases." *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 54 (S.D.N.Y. 2012). However, "a plaintiff must do more than cite relevant antitrust language to state a claim for relief." *Wolf Concept S.A.R.L. v. Eber Bros. Wine & Liquor Corp.*, 736 F. Supp. 2d 661, 667 (W.D.N.Y. 2010) (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)). "A plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant

violated those laws are insufficient." *Id.* at 667–68 (quoting *Kasada, Inc. v. Access Capital, Inc.*, No. 01 Civ. 8893 (GBD), 2004 WL 2903776, at *3 (S.D.N.Y. Dec. 14, 2004)).  "[A] bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal." *Id.* at 668 (quoting *Heart Disease Research Found. v. Gen. Motors Corp.*, 463 F.2d 98, 100 (2d Cir. 1972)).

### B.     Antitrust Standing

"Section 4 of the Clayton Act establishes a private right of action for violations of the federal antitrust laws," such as section 1 of the Sherman Act, and grants that right to "[a]ny person who [is] injured in his business or property by reason of anything forbidden in the antitrust laws." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013) (alterations in original) (quoting 15 U.S.C. § 15).  The right to pursue private actions is limited by the concept of "antitrust standing." *Id.*  "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [the Court] must dismiss it as a matter of law." *Id.* (first alteration in original) (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc)).  "In determining antitrust standing, [the Court] 'assume[s] the existence' of an antitrust violation."[14] *Total Gas*, 889 F.3d at 115 (quoting *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016)).

"To satisfy the antitrust standing requirement, a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust injury and (ii) it is an acceptable plaintiff to pursue the

---

[14] As will be explained, because Plaintiffs fail to plausibly allege antitrust standing, the Court need not address whether Plaintiffs have adequately alleged a conspiracy in violation of the antitrust laws.  *Cf. Concord Assocs., L.P. v. Entm't Props. Tr.*, No. 12 Civ. 1667 (ER), 2014 WL 1396524, at *10 n.7 (S.D.N.Y. Apr. 9, 2014) ("Since the Court may dismiss the Amended Complaint on the basis of [p]laintiffs' failure to allege a relevant market, it will not address whether [p]laintiffs have adequately alleged conduct in violation of the antitrust laws."), *aff'd*, 817 F.3d 46 (2d Cir. 2016).

13

alleged antitrust violations."[15]  *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016).  "To demonstrate antitrust injury, 'a plaintiff must show (1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute.'"[16]  *Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 568 (S.D.N.Y. 2007) (quoting *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004)).  "[T]o suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained."  *Aluminum Warehousing*, 833 F.3d at 161.  "[U]nlike [government] agencies, [private] [p]laintiffs do not have the right to bring suit against any person they reasonably suspect has committed a certain sort of wrong. . . .  Plaintiffs can only recover in a civil action if they can establish that *they themselves* have been harmed by [d]efendants' activities."  *Total Gas*, 889 F.3d at 109–10 (emphasis added).

Plaintiffs claim they are injured because at some point during the Class Period, they transacted with certain Dealer Defendants for USD SSA bonds.  CAC ¶¶ 35, 39, 51, 60, 78, 85.  During that period, they argue, every USD SSA bond transaction with the Dealer Defendants closed at a price that was artificially inflated or deflated by the antitrust conspiracy.  CAC ¶¶ 298, 307–308.  They point to numerous chat logs evincing collusive behavior, but they do not allege that any of these chats referred to transactions to which they were a party.  Pls.' Merits Opp'n 2–3, 5.  Instead, Plaintiffs contend that these chats were "mere examples" of acts in

---

[15] The suitability of the plaintiff is often described as whether the plaintiff is an "efficient enforcer" of the antitrust laws.  *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157–58 (2d Cir. 2016).

[16] "While some courts speak of 'antitrust injury' comprehensively to include" all three of these elements, the third element specifically is sometimes referred to as "antitrust injury."  2A Phillip E. Areeda, Herbert Hovenkamp, et al., *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 337a, at 99–100 (4th ed. 2014).

14

furtherance of a continuous conspiracy that infected "each and every" transaction.  Pls.' May 21, 2018 Letter 2, Doc. 488 (emphases omitted); Pls.' Merits Opp'n 3; CAC ¶¶ 20, 298, 307.

