UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE SSA BONDS ANTITRUST LITIGATION

**OPINION AND ORDER**
16 Civ. 3711 (ER)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC # _____
DATE FILED: Oct. 4, 2019

Ramos, D.J.:

This litigation arises from fourteen related complaints filed against several banks and

certain employees who allegedly conspired to fix the price of supranational, sovereign, and

agency ("SSA") bonds sold to and purchased from investors in the secondary market, where

investors can buy and sell bonds among themselves. These actions were consolidated under the

caption *In re SSA Bonds Antitrust Litigation*, No. 16 Civ. 3711. *See* Docs. 36, 314. Pending

before the Court are the motions to dismiss the Second Consolidated Amended Class Action

Complaint ("SAC") for lack of personal jurisdiction and improper venue for certain foreign

corporate and individual Defendants. Docs. 520, 533, 537, 540, 542. For the reasons set forth

below, the motions are GRANTED.

## I.  BACKGROUND

### 1)  Factual Background[1]

SSA bonds are debt securities issued by governmental and quasi-governmental entities to

fund a range of public-policy mandates. SAC ¶ 2, Doc. 506. Entities issuing SSA bonds include

supranational organizations, which are multilateral institutions with shareholders from multiple

countries, such as the World Bank and the European Investment Bank; sovereign and

---

[1] The following facts, drawn from the SAC, are presumed to be true for the purposes of Defendants' motions to dismiss. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

subsovereign borrowers, which are national, state, or provincial governments that issue debt in foreign currencies; and agency borrowers, which are typically entities owned by or working on behalf of governments, such as Germany's Kreditanstalt für Wiederaufbau (a government-owned investment bank). *Id.* ¶¶ 2, 118. SSA bonds are generally regarded as secure investments because they often enjoy special legal status or government backing. *Id.* ¶¶ 2, 49. SSA bonds can be U.S. dollar denominated ("USD") and sold in the U.S. bond market. *Id.* ¶ 52.

After being issued, SSA bonds can be resold and traded by dealers and investors. *Id.* ¶ 129. Investors trade SSA bonds in an over-the-counter market, meaning that rather than using an open, anonymous exchange that matches buyers and sellers, investors transact individually and privately with dealers. *Id.* ¶¶ 129, 553. An investor typically contacts one or more dealers by telephone, electronic chat messaging, or electronic trading platform to request a quote, which the dealer relays to the investor, who can then place the order. *Id.* ¶¶ 130–31. Because it is time-consuming to contact dealers and because their quotes usually expire in a short amount of time, investors generally do not "shop around" with more than a few dealers at a time. *Id.* ¶ 133. Investors also do not have access to real-time market data and have limited ability to purchase secondary market trading information, so they rely on dealers for pricing information for the bonds. *Id.* ¶¶ 132.

Dealers typically quote prices for SSA bonds in basis points (one basis point is 1/100th of a percentage point) as a spread above the yield of the relevant benchmark U.S. Treasury bonds with a similar maturity.[2] *Id.* ¶ 139. SSA bond yields are inversely related to bond prices: the higher the spread above Treasury bond yields, the cheaper the price of the bond, and vice versa. *Id.* ¶ 141. Therefore, investors seek to buy SSA bonds at the highest available offer in basis

---

[2] The Court will simply refer to "basis points" as a shorthand for this method of pricing.

points (i.e., the highest yield, and thus the cheapest price) and to sell them at the lowest available bid in basis points (i.e., the lowest yield, and thus the most expensive price). *Id.* For purposes of this motion, the corporate Defendants are several foreign banks operating as dealers in the USD SSA bond market (the "Foreign Dealer Defendants"). *Id.* ¶ 17. Each Foreign Dealer Defendant is headquartered and organized under the laws of a foreign country. Juris. Memo 5, Doc. 521.

The thirteen Foreign Dealer Defendants seeking dismissal of all claims based on lack of personal jurisdiction are: Barclays Bank PLC, Barclays Capital Securities Limited, Barclays Services Limited, BNP Paribas, Citigroup Global Markets Limited, Crédit Agricole Corporate & Investment Bank, Credit Suisse AG, Credit Suisse International, Credit Suisse Securities (Europe) Ltd., Nomura International [PLC], Royal Bank of Canada, RBC Europe Limited, and The Toronto Dominion Bank. *Id.* at 1 n.1, 5. A subset of six Foreign Dealer Defendants challenge venue in New York based on Plaintiffs' reliance on Section 12 of the Clayton Act: Barclays Capital Securities Limited, Barclays Services Limited, Credit Suisse International, Credit Suisse Securities (Europe) Ltd., and Nomura International PLC. *Id.* at 5.

And four individual defendants ("Individual Defendants"), all British citizens or residents, join the Foreign Dealer Defendants in their motion to dismiss: Gary McDonald ("McDonald") (Doc. 533), Amandeep Singh Manku ("Manku") (Doc. 537), Shailen Pau ("Pau") (Doc. 540), and Bhardeep Singh Heer ("Heer") (Doc. 542). These four Defendants were employed by several of the bank Defendants as USD SSA bond traders and communicated with each other via chat messages about their transactions. ██████████████████

██████████████████████████████████████████████

██████████████████████████████████ ██████████████████████████████████

██████████████████████████████ SAC ¶ 371–73, Doc. 506.

The named Plaintiffs are the Alaska Permanent Fund Corporation ("Alaska Permanent Fund"), the Alaska Department of Revenue, and the Iron Workers Pension Plan of Western Pennsylvania ("Iron Workers"). SAC ¶¶ 36–40, Doc. 506. Plaintiffs seek to represent a Class comprising of all persons or entities who directly entered into USD SSA bond transactions with Defendants, their respective subsidiaries, or affiliates, and which involved trade with the United States from January 1, 2009 to December 31, 2015 (the "Class Period"). *Id.* ¶ 561.

### 2) Jurisdictional Facts

Plaintiffs allege that the Foreign Dealer Defendants and the Individual Defendants, directly and through U.S.-based affiliates, colluded to make money in the USD SSA bond market at the expense of U.S. customers. Opp. Memo 1, Doc. 579. The Foreign Dealer Defendants approved and priced the named Plaintiffs' transactions, knowing they were with a U.S. counterparty. *Id.* at 2. As an example of how the alleged scheme worked, Plaintiffs point to an Alaska Permanent Fund USD SSA bond transaction with unnamed parties:

> Alaska Permanent Fund Corporation's decisions to buy and sell USD SSA bonds were made in the United States, after placing inquiries with U.S.-based salespeople working at the Dealer Defendants, *who then passed the inquiry to the Dealer Defendants' London-based traders for a price.* The U.S.-based salespeople then received the price and gave it to Alaska Permanent Fund Corporation's domestic investment manager in the United States. Finally, the purchase or sale transaction was executed in the United States, and either the USD SSA bond or the sale proceeds were delivered to Alaska Permanent Fund Corporation in the United States. *The Dealer Defendants' London desks knew they were pricing a trade for a U.S.-based investor and that the price would be conveyed back to the U.S.-based investor and result in a transaction executed in the United States, as they intended.*

---

[3] For simplicity, the Court collectively refers to the Foreign Dealer Defendants and the Individual Defendants as (the "Defendants").

