UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE SSA BONDS ANTITRUST LITIGATION

**OPINION AND ORDER**

16 Civ. 3711 (ER)

Ramos, D.J.:

This class action arises from twenty-five consolidated complaints filed against a number of banks and certain of their employees who allegedly conspired to fix the price of supranational, sovereign, and agency ("SSA") bonds. These actions were consolidated under the caption *In re SSA Bonds Antitrust Litigation*, No. 16 Civ. 3711. *See* Docs. 36, 314. On August 28, 2018, the Court issued an Order dismissing the consolidated amended class action complaint ("CAC") for failure to state a claim and failure to plausibly allege an injury-in-fact sufficient to establish antitrust standing. Doc. 495. Specifically, the Court dismissed the Plaintiffs' CAC because Plaintiffs had not plausibly alleged any harm to them. *Id.* at 18.

The Court gave Plaintiffs leave to amend and Plaintiffs filed a second consolidated class action complaint ("SAC") on November 13, 2018. Doc. 506. The SAC included two new Plaintiffs, new factual allegations including chatroom messages (*e.g.* messages sent through social media apps like WhatsApp) and additional economic analyses. Pending before the Court is the domestic dealer defendants' motion to dismiss the SAC for failure to state a claim. Doc. 520. For the reasons set forth below, the motion is GRANTED.

## I. Background

### A. The SSA Bond Market

As set forth in the Court's October 4, 2019 Order, SSA bonds are debt securities issued by governmental and quasi-governmental entities to fund a range of public-policy mandates. Doc. 627. SSA bonds are generally regarded as secure investments because they often enjoy special legal status or government backing. Doc. 506 ¶¶ 2, 49. SSA bonds can be U.S. dollar denominated ("USD") and sold in the U.S. bond market. *Id.* ¶ 122. SSA bonds are typically issued through syndication. *Id.* ¶ 125. If an institution were seeking to issue SSA bonds, it would retain a bank or group of banks to underwrite the bond issue and then sell those bonds to investors. *Id.* The syndicate banks would serve as lead managers on the deal and be responsible for finding investors to purchase the issued bonds and for pricing the bonds. *Id*

After being issued, SSA bonds can be resold and traded by dealers and investors. *Id.* ¶ 129. Investors trade SSA bonds in an over-the-counter market, meaning that rather than using an open, anonymous exchange that matches buyers and sellers, investors transact individually and privately with dealers. *Id.* ¶¶ 129, 553. An investor typically contacts one or more dealers by telephone, electronic chat messaging, or electronic trading platform to request a quote, which the dealer relays to the investor, who can then place the order. *Id.* ¶¶ 130–31. Because it is time-consuming to contact dealers and because their quotes usually expire in a short amount of time, investors generally do not "shop around" with more than a few dealers at a time. *Id.* ¶ 133. Investors also do not have access to real-time market data and have limited ability to purchase secondary market trading information, so they rely on dealers for pricing information for the bonds. *Id.* ¶ 132.

Dealers typically quote prices for SSA bonds in basis points (one basis point is 1/100th of a percentage point) as a spread above the yield of the relevant benchmark U.S. Treasury bonds

with a similar maturity.[1] *Id.* ¶ 139. SSA bond yields are inversely related to bond prices, thus, investors seek to buy SSA bonds at the highest available offer in basis points (i.e., the highest yield, and thus the cheapest price) and to sell them at the lowest available bid in basis points (i.e., the lowest yield, and thus the most expensive price). *Id.* ¶ 141.

### B. The Alleged Conspiracy

Plaintiffs'[2] theory is that "Defendants agreed that they would not compete against each other for the sale of USD SSA bonds to customers." *Id.* ¶ 159. Purportedly, Defendants' overarching objective was to ensure that cartel members could transact with investor clients at prices that were more favorable for the conspiring dealers than would have been achieved absent collusion. *Id.* ¶ 143. Specifically, that when an investor contacted one or more dealers to purchase a bond, the Defendants would communicate with each other via chat rooms and phone calls to achieve more favorable prices and terms for themselves. *Id.* ¶ 130.

