**quinn emanuel** trial lawyers | new york



WRITER'S DIRECT DIAL NO.
**(212) 849-7345**

March 3, 2022

WRITER'S EMAIL ADDRESS
**danbrockett@quinnemanuel.com**

<u>VIA ECF</u>

Ruby J. Krajick
Clerk of Court
United States District Court
Southern District of New York
40 Foley Square, Courtroom 619
New York, NY 10007

Re:   *In re SSA Bonds Antitrust Litigation*, No. 1:16 cv 03711 (ER)

Dear Clerk Krajick:

      We write on behalf of Plaintiffs in response to your letter advising that Judge Ramos's "stock ownership would have required recusal under the Code of Conduct for United States Judges." Dkt. No. 693 at 3. Your letter advised that any response should be filed in the above docket, and it would be considered by "another judge of this court." *Id.*

      Importantly, because Judge Ramos's mandatory recusal would have occurred before he issued two pivotal rulings in the above-captioned action, we ask the Clerk to provide this response to another judge of this court, and we hereby request the new judge void the judgments against the non-settling Defendants (Dkt. No. 643) pursuant to Federal Rule of Civil Procedure 60(b) and 28 U.S.C. § 455. We also propose below a process for then re-hearing Defendants' motions to dismiss that puts minimal burden on the parties and the court while giving Plaintiffs the fresh look they deserve.

## Case Background

      This case stems from an antitrust conspiracy between various banks and their traders to manipulate prices and bids for U.S. dollar-denominated supranational, sovereign, and agency bonds ("SSA bonds"). The operative complaint (Dkt. No. 506) cites roughly 200 Bloomberg chat transcripts documenting scores of antitrust violations. It also includes 16 econometric studies, using 1.8 million data points, showing how Defendants' conspiracy impacted class members' SSA bond transactions. On the strength of the pleadings alone, we were able to secure $95.5 million in early settlements, which itself casts doubt on whether the case was actually as implausible as the court would later declare. The court acknowledged that bank employees committed antitrust violations, but nonetheless dismissed the banks that employed those wrongdoers. *See* Dkt. No. 627 (Oct. 4, 2019 Order) at 22-23, 25; Dkt. No. 638 (Mar. 25, 2020

quinn emanuel urquhart & sullivan, llp
LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

Order) at 13. In fact, **nearly one-third** of the Defendants dismissed by those rulings relate to the court's conflict.[1]

## Legal Standard

Under Rule 60, "[a] court may relieve a party . . . from a final judgment [or] order . . . for . . . any [] reason that justifies relief." Fed. R. Civ. P. 60(b)(6). To be clear, this is not a traditional harmless-error analysis asking only whether there was a cause-effect relationship with the decision that was reached. Rather, courts must consider the relative harm to the parties, the public, and the judicial process. *United States v. Amico*, 486 F.3d 764, 777 (2d Cir. 2007). Accordingly, when a judge wrongly fails to recuse himself or herself, courts applying Rule 60 must assess: (1) "the risk of injustice to the particular parties," (2) "the risk that the denial of relief will produce injustice in other cases," and (3) "the risk of undermining the public's confidence in the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988).

## Argument

***Plaintiffs were prejudiced by dismissal, while there is no risk of unfairness to Defendants in giving the case a fresh look.*** The first factor considers if there is "a greater risk of unfairness in upholding the judgment . . . than there is in allowing a new judge to take a fresh look at the issues." *Liljeberg*, 486 U.S. at 868. Here, the injustice to Plaintiffs and other victims of the alleged conspiracy is plain: they were not given their fair day in court, and their non-settled claims were extinguished. On the other side, there is no risk of unfairness to the non-settling Defendants to having a "fresh look" at the issues. There was no detrimental reliance on Judge Ramos's dismissal rulings—for instance, there was no transaction by the non-settling Defendants that was later completed that would now have to be unwound. While the non-settling Defendants may prefer to avoid having to litigate this case in front of a judge whose recusal is not mandated by the Code of Conduct for United States Judges, the fact that one of the parties "want[s] the judgment to stand and would prefer not to incur additional . . . costs" does not satisfy the "'special hardship'" contemplated by the rule. *Driscoll v. Metlife Ins.*, 2021 WL 5323962, at *2 (S.D. Cal. Oct. 19, 2021) (vacating conflicted judge's summary judgment ruling where judge's family member owned stock in a defendant).

***Other litigants would be prejudiced if the court does not make clear the ethical rules are to be rigorously adhered to.*** The second factor considers the fact that a court's "willingness to enforce § 455 may prevent a substantive injustice in some future case by encouraging a judge or litigant to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered." *Liljeberg*, 486 U.S. at 868; *Amico*, 486 F.3d at 777 ("[V]acatur would help insure that, in the future, defendants will experience trials conducted differently.").