However, absent other allegations showing injury, courts have found no injury where the plaintiffs failed to allege any specific transactions that they entered into that harmed them through the defendants' misconduct.  *See Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402, 416 (S.D.N.Y. 2017) ("The plaintiffs' failure to allege a single specific transaction that lost value as a result of the defendants' alleged misconduct precludes a plausible allegation of actual injury."), *aff'd as modified on other grounds*, 889 F.3d 104 (2d Cir. 2018); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08 Civ. 42 (JG) (VVP), 2011 WL 7053807, at *11 (E.D.N.Y. Jan. 4, 2011) (finding no injury where plaintiffs failed to allege that they purchased freight forwarding services on the specific routes with allegedly anticompetitive surcharges), *report and recommendation adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012). Here, Plaintiffs have not alleged any specific transactions that had an artificially unfavorable price that injured them.[17]

The closest Plaintiffs come to alleging a specific transaction is one occasion where

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
████████████████████████████████████████

---

[17] Although absent putative class members may have been counterparties to and injured by manipulated transactions referenced in the chat logs, this is insufficient to establish injury to the named Plaintiffs. *See W.R. Huff*, 549 F.3d at 106 n.5 ("[N]amed plaintiffs in a class action 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" (emphasis omitted) (quoting *Warth*, 422 U.S. at 502)).

15

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ CAC ¶ 264. Even assuming this chat shows manipulation of the market for ██████ bonds, "[t]he fact that Plaintiff[] may have traded in the same 24 hour period as traders . . . discussed manipulation . . . is simply too thin a basis for the Court to infer that it is plausible that the traders' employers caused the Plaintiff[] actual damages."[18] *In re London Silver Fixing, Ltd., Antitrust Litig.*, Nos. 14 MDL 2573, 14 Misc. 2573 (VEC), 2018 WL 3585277, at *27 n.36 (S.D.N.Y. July 25, 2018).

"That is not to say that Plaintiffs must *necessarily* allege 'the specific transactions on which they were injured.'" *Id.* at *25 n.34 (emphasis added) (quoting *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789 (LGS), 2016 WL 5108131, at *20 (S.D.N.Y. Sept. 20, 2016)). "Although information regarding particular transactions is a straightforward method of pleading actual damages, it is not the only means of doing so. Among other things, statistical analysis of market prices and quotes or allegations based on government enforcement actions may suffice to allege the expected impact of a manipulative tactic on a given market and the expected frequency of manipulation."[19] *Id.*

---

[18] The requirement of "actual damages" or "actual injury" under the Commodity Exchange Act is similar to the requirement of injury-in-fact under the Clayton Act. *Total Gas*, 889 F.3d at 111, 115–16 (holding that the plaintiffs satisfied neither for similar reasons).

[19] To be sure, pleading an "actual adverse effect in the marketplace" or "harm to competition [is] not required to withstand a motion to dismiss when the conduct challenged is a *per se* violation." *Gelboim*, 823 F.3d at 775–76; *see generally Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993) (stating that *per se* violations, such as horizontal and vertical price-fixing, "are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are 'conclusively presumed illegal without further examination'" (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8 (1979))). But regardless of any *per se* violation, Plaintiffs are still required to plausibly allege harm to *them*, and one way of doing so is through an analysis of market prices.

However, Plaintiffs have provided no such statistical analyses. They point to "academic literature" for the unsurprising theory that "less competition among dealers increases spreads and prices" paid by investors. CAC ¶ 303 (emphasis omitted). But they provide no analysis showing that this theory was actually borne out by the alleged collusion in the SSA bond market and yielded higher prices on their own trades.[20] Indeed, they acknowledge that "damages can potentially be quantified by comparing the bid-ask spreads paid by Class Members in the actual world (the world affected by the conspiracy) to the spreads paid on comparable instruments after the period of collusion ended," while controlling for other factors.[21] CAC ¶ 312. Plaintiffs have provided no such comparison of spreads paid during and after the period of collusion.[22] And although Plaintiffs cite media reports confirming the existence of government investigations into collusion in the SSA bond market, none of those reports purport to show any impact of the manipulation on the market or the manipulation's scope to suggest that Plaintiffs' prices were among those affected. CAC ¶¶ 315–320. Because "Plaintiffs do not even present evidence that they traded at 'artificial prices,'" they have alleged "no actual injury . . . , let alone a connection between Defendants' unlawful conduct and that non-injury." *Total Gas*, 889 F.3d at 116.

Plaintiffs essentially ask this Court to infer, based on approximately 150 chats allegedly showing manipulated transactions with unknown counterparties over the course of eleven

---

[20] Plaintiffs admit that "there is no literature (yet) studying the precise effect that Defendants' reduction of competition had in the USD SSA bond market." Pls.' Merits Opp'n 48.