4

*Id.* at 4–5. An "essential step[]" in the conspiracy was that the foreign entities priced the bonds for their U.S. cohorts. *Id.* at 5. Allegedly, the Foreign Dealer Defendants issued billions of USD SSA bonds to U.S. Class Members during the Class Period—████████████████████████

████ *Id.* at 6. BNP Paribas, Barclays Services Limited, and The Toronto-Dominion Bank deny that they executed USD SSA bond trades with U.S. Class Members. Juris. Memo 13 n.15, Doc. 521. Defendants contend that Plaintiffs have not established that these transactions show that the United States was the "focal point" of the alleged misconduct. Juris Memo 2, Doc. 521.

Plaintiffs also claim that the Foreign Dealer Defendants created a "constant flow of market information to and from Defendants' U.S.- and New York-based salespeople and traders and the London SSA desk." Opp. Memo 8, Doc. 579. It was "routine practice" for the Foreign Dealer Defendants to communicate with U.S.-based investors through daily calls regarding the performance of the SSA bond market and which facilitated sales that were ultimately booked by a U.S. salesperson. *Id.* at 9. The Foreign Dealer Defendants also attended "meet and greet" bond conferences in New York to network and generate business. *Id.* At these conferences, they met with U.S. customers and colleagues to further promote the USD SSA bond business. Additionally, the Foreign Dealer Defendants traveled to New York outside of the industry-wide conferences to meet directly with U.S. investors, traders, salespeople, etc. at their affiliated banks. *Id.* The meetings with the customers would involve discussions about their accounts and potential additional SSA bonds business transactions with the Foreign Dealer Defendants. *Id.*

To corroborate these claims, Plaintiffs point to chat transcripts ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

5

██████ *Id.* at 10–12. Additional factual allegations include that some USD SSA bonds were called "Yankee" bonds because they were denominated in U.S. dollars and predominantly issued and traded in the United States. SAC ¶ 122, Doc. 506. For example, Plaintiffs present data "that in 2013 over 75% of USD SSA activity came from U.S.-based clients." *Id.* On the other hand, Defendants argue that Plaintiffs have failed to allege that "Foreign Dealer Defendants participated in any wrongful conduct within or specifically directed at New York, or elsewhere in the United States." Juris Memo 2, Doc. 521. The Foreign Dealer Defendants assert that Plaintiffs' claims are "factually unsupported, boilerplate allegations." *Id.* at 5.

### 3) Procedural Background

The first complaint in this case was filed on May 18, 2016 and was followed by several related actions. Doc. 1. On August 22, 2016, the Court consolidated these and subsequent related actions under the above caption. Doc. 36. Ultimately, fourteen actions were consolidated, although some plaintiffs withdrew from the consolidated action or voluntarily dismissed their complaint. *See* Docs. 304, 314, 430. On December 21, 2016, the Court appointed Quinn Emanuel Urquhart & Sullivan, LLP and Robbins Geller Rudman & Dowd LLP as interim co-lead counsel in the consolidated action. Doc. 88.

On April 7, 2017, Plaintiffs filed an amended complaint. Doc. 130. Following their settlement with Deutsche Bank, Plaintiffs requested leave to file a Consolidated Amended Complaint ("CAC") on October 6, 2017, which the Court granted on November 3, 2017. Doc. 305. The CAC asserts a single cause of action for conspiracy to restrain trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. CAC ¶¶ 413–20, Doc. 306. On December 12, 2017, Defendants moved to dismiss the CAC for lack of subject-matter jurisdiction, failure to state a claim, lack of personal jurisdiction, and improper venue. Docs. 342, 358, 365, 373, 376, 378.

6

In March 2018, the Court preliminarily approved the settlement agreements staying the proceedings between Plaintiffs and Bank of America, Deutsche Bank, and Hiren Gudka, an Individual Defendant, and Plaintiffs voluntarily dismissed TD Securities Limited, a TD Bank subsidiary. Docs. 428, 430, 431, 448. On August 24, 2018, the Court granted the Defendants' motion to dismiss for failure to state a claim because Plaintiffs did not plausibly allege an injury-in-fact sufficient to establish antitrust standing. Doc. 495. The Court allowed Plaintiffs to file a Second Amended Complaint ("SAC"), which Plaintiffs filed on November 13, 2018. Doc. 506. On December 21, 2018, the Foreign Dealer Defendants and the Individual Defendants moved to dismiss it for lack of personal jurisdiction and improper venue. Docs. 520, 527, 533, 537, 540, 542, 569.

## II.    LEGAL STANDARD

All Defendants bring this motion to dismiss the case based on lack of personal jurisdiction. Plaintiffs bear the burden of establishing that the court has jurisdiction over the Foreign Dealer Defendants and the Individual Defendants. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). Before a court can exercise personal jurisdiction over a defendant, three requirements must be met: (1) plaintiff's service of process upon the defendant must have been procedurally proper, (2) there must be a statutory basis for personal jurisdiction that renders such service of process effective, and (3) the exercise of personal jurisdiction must comport with constitutional due process principles. *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 197 (S.D.N.Y. 2018). Six Foreign Dealer Defendants challenge venue under Section 12 of the Clayton Act. "The legal standard for a motion to dismiss for improper venue is the same as a motion to dismiss for lack of personal jurisdiction." *Casville Invs., Ltd. v. Kates,* No. 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005)).

On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[A] plaintiff may not rely on conclusory statements without any supporting facts, as such allegations would 'lack the factual specificity necessary to confer jurisdiction.'" *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14 Civ. 3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (quoting *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998)).

## III.    CLAYTON ACT

Personal jurisdiction is not proper under § 12 of the Clayton Act because Plaintiffs have not satisfied its venue provision. Plaintiffs bring this case pursuant to § 1 of the Sherman Act, which prohibits conspiracies restraining trade. SAC ¶ 571, Doc. 506. "Although plaintiffs allege violations of the Sherman Act, the private right of action to pursue antitrust claims is provided by the Clayton Act[.]" *In re Vitamin C Antitrust Litig.*, No. 05 Civ. 453 (BMC) (JO), 2012 WL 12355046, at *5 (E.D.N.Y. Aug. 8, 2012). In federal antitrust cases, § 12 of the Clayton Act provides for venue and service of process against a corporation in the judicial district where it is an inhabitant or where it may be found or transacts business. 15 U.S.C. § 22. The Section provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process *in such cases* may be served in the district of which it is an inhabitant, or wherever it may be found.