### C. Procedural History

On December 21, 2018, twenty-two Dealer Defendants—including nine Domestic Dealer Defendants[3] and thirteen Foreign Dealer Defendants[4]—and four Individual Defendants,[5] filed

---

[1] The Court will simply refer to "basis points" as a shorthand for this method of pricing.

[2] The named plaintiffs are the Alaska Department of Revenue, Treasury Division, the Alaska Permanent Fund Corporation, and Iron Workers Pension Plan of Western Pennsylvania ("Iron Workers") (collectively, "Plaintiffs"). Doc. 506.

[3] Barclays Capital Inc., BNP Paribas Securities Corp., Citigroup Inc., Citibank N.A., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Nomura Securities International, Inc., RBC Capital Markets, LLC, and TD Securities (USA) LLC (together, the "Domestic Dealer Defendants"). *Id.*

[4] Barclays Bank PLC, Barclays Services Limited, Barclays Capital Securities Limited, BNP Paribas, Citigroup Global Markets Limited, Crédit Agricole Corporate & Investment Bank, Credit Suisse AG, Credit Suisse International, Credit Suisse Securities (Europe) Ltd., Nomura International plc, Royal Bank of Canada, RBC Europe Limited, and The Toronto Dominion Bank (together, the "Foreign Dealer Defendants"). Doc. 521, 1 n.1, 5.

[5] Gary McDonald (Doc. 533), Amandeep Singh Manku (Doc. 537), Shailen Pau (Doc. 540), and Bhardeep Singh Heer (Doc. 542) (together, the "Individual Defendants").

motions to dismiss the SAC for failure to state a claim, lack of personal jurisdiction, and improper venue. Doc. 520.

Given the complex and fact-intensive nature of the claims, the Court addressed the Foreign Dealer Defendants' and Individual Defendants' arguments in a separate opinion filed on October 4, 2019. Doc. 627. The Court analyzed the Plaintiffs' factual allegations against the Individual Defendants and the Foreign Dealer Defendants and found them insufficient to establish an antitrust conspiracy claim, an antitrust injury claim, personal jurisdiction, or venue. *Id.* at 23–27. The Court presumes familiarity with the remaining facts and legal analyses set out in the October 4, 2019 Order and incorporates them in this Order. The Court now addresses the Domestic Dealer Defendants' motion to dismiss for failure to state a claim.

## II. Legal Standard

### A. Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50, 50 n.3 (2d Cir. 2007) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007)), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits'" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)). The Court therefore must ordinarily confine itself to the four corners of the complaint and look only to the allegations contained therein. *Id.* When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . .").

Likewise, "[t]here is no heightened pleading requirement in antitrust cases." *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 54 (S.D.N.Y. 2012). However, "a plaintiff must do more than cite relevant antitrust language to state a claim for relief." *Wolf Concept S.A.R.L. v. Eber Bros. Wine & Liquor Corp.*, 736 F. Supp. 2d 661, 667 (W.D.N.Y. 2010) (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)). "A plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated those laws are insufficient." *Id.* at 667–68 (quoting *Kasada, Inc. v. Access Capital, Inc.*, No. 01 Civ. 8893 (GBD), 2004 WL 2903776, at *3 (S.D.N.Y. Dec. 14, 2004)). "[A] bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits

dismissal." *Id.* at 668 (quoting *Heart Disease Research Found. v. Gen. Motors Corp.*, 463 F.2d 98, 100 (2d Cir. 1972)).

### B. Antitrust Standing

"Section 4 of the Clayton Act establishes a private right of action for violations of the federal antitrust laws," such as section 1 of the Sherman Act, and grants that right to "[a]ny person who [is] injured in his business or property by reason of anything forbidden in the antitrust laws." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013) (alterations in original) (quoting 15 U.S.C. § 15). The right to pursue private actions is limited by the concept of "antitrust standing." *Id.* "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [the Court] must dismiss it as a matter of law." *Id.* (first alteration in original) (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc)). "In determining antitrust standing, [the Court] 'assume[s] the existence' of an antitrust violation." *Total Gas*, 889 F.3d at 115 (quoting *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016)).