---

[1] The Clerk's letter indicated Judge Ramos held stock in Citigroup and Credit Suisse. That conflict is relevant to ten of the dismissed Defendants: Citigroup Inc., Citibank N.A., Citigroup Global Markets Inc., Citigroup Global Markets Limited, Credit Suisse AG, Credit Suisse Securities (USA) LLC, Credit Suisse Securities (Europe) Limited, Credit Suisse International, Gary McDonald (employee of Citigroup Global Markets Limited and Citibank N.A.), and Shailen Pau (employee of the Credit Suisse entities).

The other side of that coin is that a failure to take the ethical rules seriously "could produce injustice in other cases because it could discourage litigants from examining the grounds for disqualification of judges under the belief that courts are disinterested in enforcing § 455." *Driscoll*, 2021 WL 5323962, at *2.

Given how Judge Ramos's conflict came to be publicly known, this second factor militates strongly in favor of voiding the judgments. In *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 129 (2d Cir. 2003), the Second Circuit worried about the damage of a hypothetical headline about a judge's conflict, and how it might "damage public confidence in the judiciary." Here, unfortunately, the headlines are real. That is, the Clerk's letter alerting the parties (and the public) of the missed mandatory recusal did not arise in a vacuum. *See* James V. Grimaldi et al., *131 Federal Judges Broke the Law by Hearing Cases Where They Had a Financial Interest*, Wall St. J. (Sept. 28, 2021).[2] Since the issue of judicial conflicts began receiving widespread attention, Congress, the Judicial Conference, the Administrative Office of the U.S. Courts, and the Chief Justice of the United States have focused attention on the issue. For example, the Chief Justice's Year-End Report on the Federal Judiciary stressed that the lack of direct monetary benefit to a judge is "no[] excuse" because "[w]e are duty-bound to strive for 100% compliance because public trust is essential, not incidental, to our function."[3] The world is still watching. *See, e.g.*, James V. Grimaldi et al., *Fallout from Judge's Financial Conflicts Spreads to Appellate Courts*, Wall St. J. (Mar. 1, 2022);[4] Michael Siconolfi et al., *Dozens of Federal Judges Had Financial Conflicts: What You Need To Know*, Wall. St. J. (Jan. 25, 2022, updated Mar. 1, 2022).[5] Indeed, the world is even watching *this case* and *this conflict* in particular. Hailey Konnath, *Judge In Citigroup Bond-Rigging Case Says He Held Co. Stock*, Law360 (Jan. 20, 2022).[6] Regardless of the size of Judge Ramos's financial stake, this context— a high-stakes case with direct evidence of defendants' wrongdoing, a complete victory being handed to the defendants that relate to the conflict, all as part of an ongoing scandal playing out in the press—means that it is simply not the time to refuse to give Plaintiffs here a "fresh look." *See Driscoll*, 2021 WL 5323962, at *2 (in vacating summary judgment award, citing Wall Street Journal article and noting that violation was "not an isolated instance but one of many publicly reported instances" of ignored conflicts).

The risk of prejudice in other cases also exists because a failure to act will leave multiple potentially influential opinions on the books. The court created precedent in multiple important areas of the law. This case was fully dismissed even though Plaintiffs managed to get roughly 200 "smoking guns," perform numerous statistical analyses, and secure $95.5 million in settlements, all *pre-discovery*. The dismissal of such a facially strong case has, unsurprisingly,

---

[2] https://www.wsj.com/articles/131-federal-judges-broke-the-law-by-hearing-cases-where-they-had-a-financial-interest-11632834421.

[3] https://www.supremecourt.gov/publicinfo/year-end/2021year-endreport.pdf.

[4] https://www.wsj.com/articles/fallout-from-judges-financial-conflicts-spreads-to-appeals-courts-11646155384.

[5] https://www.wsj.com/articles/dozens-of-federal-judges-broke-the-law-on-conflicts-what-you-need-to-know-11632922140.

[6] https://www.law360.com/articles/1457320.

been seized upon by defendants in all sorts of contexts,[7] which may have the practical effect of raising the pleading bar.  It is unfair to other plaintiffs and other judges to force them to grapple with pro-defense rulings that should never have been issued.  *See, e.g.*, *In re Eur. Gov't Bonds Antitrust Litig.*, 2020 WL 4273811, at *13 (S.D.N.Y. July 23, 2020) (criticizing and distinguishing *SSA Bonds*); *Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 2020 WL 4194962, at *7 n.12 (S.D.N.Y. July 20, 2020) (citing *SSA Bonds* as an example of failure to plead sufficient facts to establish conspiracy jurisdiction).

***Public confidence in the court system would be undermined if the court does not make clear that the applicable ethical rules must be adhered to.***  The third factor—the "risk of undermining the public's confidence"—is also clearly met here for similar reasons as discussed above.  Again, the belated recusal here was just the latest step in a scandal that has already reached the halls of Congress and the Supreme Court.  And again, this was an incredibly high-stakes, high-profile case.  Moreover, this conflict here was not indirect or theoretical—it was by the Clerk's own letter direct and inexcusable.  The Second Circuit has made clear that such conflicts necessarily "bring[] into question a judge's impartiality." *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313-14 (2d Cir. 1988).  Remedies are thus appropriate even if there is not a cause-effect relationship between the conflict and the case's result.  *See Amico*, 486 F.3d at 775 ("While we credit the judge's explanation of what transpired with regard to his mortgage application, this test deals exclusively with appearances.  Its purpose is the protection of the public's confidence in the impartiality of the judiciary."); *United States v. Lindsey*, 556 F.3d 238 (4th Cir. 2009) (vacating judgment even though district court judge only learned of conflict after the fact).