[21] The alleged collusion appears to be over or at least significantly reduced since "all or nearly all of the key participants in the cartel were removed from their positions" in late 2015 or early 2016 as their employers and government investigators became aware of the conspiracy. CAC ¶ 314.

[22] While the Court "do[es] not require that a plaintiff calculate damages at the pleading stage, [it] certainly need[s] some reason to believe that any damage has occurred at all." *Total Gas*, 889 F.3d at 115.

17

years,[23] that Plaintiffs' individually negotiated transactions with the Dealer Defendants during that period must have likewise been tainted and injured them. Pls.' Merits Opp'n 2–3. This, by itself, is insufficient for the Court to reasonably draw such an inference. *See London Silver Fixing*, 2018 WL 3585277, at *25 n.34 (rejecting "[p]laintiffs' theory . . . that the Court can infer from the chat messages and government enforcement proceedings both that the chat messages are the 'tip of the iceberg' and, that given this presumed frequency of manipulation, [p]laintiffs must have been injured"); *cf. In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 623 (S.D.N.Y. 2013) (rejecting the argument that alleged "manipulation was so constant that plaintiffs adequately plead actual damages by alleging merely that they traded during the Class Period" where allegations indicated that manipulation occurred between approximately 10% to 20% of the time over a four-year period).[24]

Accordingly, because Plaintiffs have not plausibly alleged that they themselves were injured by the alleged conspiracy, their antitrust claim must be dismissed.

---

[23] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Plaintiffs ask the Court to infer that the depicted conduct took place continuously over an eleven-year Class Period. CAC ¶¶ 5, 404.

[24] Plaintiffs urge the Court to infer that their transactions with the Dealer Defendants injured them because Defendants' "agreement not to compete is illegal *per se*." Pls.' Merits Opp'n 45. "For standing purposes, however, whether there was or was not a *per se* violation is irrelevant." *Balaklaw v. Lovell*, 14 F.3d 793, 800 (2d Cir. 1994); *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341–42 (1990) ("The *per se* rule is a method of determining whether § 1 of the Sherman Act has been violated, but it does not indicate whether a private plaintiff has suffered antitrust injury . . . ."). "Regardless of any substantive violation of the Sherman Act," Plaintiffs must still plausibly allege that Defendants "engaged in anticompetitive conduct that caused them an antitrust injury." *Balaklaw*, 14 F.3d at 800. Plaintiffs rely on *New York v. Hendrickson Bros.*, 840 F.2d 1065 (2d Cir. 1988), which held that "[i]n general, the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust laws is deemed to have suffered the antitrust injury," but that case is not to the contrary. *Id.* at 1079. Plaintiffs must still plausibly allege that the prices that *they* paid were fixed at an artificially high level. *See Arista Records*, 532 F. Supp. 2d at 568–69 ("Although such a horizontal price-fixing arrangement is *per se* unlawful under § 1 of the Sherman Act, [counter-plaintiff] has not established that *it* suffered injury-in-fact as a result of counter-defendants' purported arrangement." (citation and footnote omitted)).

## IV. Leave to Amend

Federal Rule of Civil Procedure 15 instructs courts to "freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has instructed courts not to dismiss a complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Shabazz v. Bezio*, 511 F. App'x 28, 31 (2d Cir. 2013) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)). In *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160 (2d Cir. 2015), the Second Circuit reaffirmed the "liberal spirit" of Rule 15 and counseled strongly against the dismissal of claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of those claims. *Id.* at 190–91 (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011) (per curiam)).

Here, although Plaintiffs have already had the opportunity to amend their original complaint, because this is the Court's first opportunity to highlight the precise defects of Plaintiffs' pleading and it is not yet apparent that another opportunity to amend would be futile, the Court will permit Plaintiffs to replead their dismissed claims.

## V. Conclusion

The Court GRANTS Defendants' motions to dismiss for failure to state a claim because Plaintiffs have failed to plausibly allege an injury-in-fact sufficient to establish antitrust standing.[25] The Clerk of the Court is respectfully directed to terminate the motions, Docs. 342, 344, 358, 365, 373, 376, 378, 406, 453, 468. Plaintiffs may file a second consolidated amended complaint, if at all, on or before **October 23, 2018**. If Plaintiffs elect to not file a second

---

[25] Defendants' requests for oral argument on the motions and Plaintiffs' request for a conference concerning possible jurisdictional discovery are denied as moot.

...

consolidated amended complaint, they may apply to the Court for entry of judgment any time before then.

It is SO ORDERED.

Dated: August 24, 2018
New York, New York

_____
Edgardo Ramos, U.S.D.J.