*Id.* (emphasis added). By authorizing service outside of the state, this Section is construed as conferring personal jurisdiction over the corporation served. *Goldlawr, Inc. v. Heiman*, 288 F.2d 579–81 (2d Cir. 1961), *rev'd on other grounds*, 369 U.S. 463 (1962). The Second Circuit has interpreted the phrase "in such cases," to limit Clayton Act personal jurisdiction only to suits where venue is proper—the judicial district where the corporation is an inhabitant, may be found,

or transacts business—and not more broadly to "any suit . . . under the antitrust laws." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005) (holding personal jurisdiction under Clayton Act is only proper when venue provision has been satisfied).

Alternatively, Plaintiffs seek to assert that venue is proper under § 12 of the Clayton Act by relying on a separate statute for venue, 28 U.S.C. § 1391(d), which provides that "a defendant not resident in the United States may be sued in any judicial district." Juris Memo 23, Doc. 521. However, if venue is not proper under the Clayton Act, then Plaintiffs cannot rely on § 1391(d) to apply the Clayton Act's worldwide service provisions and establish personal jurisdiction over the Defendants. Accordingly, to establish personal jurisdiction over the Foreign Dealer Defendants pursuant to § 12 of the Clayton Act, Plaintiffs must first prove that they are an inhabitant of, are found in, or transact business in New York.

For venue to be proper in a district where the defendant is not an "inhabitant,"[4] the defendant must "be found[5] or transact[] business" there. 15 U.S.C. § 22. The Supreme Court has construed the Clayton Act phrase "transacts business" as "the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character." *Dennis*, 343 F. Supp. 3d at 198–99. For a defendant to transact business of a "substantial character" there must be "some amount of business continuity and certainly more than a few isolated and peripheral contacts with the particular judicial district." *Id.* at 199.

---

[4] For a corporation, "inhabitant" means its place of incorporation. *See, e.g.*, *Expoconsul Int'l, Inc. v. A/E Systems, Inc.*, 711 F. Supp. 730, 732–33 (S.D.N.Y. 1989).

[5] To "be found" in a district requires more than "transacting business" there. *U.S. v. Watchmakers of Switzerland Info. Ctr.*, 133 F. Supp. 40, 42–43 (S.D.N.Y. 1955) (defining "more" as "proof of continuous local activities").

Of the thirteen Foreign Dealer Defendants, a subset of five challenge venue.[6]  Opp.

Memo 46, Doc. 579.  Plaintiffs argue that the "'transacts business' test is readily met here," as

every Venue Defendant "directed its collusive USD SSA bond trading activities to [and engaged

in these activities in] the United States, including to New York in particular." *Id.* at 47.  The

alleged trading activities included setting artificial prices that U.S. affiliates used to execute USD

SSA bond transactions with members of the Class in New York and that all Venue Defendants,

except Barclays Services Limited, directly executed bond transactions with members of the Class

in New York. *Id.*  Plaintiffs also allege that all the Venue Defendants periodically attended bond

conferences and in-person client meetings in New York to promote the USD SSA business. *Id.*

The New York contacts that Plaintiffs allege do not meet the "transacts business"

standard required to establish venue.  Plaintiffs' allegations do not provide factual corroboration

for the alleged New York-based bond transactions. *See, e.g.*, *Raul Int'l Corp. v. Nu-Era Gear

Corp.*, 28 F.R.D. 368, 371 (S.D.N.Y. 1961) (finding evidence like "correspondence, invoices and

other records" showed the degree of business transacted was of a substantial nature).  This lack

of factual support is the type of "legal conclusion couched as factual allegation" that courts need

not accept as true. *Twombly*, 550 U.S. at 555.

Plaintiffs also state that Credit Suisse Securities (Europe) Ltd. and Credit Suisse

International have significant operations in New York through their U.S. subsidiaries and

affiliates, and that Nomura International PLC has many employees based in New York.  Opp.

Memo 48, Doc. 579.  But without allegations of specific activities, these are "minimal

allegations" that do not satisfy the "transacts business" standard. *Dennis*, 343 F. Supp. 3d. at

---

[6] The five Venue Defendants are:  Barclays Capital Securities Limited, Barclays Services Limited, Credit Suisse International, Credit Suisse Securities (Europe) Ltd., and Nomura International PLC.

200. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

SAC ¶ 392, Doc. 506. Attending one bond conference in New York is not evidence of "carrying on business of any substantial character." *Dennis*, 343 F. Supp. 3d. at 200.

The fact that Plaintiffs cannot establish § 12's venue requirement over the Foreign Dealer Defendants means that the Court must find that it lacks jurisdiction over the Foreign Dealer Defendants. *News Am. Mktg. In-Store, Inc. v. Insignia Sys., Inc.*, No. 03 Civ. 8555 (RCC), 2006 WL 2807189, at *2 (S.D.N.Y. Sept. 28, 2006) (finding lack of personal jurisdiction on out-of-state defendant when plaintiff relied on the Clayton Act and failed to establish § 12's venue provision).

## IV. NEW YORK LONG-ARM STATUTE

Next, the Court turns to whether Plaintiffs have alleged sufficient facts to rely on New York's long-arm statute for personal jurisdiction. The statute states in relevant part that:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
>
> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act . . . .

N.Y. C.P.L.R. 302(a)(1)–(3). Plaintiffs claim that § 302 applies to the Foreign Dealer Defendants on these three bases.

11

### 1) Transacts Business Within the State

A defendant transacts business within the meaning of § 302(a)(1) when through volitional acts he avails himself of the privilege of conducting business in New York, thus invoking its benefits and legal protections. *Fischbarg v. Doucet*, 880 N.E.2d 22, 26 (2007). "The appropriate focus of an inquiry under CPLR § 302(a)(1) is on what the non-domiciliary defendant did in New York and not on what the plaintiffs did." *Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1251, 1262 (S.D.N.Y. 1995), *aff'd*, 307 F. App'x 479 (2d Cir. 2008). Courts consider the totality of all defendant's contacts with New York when determining if exercising jurisdiction would be proper. *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165–66 (2d Cir. 2005) (construing New York's long-arm statute).

#### a) Foreign Dealer Defendants

Plaintiffs allege that because the Clayton Act's venue clause "requires as much as, if not more than," the "transacts business" requirement under the New York long-arm statute, the same facts discussed as to the Venue Defendants apply here, too. Opp. Memo 49–50, Doc. 579 (quoting *Grosser v. Commodity Exch., Inc.*, 639 F. Supp. 1293, 1313 (S.D.N.Y. 1986), *aff'd*, 859 F.2d 148 (2d Cir. 1988). Having a business office in New York is an example of transacting business under the long-arm statute. *See Corley v. Vance*, 365 F. Supp. 3d 407, 434 (S.D.N.Y. 2019) (finding that company "plainly availed itself of New York law" when it was registered to do business in New York and had two offices in New York). However, the inquiry does not end there, as plaintiffs must then show that the underlying lawsuit arose from the transacted business. *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (finding that to support jurisdiction under N.Y. C.P.L.R. § 302, there must be "an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York").