"To satisfy the antitrust standing requirement, a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust injury and (ii) it is an acceptable plaintiff to pursue the alleged antitrust violations."[6] *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016). "To demonstrate antitrust injury, 'a plaintiff must show (1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute.'"[7] *Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 568 (S.D.N.Y. 2007)

---

[6] The suitability of the plaintiff is often described as whether the plaintiff is an "efficient enforcer" of the antitrust laws. *Aluminum*, 833 F.3d at 157–58.

[7] "While some courts speak of 'antitrust injury' comprehensively to include" all three of these elements, the third element specifically is sometimes referred to as "antitrust injury." 2A Phillip E. Areeda, Herbert Hovenkamp, et al., *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 337a, at 99–100 (4th ed. 2014).

6

(quoting *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004)). "[T]o suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained." *Aluminum*, 833 F.3d at 161. "[U]nlike [government] agencies, [private] [p]laintiffs do not have the right to bring suit against any person they reasonably suspect has committed a certain sort of wrong. . . . Plaintiffs can only recover in a civil action if they can establish that *they themselves* have been harmed by [d]efendants' activities." *Total Gas*, 889 F.3d at 109–10 (emphasis added).

### III.    Discussion

#### A.    Plaintiffs Lack Antitrust Standing

Defendants brought this motion to dismiss for failure to state a claim, which in antitrust actions, involves an inquiry into whether plaintiffs have the right to pursue this private action. Doc. 520; *see also Gatt Commc'ns*, 711 F.3d at 75 (holding antitrust standing is threshold inquiry and if complaint fails to establish this requirement, courts must dismiss it as matter of law). The law is clear that in antitrust conspiracy cases, plaintiffs must show that they have antitrust standing by plausibly alleging that they were a participant in the market defendants sought to restrain and suffered an antitrust injury as a result of the defendants' alleged violations. *See* 15 U.S.C. § 12; *Aluminum*, 833 F.3d at 157.

Here, Plaintiffs allege that they bought and sold USD SSA bonds from the Dealer Defendants, however they do not plausibly plead that they suffered antitrust harm. Doc. 506 ¶¶ 36–41. Fatally, Plaintiffs have not plead to a single transaction that leads to a plausible inference that they suffered antitrust harm. Rather they make conclusory allegations that Defendants, like Barclays Capital Inc., "executed collusive USD SSA bond trades with Plaintiffs Alaska Department of Revenue, Alaska Department Fund Corporation, and Iron Workers during the Class Period." *See, e.g., id.* ¶¶ 54, 68 77, 88, 99. Plaintiffs can only bring a civil action for

injuries that they establish they themselves suffered and Plaintiffs have not met that burden here. *See Total Gas*, 889 F.3d at 109–10.

The closest that Plaintiffs come to making such an allegation is when they highlight



Plaintiffs identify the harm suffered as the fact that the transaction was priced at an artificially high level because of the reduced market competition among dealers. While the exchange of price information among competitors is not a Sherman Act violation *per se*—a number of factors are involved in determining whether the exchange had anticompetitive effects, i.e. the industry structure and nature of the information exchanged— exchanges of *current* price information have the greatest potential of creating anticompetitive effects and have consistently been held to violate the Sherman Act. *See, e.g., United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) (citations omitted).

Generally, when a consumer, because of a conspiracy, pays prices that do not reflect ordinary market conditions, they suffer injury of the type the antitrust laws intended to prevent

---

8

and that flows from that which makes defendants' acts unlawful. *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 557–58 (S.D.N.Y. 2017) (citing *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016)). In one case, plaintiffs were found to have sufficiently alleged a legally cognizable injury where several department stores agreed among themselves to price products, as opposed to letting market competition determine prices, resulting in excessive pricing of the product. *In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 190 (S.D.N.Y. 2000).