***The Second Circuit's intervening review does not justify a refusal to give Plaintiffs a truly "fresh look."***  Defendants will certainly argue that this should be quietly swept under a rug because a Second Circuit panel already reviewed the court's decisions.[8]  But the policies animating the conflict rules reject such logic.  Again, this is not a traditional harmless-error type of inquiry.  *See Amico*, 486 F.3d at 777.  This is because "justice must satisfy the appearance of

---

[7]  Judge Ramos's jurisdictional opinion in this case has already been cited over 100 times in cases, secondary sources, and court submissions.  Judge Ramos's dismissal of the domestic defendants has already been cited over 30 times.  Though decreed to be non-precedential and non-published, the Second Circuit's Summary Order has already been cited 13 times.

[8]  As an initial matter, as a matter of pure procedure, that the Second Circuit affirmed the judgment does not deprive this court of the power to vacate those judgments under Rule 60. *Stone v. INS*, 514 U.S. 386, 401 (1995) (noting that "after filing his appeal, [a] litigant may also file a Rule 60(b) motion for relief with the district court"); *see also Chase*, 343 F.3d at 128 (vacating $70 million judgment issued by district court after Second Circuit's partial remand, ordering new trial, and holding that judge was disqualified because he inadvertently owned stock in bank that merged with party).

justice." *Offutt v. United States*, 348 U.S. 11, 14 (1954). "[W]hat matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994).[9]

Moreover, there are far too many variables, such that no one can say for certain what an alternative universe where Judge Ramos timely recused himself would have looked like. Would the new judge have provided a different process for briefing the motions to dismiss? Held oral argument? No two judges reason the exact same, nor do they write the exact same. So would the new judge have dismissed the case at all? Would leave to amend have been granted, instead of dismissal with prejudice? Would any dismissal have been on the same grounds? What issues would they have set up for appeal? Indeed, even something as simple as the timing of the orders could have mattered—by luck of the draw, a different Second Circuit panel likely would have been drawn. Would that different panel have reached a different result if presented with a different record? To presume that one panel's de novo review—made without knowledge that it was reviewing a irremediably impacted record—is a cure-all in this situation requires one to ignore the far more complicated nature of human decision-making.

Courts have thus rejected the idea that appellate review suffices to render a lower-court conflict harmless. Indeed, such logic would lead to an "untenable" result where "there would be no need for a trial judge to recuse from any action in which the appellate court will apply de novo review." *Shell Oil Co. v. United States*, 672 F.3d 1283, 1294 (Fed. Cir. 2012) (vacating conflicted judge's summary judgment decision, and noting that a "judge's failure to recuse does not automatically constitute harmless error whenever there is de novo review on appeal," nor does de novo review "supplant" the court's responsibility to consider the "potential injustice"); *Clark v. City of Draper*, 1997 WL 157382, at *2 (10th Cir. Apr. 4, 1997) ("The defendants argue further that a grant of summary judgment is reviewed de novo, and hence, there is no risk of injustice. However, de novo review in no way removes the appearance of impropriety, which, given the circumstances here, we deem controlling. The circumstances that occurred would surely undermine the public confidence in the judicial system, regardless of our standard of review.").

### Request for Relief

Plaintiffs respectfully request that the Clerk provide this letter to a non-conflicted judge. Plaintiffs request that the non-conflicted judge enter an order: (1) voiding the judgments against the non-settling Defendants, *see* Dkt. No. 643; (2) taking the previously filed, more-than-fully-briefed motions to dismiss under advisement, *see* Dkt. Nos. 520-604; (3) allowing each side to submit only a single 3-page letter strictly limited to the submission of case law that both post-dates the parties' original briefs and bears on arguments already raised in those original briefs; and (4) confirming that, as it was all the fruit of the poisonous tree, neither side in their submissions or at oral argument (if held) would be allowed to refer to or rely on either of Judge Ramos's post-conflict dismissal orders or the summary, non-precedential Second Circuit order relating thereto.

---

[9] *See also generally Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171 (1951) ("The validity and moral authority of a conclusion largely depend on the mode by which it was reached.") (Frankfurter, J., concurring).

Respectfully submitted,

| | |
|---|---|
| */s/ Daniel L. Brockett* | */s/ David W. Mitchell* |
| Daniel L. Brockett | David W. Mitchell |
| QUINN EMANUEL URQUHART & SULLIVAN, LLP | ROBBINS GELLER RUDMAN & DOWD LLP |
| 51 Madison Avenue, 22nd Floor | 655 West Broadway, Suite 1900 |
| New York, NY 10022 | San Diego, CA 92101 |

*Interim Co-Lead Counsel for the Proposed Class*