Having found that Plaintiffs did not sufficiently allege that the Venue Defendants transacted business within New York State, the Court focuses its analysis on the remaining eight Foreign Dealer Defendants.[7] Plaintiffs summarily argue that all the foreign banks structured their USD SSA operations in the same way, with the London desks provided marketing, pricing, and approval direction to their New York counterparts. Opp. Memo 50, Doc. 579. Alone, this argument lacks specificity and does not support a finding that the non-Venue Defendants also transacted business in New York. *See Gerstle v. Nat'l Credit Adjusters, LLC*, 76 F. Supp. 3d 503, 510 (S.D.N.Y. 2015) (rejecting conclusory allegations and finding lack of specificity is highlighted when plaintiffs use of same boilerplate description for actions of multiple defendants).

Plaintiffs do establish that six of the Foreign Dealer Defendants have New York offices and "transact business" in New York State: Barclays Bank PLC (New York office); BNP Paribas (New York office); Crédit Agricole Corporate & Investment Bank (New York branch and Chief Financial Officer is based in New York); Credit Suisse AG (New York office); Royal Bank of Canada (New York office and is listed on the New York Stock Exchange); and The Toronto-Dominion Bank (New York office). Opp. Memo 50, Doc. 579. Citigroup Global Markets Limited does not have an office anywhere in the United States and Plaintiffs make no factual allegations that they transacted business in New York. Juris Memo 5 n.6, Doc. 521. Accordingly, the Court next considers whether Plaintiffs' claims against the Foreign Dealer Defendants with New York offices arises out of their business activity within New York State.

---

[7] Barclays Bank PLC, BNP Paribas, Citigroup Global Markets Limited, Credit Agricole Corporate & Investment Bank, Credit Suisse AG, Royal Bank of Canada, RBC Europe Limited, and The Toronto Dominion Bank.

Plaintiffs identify only one specific trade between a Plaintiff and a non-venue Defendant with an office in New York: a transaction between the Alaska Department of Revenue and "Credit Suisse." SAC ¶ 177, Doc. 506. However, there are four Credit Suisse entities sued as Defendants herein, and Plaintiffs do not specify whether the Credit Suisse entity they refer to is Credit Suisse AG ("CSAG"), Credit Suisse Securities (USA) LLC ("CSSUSA"), Credit Suisse Securities (Europe) Limited ("CSSEL"), or Credit Suisse International ("CSI"). *Id.* ¶ 80. Plaintiffs reference these entities collectively as "Credit Suisse." *Id.* Because this is a class action, Plaintiffs are required to make a personal jurisdiction claim regarding each Defendant with respect to the "named" Plaintiffs. *Famular v. Whirlpool Corp.*, 16 Civ. 944 (VB), 2017 WL 2470844, at *2 (S.D.N.Y. June 7, 2017). Allegations in the form of a group pleading are insufficient, even for affiliated corporate entities. *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016). As to Barclays Bank PLC, BNP Paribas, Crédit Agricole Corporate & Investment Bank, Royal Bank of Canada, and the Toronto-Dominion Bank, Plaintiffs do not allege any specific transactions, let alone transactions that took place in New York, with a substantial connection to Plaintiffs' claims. Plaintiffs have not established a nexus between the alleged business transactions in New York and the claims of this antitrust case. Therefore, the New York long-arm statute does not reach the Foreign Dealer Defendants.

### b) Individual Defendants

Plaintiffs claim that each of the Individual Defendants deliberately targeted New York with their USD SSA bond trading activities. Opp. Memo 66, Doc. 579. Each one allegedly promoted, artificially priced, and traded USD SSA bonds with members of the Class in the United States and New York. *Id.* Yet, Plaintiffs cannot rely on bare allegations that Defendants transacted with unnamed absent class members to establish jurisdiction. Plaintiffs would need to

show that the Individual Defendants transacted with named Plaintiffs, not just unnamed members of the class. *Beach v. Citigroup Alt. Invs. LLC*, No. 12 Civ. 7717 (PKC), 2014 WL 904650, at *6 (S.D.N.Y. Mar. 7, 2014) (finding a defendant's alleged "[c]ontacts with unnamed class members may not be used as a jurisdictional basis")

Plaintiffs allege that each Individual Defendant traveled to New York to promote his bond trading services and to maintain relationships with his New York-based customers for USD SSA bonds and was personally responsible for USD SSA transactions with members of the Class in the United States, including in New York. SAC ¶¶ 110 (Heer), 111 (Manku), 112 (McDonald), and 113 (Pau), Doc. 506. Plaintiffs assert that Pau worked with U.S.-based salespeople, *id.* ¶ 114, and traveled to New York for a USD SSA bond conference, but Plaintiffs do not allege that he manipulated or even discussed bond prices at the conference. Pau Memo 2, Doc. 541. Neither do Plaintiffs present facts to support their allegation that the trips were used to plan the manipulation. *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, 2017 WL 1113080, at *4 (S.D.N.Y. Mar. 10, 2017). These are boilerplate allegations. These limited contacts are not sufficient to establish jurisdiction over the Individual Defendants. *See Beatie & Osborn LLP v. Patriot Sci. Corp.*, 431 F. Supp. 2d 367, 387 (S.D.N.Y. 2006) (observing that "random," "fortuitous," or "attenuated" contacts do not support § 302(a)(1) jurisdiction) (citations omitted).

Moreover, the Court cannot credit these allegations because Plaintiffs do not offer particularized facts to show that the Individual Defendants' activities in New York had an articulable nexus, or substantial relationship, to the underlying cause of action. *See King Cty., Wash. v. IKB Deutsche Industriebank, AG*, 769 F. Supp. 2d 309, 316 (S.D.N.Y. 2011). Accordingly, Plaintiffs have not established that the Individual Defendants transacted business in New York such that personal jurisdiction may properly be obtained.

### 2) Tortious Acts and New York State

#### a) *Section 302(a)(2): Tortious Acts Within the State*

Plaintiffs improperly conflate the standard for §302(a)(2) and (3), and simply state that

the Foreign Dealer Defendants engaged in a "continuous course of tortious conduct—sometimes

within New York, and sometimes [outside of] New York." Opp. Memo 50, Doc. 579. Pursuant

to § 302(a)(2), New York courts have recognized that jurisdiction may extend to out-of-state

individuals if they have an agent or co-conspirator physically present in New York who

committed a tort in furtherance of a conspiracy. *LaChapelle v. Torres*, 1 F. Supp. 3d 163, 169

(S.D.N.Y. 2014). Under Section 302(a)(3), antitrust violations are "tortious acts" if the

defendant should have reasonably expected that the violations would cause injury in New York.