The Court accepts as true the allegation that ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████

The Court does not have sufficient facts to plausibly infer that any of the Domestic Dealer Defendants involved ████████████████████████████████ were conspiring to fix prices and distort the USD SSA bond market. It is "harder to infer a conspiracy from individual acts of trader-based manipulation because large financial institutions are both buyers and sellers of derivative products, and thus any changes may well offset each other." *Sonterra*, 277 F. Supp. 3d at 555. Furthermore, the pleading is insufficient because Plaintiffs do not identify which of the ████████ entities was involved in the trade—████████

Allegations in the form of group pleadings are insufficient, even for affiliated corporate entities. *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016). In sum, Plaintiffs have not sufficiently plead they have antitrust standing.

  i. *Supplemental Authority*

On October 18, 2019, Plaintiffs urged the Court to consider a supplemental authority in further opposition to the remaining Domestic Defendants' motion to dismiss for failure to state a claim: *In re GSE Bonds Antitrust Litigation*, No. 1:19-cv-01704, Doc. 288 (S.D.N.Y. Oct. 15, 2019) ("*GSE II*"). Doc. 629, 1. Plaintiffs asked the Court to consider the plausibility of the overarching conspiracy they allege in connection to Defendants' argument that Plaintiffs lack antitrust standing. *Id.* at 3. However, as the ruling in *GSE II* had nothing to do with antitrust standing, the Court is unable to do so. The Court notes that the first *GSE* case does discuss antitrust standing. *See In re GSE Bonds Antitrust Litigation*, 396 F. Supp. 3d 354, 366 (S.D.N.Y. Aug. 29, 2019) ("*GSE I*") (holding plaintiffs proved antitrust standing after they plausibly alleged conspiracy and traded bonds directly with several defendants during class period). But as will be discussed in more detail *infra* in Part III(B), Plaintiffs have not plausibly alleged a conspiracy as to the Domestic Dealer Defendants.

The *GSE II* Court's ruling is also inapposite because it was based on distinctive features of the alleged market for government-sponsored entity ("GSE") bonds that are easily distinguishable from the SSA bonds market that Plaintiffs allege here. Doc. 632, 1. First, GSE bonds have a benchmark rate that the defendants allegedly manipulated but SSA bonds do not. *See GSE I*, 396 F. Supp. 3d at 369. Here, the pleadings do not point to a mechanism by which traders could control the SSA bond price benchmark: U.S. Treasury bonds. Doc. 506 ¶ 125. In

a prior briefing, Plaintiffs explicitly stated that they "do not allege that Defendants specifically manipulated the price of every USD SSA bond traded in the market, whether through a financial benchmark or otherwise," but rather that there was an agreement among Defendants to not compete against each other in the market for USD SSA bonds. Doc. 407, 37–38.

Also, as the Court noted in its October 4, 2019 Order, "[t]he nature of the SSA bond market differs from that of the GSE bond market in one crucial way: SSA bonds are quoted on an individual and not systemic basis." Doc. 627, 25. SSA bond quotes were exchanged over-the-counter based on highly customized market information about specific investors, such as which bonds the investors held and in what quantity, whether the investor was an ongoing seller or buyer of certain bonds, and price levels at which the investor had traded or was seeking to trade. Doc. 506 ¶ 135.

Lastly, the extent to which the *GSE* defendants were alleged to have controlled the relevant market is markedly different than in this case. Doc. 632, 2. The *GSE* defendants were alleged to have traded about 77% of all GSE bonds issued during the class period, pointing to a market-wide conspiracy. *GSE I*, 396 F. Supp. 3d at 357–58, 362. Here, Plaintiffs estimated that the Dealer Defendants controlled as much as 60% of the SSA bond market, but this percentage only relates to the Defendants' underwriting of SSA bonds in the primary market. Doc. 506 ¶ 505. Without supporting facts, the Court cannot assess what percentage of the secondary USD SSA bond market the Dealer Defendants traded. Accordingly, the supplemental authority is not persuasive in this case.

### B. The Alleged Conspiracy Is Not Plausible

Plaintiffs have not adequately plead sufficient facts in the SAC to plausibly allege a conspiracy that includes any of the Domestic Dealer Defendants. Where an antitrust complaint

11

names multiple defendants, plaintiffs must "make allegations that plausibly suggest that each defendant participated in the alleged conspiracy." *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) (quotation marks and citation omitted); *see also Concord Assocs., L.P. v. Entm't Props. Tr.*, No. 12 Civ. 1667 (ER), 2014 WL 1396524, at *23 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016) (same). In antitrust conspiracy cases, defendants are entitled to know how they are alleged to have conspired, with whom, and for what purpose. *Id.* (citing *Zinc*, 155 F. Supp. 3d at 384). Plaintiffs have not met that burden here.