*In re Vitamin C*, 2012 WL 12355046, at *6. When courts determine whether an injury in New

York is sufficient to warrant § 302(a)(3) jurisdiction, they generally apply a situs-of-injury test,

which asks them to locate the "original event which caused the injury," which is the first effect

of the tort that caused injury. *Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 269–70

(S.D.N.Y. 2000) (quoting *Brussels*, 171 F.3d at 791).

Plaintiffs allege that the Defendants engaged in marketing, pricing, and approving USD

SSA bond transactions; providing a constant flow of information to and from New York-based

salespeople and traders; and traveling to New York to meet U.S. investors. *Id.* at 50–51.

However, Plaintiffs do not point to any specific salesperson, date of transaction, amount of

transaction, or any other fact that can support a finding of a tortious act within New York State

committed by Defendants or their alleged co-conspirators in furtherance of the conspiracy.

Without factual support for this claim, the Court cannot credit it. Lastly, nothing in the record

indicates that the original event occurred in New York. On the contrary, Plaintiffs allege that the

tort originated at the London desks of the Defendants who conspired not to compete on USD

SSA bonds with U.S.-based investors and then controlled their U.S.-based associates. Opp.

Memo 4, Doc. 579. Plaintiffs have not established a tort committed within New York that gives

rise to personal jurisdiction here.

In sum, Plaintiffs do not meet their burden of establishing that the Court has personal

jurisdiction over the Foreign Dealer Defendants or the Individual Defendants pursuant to the

New York long-arm statute.

### b) Due Process Requirements

The Court does not need to reach whether establishing personal jurisdiction over the

Defendants comports with due process. *See, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, 392

F. Supp. 2d 539, 558 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008) (finding if personal

jurisdiction exists under the New York long-arm statute, then Fourteenth Amendment's due

process standards apply). But even if the Court did so, Plaintiffs have failed to show that the

Foreign Dealer Defendants and the Individual Defendants had minimum contacts with New

York. The touchstone due process principle has been that the defendant must have sufficient

"minimum contacts" with the forum such that the lawsuit does not offend "traditional notions of

fair play and substantial justice." *Dennis*, 343 F. Supp. 3d at 200 (citing *Gucci Am., Inc. v.

Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014) (collecting cases)).

There are two types of personal jurisdiction: general jurisdiction and specific

jurisdiction. *Dennis*, 343 F. Supp. 3d at 201. General jurisdiction over foreign corporations is

proper when the corporations' affiliations are so continuous and systematic that they are

essentially "at home" in the forum state. *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014).

Plaintiffs' claim that the Foreign Dealer Defendants are subject to general jurisdiction in the

United States can be dispensed with quickly, as none of the Foreign Dealer Defendants are domiciled or have a principal place of business in the United States and Plaintiffs have not alleged exceptional circumstances apply here. *Dennis*, 343 F. Supp. 3d at 202.

"Specific jurisdiction is a significantly more limited doctrine" than general jurisdiction. *Id.* "In order for a state court to exercise specific jurisdiction, the suit must arise out of the defendants' contacts which create a substantial connection with the forum state." *Daimler*, 571 U.S. at 127. The due process inquiry requires courts to evaluate the "quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test." *Licci*, 732 F.3d at 170 (internal quotation marks omitted). This is also known as the "minimum contacts" test, which includes two methods for proving minimum contacts: (1) "purposeful availment," in which "the defendant purposefully availed itself of the privilege of doing business in the forum state and could foresee being haled into court there," *Licci*, 732 F.3d at 170 (internal quotation marks omitted); and (2) "purposeful direction," also known as the "effects test," which establishes personal jurisdiction when "the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff," *id.* at 173. The "effects test" generally requires that plaintiffs show that the defendants' conduct was intentional and expressly aimed at the forum state with the knowledge that substantial injury would be felt there. *Calder v. Jones*, 465 U.S. 783, 790–91 (1984) (finding effects test applied when forum state was "focal point" of both conduct and harm suffered).

Here, Plaintiffs do not allege facts that specifically show that any of the Defendants sold USD SSA bonds in New York. *Fire & Police Pension Ass'n of Colorado v. Bank of Montreal*, 368 F. Supp. 3d 681, 695 (S.D.N.Y. 2019) (finding that in financial conspiracy cases, "suit-

related conduct" means sale of derivative in forum state and that sale has connection to price manipulation scheme). Accordingly, Plaintiffs have not alleged purposeful availment. Plaintiffs also allege the Foreign Dealer Defendants artificially priced and approved USD SSA bonds knowing the trades were for a U.S. investor. Opp. Memo 30–31, Doc. 579. This is a conclusory statement. There is no factual support for the proposition that Defendants directed any actions at New York specifically. *See Dennis*, 343 F. Supp. 3d at 207–08 (finding no jurisdiction where foreign defendants aimed their conduct at transactions worldwide and some counterparties happened to be in United States).

In sum, exercising personal jurisdiction over any of the Defendants in the instant case would not be proper and would violate due process.

## V. CONSPIRACY JURISDICTION

Another jurisdictional theory, called "conspiracy jurisdiction," may be available in cases alleging a conspiracy. *Dennis*, 343 F. Supp. 3d at 203. "[T]he appropriate test for alleging a conspiracy theory of jurisdiction," is an allegation that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018). Conspiracy jurisdiction allows a plaintiff to establish personal jurisdiction over a defendant by imputing to them the jurisdictional contacts of in-forum defendants based on the alleged conspiracy. Juris Memo 29, Doc. 521 (citing SAC ¶¶ 31–35, Doc. 506).

### 1) Existence of a Conspiracy

To establish a conspiracy under § 1 of the Sherman Act, proof of joint or concerted action is necessary and mere parallel conduct is not sufficient. *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 550 (S.D.N.Y. 2018). There are two ways that a

plaintiff can allege enough facts to support the inference that a conspiracy existed and overcome a motion to dismiss: (1) present direct evidence that the defendants entered into an agreement in violation of the antitrust laws, or (2) present circumstantial facts supporting the inference that a conspiracy existed. *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). Such direct evidence could consist of, for example, "a recorded phone call in which two competitors agreed to fix prices at a certain level." *Id.* But in many antitrust cases, this type of "smoking gun" direct evidence is hard to come by. *Id.* In the absence of "smoking gun" evidence, a horizontal anticompetitive agreement may be inferred when interdependent conduct among competitors is accompanied by circumstantial evidence and plus factors. *Id.* "These 'plus factors' may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* (quoting *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 114 (2d Cir. 2005), *rev'd on other grounds*, *Twombly*, 550 U.S. 544).