As the Domestic Dealer Defendants allege, Plaintiffs failed to cure their improper group pleading when they amended the CAC—they continue to make undifferentiated allegations against all defendants and tie together corporate affiliates without justification. Doc. 525. *See Zinc Antitrust Litig.*, 155 F. Supp. 3d at 38 (holding allegations in form of a group pleading are insufficient, even for affiliated corporate entities). For example, Plaintiffs allege that Barclays Capital Inc. was the "Barclays Defendants' U.S.-based broker-dealer" and took directions from its overseas counterparts, served as their counterparty in most transactions, and knowingly executed collusive USD SSA bond transactions with Plaintiffs during the Class Period. Doc. 578, 80 (citing Doc. 506 ¶ 54). Allegedly, Barclays Capital Inc. also employed U.S.-based salespeople and traders who engaged in collusive trades with U.S. customers. *Id.* However, Plaintiffs do not allege any facts that show a single instance of Barclays Capital Inc. coordinating bidding, engaging in price-fixing, agreeing not to compete, etc. Doc. 603, 1.

Plaintiffs make nearly identical conclusory allegations of taking directions from their overseas counterparts to manipulate SSA bond trades with U.S. counterparties against all of the Domestic Dealer Defendants: BNP Paribas Securities Corp., Doc. 578, 84–85 (citing SAC); Citigroup, Inc., *id.* at 87; Citibank N.A., *id.*; Citigroup Global Markets Inc., *id.*; RBC Capital

12

Markets, LLC, *id.* at 98; Credit Suisse Securities (USA) LLC, *id.* at 99; Nomura Securities International, Inc., *id.* at 103; and TD Securities (USA) LLC, *id.* at 117. Plaintiffs argue that they need not show that a particular Defendant knew all of the details of the conspiracy or even prove that they knew the identities of all the other conspirators. *Id.* at 78. Rather, a single act may be sufficient for an inference of a Defendant's involvement in a conspiracy. *Id.* (citing *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008)).

However, the closest Plaintiffs come to making specific allegations against any Domestic Dealer Defendant is when they allege that Citigroup, Inc. and Citibank N.A. participated in the conspiracy through the same Individual Defendant, Gary McDonald ("McDonald"), within the Class Period. Doc. 578, 86. Plaintiffs assert that McDonald ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.* at 86–87. *See, e.g.,* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

While these transactions hint at anticompetitive conduct between ▓▓▓▓ and ▓▓▓▓▓▓, they do not involve any specific Plaintiff, which is required in antitrust cases, or point to a wider conspiracy that extends beyond these traders to the Domestic Dealer Defendants. A barebones statement of conspiracy without supporting facts is not enough to survive a motion to dismiss.

---

9 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

*See Wolf Concept*, 736 F. Supp. 2d at 668. Accordingly, the Court finds that Plaintiffs have not sufficiently plead that they have antitrust standing or facts that support a plausible conspiracy.

## IV. Conclusion

The Domestic Dealer Defendants' motion to dismiss for failure to state a claim is GRANTED with prejudice. For the reasons set forth in the October 4, 2019 Order, Doc. 627, and the instant Order, the Clerk of Court is respectfully directed to terminate the Domestic Dealer Defendants, Foreign Dealer Defendants, and Individual Defendants as parties.[10] *See supra* notes 3–5.

It is SO ORDERED.

Dated:  March 18, 2020
        New York, New York

                                              _____
                                              Edgardo Ramos, U.S.D.J.

---

[10] The Court notes that some Defendants, such as Bank of America, Deutsche Bank, and HSBC Defendants, are currently in settlement negotiations with Plaintiffs and thus the case remains active. *See, e.g.*, Doc. 636 (letter from Plaintiffs advising Court that settlement negotiations are ongoing).