"The crucial question in a Section 1 case is . . . whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Mayor & City Council of Baltimore*, 709 F.3d at 136 (citing *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (internal quotations omitted)). Here, Plaintiffs allege the existence of a horizontal conspiracy among Defendants to not compete against each other in the market for USD SSA bonds and to cooperate and maximize their own profits at the expense of their customers. SAC ¶ 143, Doc. 506. Purportedly, Defendants' overarching objective was to ensure that cartel members could transact with investor clients at prices that were more favorable for the conspiring dealers than would have been achieved absent collusion. *Id.* Specifically, that when

an investor contacted one or more dealers to purchase a bond, the Defendants communicated with each other via chat rooms and phone calls, where they coordinated sales to achieve more favorable prices and terms for themselves. *Id.* ¶ 130. ████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████ *Id.* ¶ 503. They argue that these techniques were *per se* unlawful. *Id.*

### a. Direct Evidence

A court in this District found that a horizontal conspiracy existed in a consolidated class action alleging a long-running agreement between the world's largest banks to manipulate the benchmark rates in the foreign exchange ("FX") market. *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 585 (S.D.N.Y. 2015) [hereinafter "*FOREX*"]. The District Court found the existence of a conspiracy and that all defendants were part of the conspiracy based on the chat room messages traders exchanged. *Id.* at 591–92. The defendants used chat rooms with evocative names like "The Cartel," "The Bandits' Club," "The Mafia" and "One Team, One Dream," which were the primary sites of the conspiracy. *Id.* at 587. The chat rooms included traders from several of the bank defendants, including high-ranking employees, such as a chief currency dealer. *Id.* The traders shared inappropriate, market-sensitive information with rivals about pricing, customer's orders, net trading positions, and types and volumes of trades they planned to place. *Id.* The court found that, in totality, these chat room exchanges were not "isolated instances of inter-firm communications by rogue employees, but common practice" in a market where tight-knit social and professional ties in the FX trading community created incentives and opportunities for collusion. *Id.* at 588. No one defendant could accomplish

systematic and continuing manipulation of "the Fix," a benchmark exchange rate for trading

currency globally without coordination with its rivals. *Id.* at 586–88.

Here, the Defendants are horizontal competitors in the USD SSA bonds market who

compete for customers by supplying different bid and ask quotes. If Defendants collude,

costumers pay non-competitive prices. ███████████████████████████



SAC ¶ 252, Doc. 506.

*Id.* ¶¶ 190–92.

*Id.* ¶¶ 173–76.

. *FOREX*, 74 F. Supp. 3d at

591–92. Such chat communications are the type of "rare smoking gun" evidence that shows

███████. *In re GSE Bonds Antitrust Litig.*, No. 19 Civ. 1704 (JSR), 2019 WL 4071070, at *5 (S.D.N.Y. Aug. 29, 2019). In *GSE Bonds*, plaintiffs filed a class action alleging a conspiracy to fix secondary market prices of bonds issued by government-sponsored entities ("GSEs"). *Id.* at *1. Here, Plaintiffs have sufficiently alleged that these conversations were ███████████████████

████████████████████████████████████████████████████

███████. *Mayor & City Council of Baltimore*, 709 F.3d at 136.

### b. Indirect and Statistical Evidence

Plaintiffs further corroborate this inference with statistical analyses that indicate collusion during the Class Period, January 1, 2009 to December 31, 2015, which overlapped with the employment periods of certain Individual Defendants. SAC ¶ 561, Doc. 506. Plaintiffs allege that beginning in late 2015, the U.S. Department of Justice ("DOJ") began an investigation that led "all or nearly all of the key participants in the cartel" to be removed from their trading desks. SAC ¶ 375–380, Doc. 506. In late 2015, Bank of America suspended or terminated Gudka, who worked as a bond trader at several banks from December 2001 to November 2015. *Id.* ¶¶ 145, 377. In late 2015 or early 2016, Credit Suisse suspended or terminated Pau, who traded bonds at several banks from 1999 to February 2016. *Id.* ¶¶ 146, 378. In late 2015 or early 2016, Crédit Agricole suspended or terminated Manku, who traded bonds at several banks between January 2002 and December 2015. *Id.* ¶¶ 147, 379. And in late 2015 or early 2016, Nomura suspended Heer, who worked at Nomura from January 2005 to March 2016. *Id.* ¶¶ 148, 380. Plaintiffs infer that the conspiracy was in place as early as January 1, 2009, when several of the "individual cartel members" were employed at USD SSA trading desks for Dealer Defendants: i.e., Gudka was working at Bank of America; Pau was working at RBC; Manku was working at HSBC; Heer was working at Nomura, etc. *Id.* ¶ 158.

Prosecutors obtained transcripts of online chat rooms indicating possible misconduct of SSA traders at defendant banks who were sharing information on certain USD dollar bonds. *Id.* ¶ 383. Plaintiffs rely on SSA bond data from Bloomberg that does not allow for the identification of bids, offers, or final prices at an individual or trade level, but does allow for analyses on market-wide pricing in the USD SSA bond market. *Id.* ¶ 509. A regression model is an econometric tool for measuring how well one or more tested variables perform in terms of predicting or explaining a given outcome and is an accepted model for determining whether an alleged antitrust conspiracy impacted purchasers. *Id.* ¶ 512. The regression analysis Plaintiffs conducted included a variable to indicate whether or not the pricing information was being drawn from the core conspiracy period. *Id.* ¶ 515. The role of this "Collusion Indicator" is to detect if bid-ask spreads were higher (or lower) during the alleged conspiracy period, after controlling for factors that can legitimately cause spreads to vary across bonds and over time. *Id.*

The "Collusion Indicator" analysis showed a "no" reading prior to 2009 and after 2015. *Id.* ¶ 516–17. Plaintiffs allege that the reports of the investigation placed a regulatory spotlight on the Defendants and cast a chilling effect on their collusion activity. *Id.* ¶ 517. This leads to an inference that there was a correlation between the removal of certain Individual Defendants from their trading desks and a "Collusion Indicator" of "no," or 0, outside of the alleged conspiracy period. *Id.* A relevant plus factor is that some of the traders' actions went against their economic interests, ███████████████████████████████████████████████ *See, e.g.*, SAC ¶¶ 173, 219, 444, Doc. 506; *Twombly*, 425 F.3d 99 at 114. Thus, Plaintiffs have alleged a plausible inference that certain Individual Defendants colluded.

### 2) **Foreign Dealer Defendants' Participation**

While the chat messages ████████████████████████████████, the

Foreign Dealer Defendants argue that the instant case differs from *GSE Bonds* because the chats

here are sporadic discussions concerning individual bonds, from numerous distinct issuers,

trading at different times and in disparate circumstances. Doc. 624, 2. They allege these

"fragmented communications" do not suggest any overarching conspiracy to fix prices

throughout the SSA bonds "market." *Id.* In *GSE Bonds*, the court found that the bank

defendants (there were no individual defendants in the case) colluded to inflate prices for *all*

bonds they co-underwrote at a critical juncture, when the secondary market trading was set to

begin, and that they collectively traded 77% of the overall market, pointing to a market-wide

conspiracy. *GSE Bonds*, 2019 WL 4071070, at *1–2, *5–6. Defendants argue that Plaintiffs

have not alleged that Defendants hold a similarly large share of the market here and have

acknowledged that the market is composed of numerous other non-colluding members. Doc.

624, 2.

The nature of the SSA bond market differs from that of the GSE bond market in one

crucial way: SSA bonds are quoted on an individual and not a systemic basis. Plaintiffs explain

that investors operate in a dealer-to-customer market where investors call SSA bond traders

individually and get quotes. SAC ¶ 133, Doc. 506 (explaining that it is laborious and time-

consuming for investors to contact too many dealers and that dealers usually placed short

expiration times on quotes they provide). While SSA bond prices are quoted in basis points as a

spread above the yield of the relevant benchmark U.S. Treasury bonds with a similar maturity,

Plaintiffs have not alleged that any Defendant manipulated the benchmark rate. *Id.* ¶ 139. While

"there is no rule that isolated occurrences of conspiratorial conduct do not qualify as direct

evidence," the chat messages here do not qualify as direct evidence of a "broad, market-wide" conspiracy. *GSE Bonds*, 2019 WL 4071070, at \*5–6 (citing *Mayor & City Council of Baltimore*, 709 F.3d at 136).

The group chats here merely show opportunistic attempts at collusion by individual traders and are not evidence of an overarching conspiracy committed by the Foreign Dealer Defendants. *Silver Fix II*, 332 F. Supp. 3d at 904. Put differently, the chats do not signal a widespread, multi-bank conspiracy, but rather █████████████████████████████████

█████████████████████████ SAC ¶ 371–73, Doc. 506. ████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████ *Id.* ¶ 160. It is "harder to infer a conspiracy from individual acts of trader-based manipulation because large financial institutions are both buyers and sellers of derivative products, and thus any changes may well offset each other." *Sonterra*, 277 F. Supp. 3d at 555. The *GSE Bonds* court dismissed the claims against those defendants that plaintiffs had failed to "tie" to the conspiracy. *GSE Bonds*, 2019 WL 4071070, at \*5. At this stage of the litigation, Plaintiffs need only plead that their theory of conspiracy is plausible, but they have not met that burden as to the Foreign Dealer Defendants. *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016).

### 3) Co-Conspirator's Acts in New York

Lastly, while Plaintiffs have pleaded plausible collusion existed among certain Individual Defendants, they have failed to show that the any Defendants' alleged co-conspirators committed a tort in New York. At the pleading stage, Plaintiffs must at least provide some details about the transactions that bear on the plausibility that the alleged manipulation caused actual damage.

*Sonterra*, 277 F. Supp. 3d at 571; *see also Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 762–63 (S.D.N.Y. 2004) (finding no personal jurisdiction under conspiracy theory because there was no factual basis from which court could impute conduct of putative co-conspirators to defendants). While, here, the chat history ███████████████

████████████████████████████████████, Plaintiffs provide no evidence as to any specific transactions that occurred in New York or who the alleged co-conspirators were. In sum, Plaintiffs have not met their burden of establishing conspiracy jurisdiction.

## VI.    FEDERAL LONG-ARM STATUTE

Having found that Plaintiffs have not established personal jurisdiction over Defendants pursuant to the Clayton Act or the New York long-arm statute, the Court next considers whether Rule 4(k)(2) of the Federal Rules applies. "This Rule, which is commonly known as the federal long-arm statute, permits federal courts to exercise personal jurisdiction over a defendant that lacks contacts with any single state if the complaint alleges federal claims and the defendant maintains sufficient contacts with the United States as a whole." *Havlish v. Royal Dutch Shell PLC*, No. 13 Civ. 7074 (GBD), 2014 WL 4828654, at *4 (S.D.N.Y. Sept. 24, 2014). Rule 4(k)(2) is designed to fill a gap in federal law when exercising personal jurisdiction over defendant with enough contacts with the United States to satisfy due process, but not enough contacts with any single state to support jurisdiction under a state's long-arm jurisdiction. *Daventree*, 349 F. Supp. 2d at 760. Here, Plaintiffs have alleged claims under two federal statutes: the Sherman Act and the Clayton Act. SAC ¶¶ 28, 571, Doc. 506.

Rule 4(k)(2) establishes personal jurisdiction "where (1) the claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) exercising jurisdiction is consistent with the United States Constitution and laws."

*Havilish*, 2014 WL 4828654, at *4 (quotations omitted). There is no dispute that this case arises under federal law claims and thus meets the first requirement of Rule 4(k)(2). However, the Foreign Dealer Defendants argue that Rule 4(k)(2) is unavailable because Plaintiffs did not provide a certification that Defendants are not subject to jurisdiction in any one state. Juris Memo 34 n.32, Doc. 521. Plaintiffs rely on cases outside of this Circuit to claim that the burden is on the defendant to "name some other state in which the suit could proceed." Opp. Memo 52–53, Doc. 579 (quoting *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001)).

In this Circuit, plaintiffs need to certify that the foreign defendants are not subject to jurisdiction in any other state to meet the second requirement of Fed. R. Civ. P. 4(k)(2). *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, No. 13 Civ. 981 (PGG), 2015 WL 1514539, at *13 (S.D.N.Y. Mar. 31, 2015*), aff'd*, No. 18 Civ. 1102, 2019 WL 1914278 (2d Cir. Apr. 30, 2019); *see also Porina v. Marward Shipping Co., Ltd.*, No. 05 Civ. 5621 (RPP), 2006 WL 2465819, at *4 (S.D.N.Y. Aug. 24, 2006) (finding plaintiffs bear burden of certifying that to their knowledge, "the defendant is not subject to suit in the courts of general jurisdiction of any state"). Because the Plaintiffs in the instant case have not certified that the Foreign Dealer Defendants are not subject to general jurisdiction in another state, they have not met all of the elements of Rule 4(k)(2), and this Court can decline to apply the provision here. *7 W. 57th St. Realty*, 2015 WL 1514539, at *13.

Plaintiffs request that should this Court conclude that certification is required, Plaintiffs be allowed the opportunity to certify that the Foreign Dealer Defendants are not subject to jurisdiction in any other state court. Opp. Memo 54, Doc. 579. But even if Plaintiffs met their burden of certifying that the Foreign Dealer Defendants cannot be haled into court in any other

state, Plaintiffs fail to show that the exercise of personal jurisdiction over defendants is "consistent with the United States Constitution and laws." *Porina*, 521 F.3d at 127 (quoting Fed. R. Civ. P. 4(k)(2)). "Due process for purposes of Rule 4(k)(2) requires (1) that the defendant have sufficient minimum contacts with the United States in general, rather than any particular state and (2) that the exercise of jurisdiction is reasonable." *Id.*

The first step in the Rule 4(k)(2) due process analysis is applying the minimum contacts test. "In applying Rule 4(k)(2), courts have engaged in the traditional minimum contacts analysis based on an aggregation of the defendant's contacts with the nation as a whole." *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 956 F. Supp. 427, 439 (S.D.N.Y. 1996) (citing *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F. Supp. 81, 87 (S.D.N.Y. 1995)). In *Eskofot*, the District court listed the following non-exhaustive factors for meeting the standard: "(1) transacting business in the United States, (2) doing an act in the United States, or (3) having an effect in the United States by an act done elsewhere." 872 F. Supp. at 87 (citing *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir. 1972)). The second step in the analysis is determining whether the exercise of personal jurisdiction is reasonable. *TAGC Mgmt., LLC v. Lehman*, No. 10 Civ. 06563 (RJH), 2011 WL 3796350, at *6 (S.D.N.Y. Aug. 24, 2011) (establishing "reasonableness" factors).

For the Foreign Dealer Defendants, Plaintiffs merely assert they purposely availed themselves of the forum and argue that certification under Rule 4(k)(2) is not necessary. Opp. Memo 54, Doc. 579. They do not attempt to make a prima facie case that Rule 4(k)(2) applies to the Foreign Dealer Defendants. For the Individual Defendants, Plaintiffs propose that all the same facts and arguments that applied to the New York long-arm statute apply to the Rule 4(k)(2) analysis, except that the Individual Defendants' ties to the United States are stronger than

to New York State. Opp. Memo 75–76, Doc. 579. Plaintiffs repeat their boilerplate allegations that the Individual Defendants executed and marketed USD SSA bonds at artificial prices with members of the Class in New York, directly and via U.S.-based salespeople. *Id.* at 76. However, as discussed above, Plaintiffs' bare allegations concerning the sporadic contacts that the Individual Defendants had with New York are not sufficient to establish personal jurisdiction over them. *See supra* Section IV(1)(a). Accordingly, Plaintiffs have not met their burden of establishing that this Court has jurisdiction over the Defendants pursuant to Rule 4(k)(2).

## VII.   JURISDICTIONAL DISCOVERY

The final argument that the instant Plaintiffs make is that they are entitled to jurisdictional discovery, Opp. Memo 82, Doc. 579, as they have made allegations "sufficient to articulate a colorable basis for personal jurisdiction, which could be established with further development of the factual record." *Leon v. Shmukler*, 992 F. Supp. 2d 179, 195 (E.D.N.Y. 2014). Plaintiffs do not point to any information they hope to obtain. The Foreign Dealer Defendants respond that after three prior attempts (and now the instant fourth attempt) Plaintiffs have failed to cure the jurisdictional deficiencies in their case and do not establish a prima facie case for personal jurisdiction. Foreign Dealer Defendants' Reply 24–25, Doc. 589. Plaintiffs did not submit a discovery plan.

"It is within the Court's discretion to allow jurisdictional discovery," but given that Plaintiffs have not proposed an actual plan for such discovery, it would be inappropriate to permit limitless discovery at this stage of the proceedings. *Dennis*, 343 F. Supp. 3d at 212 (refusing jurisdiction when plaintiffs did not propose jurisdictional discovery plan). Here, the allegations that link any of the Foreign Dealer Defendants to New York are conclusory and devoid of any facts that show specific transactions in New York that were in furtherance of the alleged conspiracy. Although Plaintiffs rely on *Leon*, that case notes that plaintiffs are not

entitled to jurisdictional discovery in every situation. 992 F. Supp. 2d at 195. Plaintiffs have not

presented evidence that leads to a colorable jurisdictional claim against the Defendants. Thus,

the Court denies Plaintiffs' request for jurisdictional discovery.

## VIII.    ANTITRUST INJURY

The Court has already dismissed Plaintiffs' allegations of antitrust injury and so no

underlying tort has been sufficiently pled. *In re SSA Bonds Antitrust Litig.*, No. 16 Civ. 3711

(ER), 2018 WL 4118979, at *9 (S.D.N.Y. Aug. 28, 2018). But on September 9, 2019, Plaintiffs

urged the Court to consider a supplemental case where the Second Circuit held that where

plaintiffs' injury occurred in the very market that the defendants sought to constrain, plaintiffs

have standing to bring an antitrust claim. Doc. 623 (citing *Eastman Kodak Co. v. Henry Bath

LLC*, 936 F.3d 86, 95 (2d Cir. 2019) [hereinafter "*Aluminum IV*"]). The defendants in *Aluminum

IV*, allegedly restrained the market for aluminum sales by artificially manipulating a price

component for sales of the metal. *Aluminum IV*, 936 F.3d at 95. The plaintiffs' injury was not

an incidental byproduct of the defendants' alleged violation, but a direct result of defendants'

anticompetitive conduct. *Id.* at 96.

In this case, the Dealer Defendants[8] rely on a prior *Aluminum* decision to argue that

Plaintiffs lack antitrust standing because the alleged misconduct occurred in the interdealer

"market" where the Defendants transacted with each other, and not in the dealer-to-customer

"market" where the Defendants allegedly transacted with Plaintiffs. Doc. 525, 10. Put

differently, the Defendants argue that Plaintiffs cannot plead antitrust standing for alleged

misconduct that occurred in an interdealer "market" they had no access to and never transacted

---

[8] In this instance, the term "Dealer Defendants" includes both domestic and foreign dealer defendants and has the same meaning ascribed to it as defined in Doc. 525, 1 n.1.

in. *Id.*  Plaintiffs argue that this argument is erroneous in light of *Aluminum IV* because the fact that one means of accomplishing Defendants' conspiracy occurred in the interdealer market does not render Plaintiffs' standing less relevant.  Doc. 623, 1.  While the Court agrees with Plaintiff's interpretation of the Second Circuit's reasoning in *Aluminum IV*, Plaintiffs have not pleaded facts sufficient to show an antitrust injury.  *In re SSA Bonds Antitrust Litig.*, 2018 WL 4118979, at *9. Specifically, Plaintiffs failed to show that they themselves were party to any specific price-fixed transaction with a named Defendant.  Doc. 525, 7–11.

## IX.  CONCLUSION

The Defendants' motion to dismiss for personal jurisdiction and improper venue is GRANTED with prejudice.  The Foreign Dealer Defendants' and McDonald's requests for oral arguments, and the joint letter motion for a conference, are DENIED as moot.

It is SO ORDERED.

Dated:  September 30, 2019
       New York, New York

Edgardo Ramos, U.S.D.J.